1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
 2                   LUFKIN DIVISION

 3  CUMMINS-ALLISON CORP.     |  DOCKET 9:07CV196
                              |            (CONSOLIDATED)
 4                            |
    VS.                       |  OCTOBER 22, 2009
 5                            |  8:42 A.M.
                              |
 6  SBM CO., LTD., ET AL      |  BEAUMONT, TEXAS

 7  ----------------------------------------------------------

 8          VOLUME 1 OF 2, PAGES 1 THROUGH 199

 9   REPORTER'S TRANSCRIPT OF HEARING ON POST-TRIAL MOTIONS

10          BEFORE THE HONORABLE RON CLARK
                UNITED STATES DISTRICT JUDGE
11
    ----------------------------------------------------------
12

13
    APPEARANCES:
14

15  FOR THE PLAINTIFF:      EDWARD L. FOOTE
                            WINSTON & STRAWN
16                          35 WEST WACKER DRIVE
                            CHICAGO, ILLINOIS  60601
17

18                          J. THAD HEARTFIELD
                            THE HEARTFIELD LAW FIRM
19                          2195 DOWLEN ROAD
                            BEAUMONT, TEXAS  77706
20

21                          STEPHEN G. RUDISILL
                            DAVID C. MCKONE
22                          NIXON PEABODY
                            300 SOUTH RIVERSIDE PLAZA
23                          16TH FLOOR
                            CHICAGO, ILLINOIS  60601
24

25
```

2



```
 1   FOR THE DEFENDANTS:      CHARLES J. ROGERS
                              THOMAS L. WARDEN
 2                            MICHAEL J. GUTHRIE
                              CONLEY ROSE
 3                            600 TRAVIS STREET
                              SUITE 7100
 4                            HOUSTON, TEXAS   77002

 5
                              MICHAEL J. TRUNCALE
 6                            ORGAIN, BELL & TUCKER
                              470 ORLEANS STREET
 7                            BEAUMONT, TEXAS   77701

 8

 9

10   COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                              FEDERAL OFFICIAL REPORTER
11                            300 WILLOW, SUITE 221
                              BEAUMONT, TEXAS   77701
12

13

14

15      PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
16

17

18

19

20

21

22

23

24

25
```

3

1                          INDEX

2

3                                                    PAGE

4    INVENTORSHIP                                     7

5    DIRECT EXAMINATION OF BRADFORD GRAVES            11
     CROSS-EXAMINATION OF BRADFORD GRAVES             22
6    REDIRECT EXAMINATION OF BRADFORD GRAVES          25
     RECROSS-EXAMINATION OF BRADFORD GRAVES           26
7
     DIRECT EXAMINATION OF AARON BAUCH                26
8    CROSS-EXAMINATION OF AARON BAUCH                 33

9    DIRECT EXAMINATION OF DOUG MENNIE                40
     CROSS-EXAMINATION OF DOUG MENNIE                 43
10   REDIRECT EXAMINATION OF DOUG MENNIE              63
     RECROSS-EXAMINATION OF DOUG MENNIE               63
11
     DIRECT EXAMINATION OF WILLIAM JONES              64
12   CROSS-EXAMINATION OF WILLIAM JONES               67

13   COURTS RULING ON INVENTORSHIP                    96

14

15   WILLFULNESS                                      116

16

17   '806 PATENT, OBVIOUSNESS                         119

18   '806 PATENT, PRINTED PUBLICATIONS               120

19   '806 PATENT, VALIDITY                            120

20

21   '503 PATENT, NONINFRINGEMENT, CLAIM 15           125

22   '503 PATENT, OBVIOUSNESS, CLAIM 15               129

23   '503 PATENT, VALIDITY                            130

24   '503 PATENT, VALIDITY FOR CLAIM 15               139

25

4

1    '354 PATENT, NONINFRINGEMENT                      142

2    '354 PATENT, JMOL, JETSCAN 3042                   155

3

4    ATTORNEYS' FEES                                   157

5

6    STIPULATION REGARDING THE '456 PATENT             172

7

8    MOTION FOR PERMANENT INJUNCTION                   175

9    DIRECT EXAMINATION OF WILLIAM JONES               176
     CROSS-EXAMINATION OF WILLIAM JONES                186
10

11

12

13                    INDEX OF EXHIBITS

14                                                     PAGE

15   EXHIBIT 589                                       9

16   EXHIBITS 588 AND 589                              9

17   PLAINTIFF'S EXHIBITS 588 AND 589                  10

18   588                                               10

19   PLAINTIFF'S EXHIBIT 191                           11

20   PLAINTIFF'S EXHIBIT 7                             12

21   PLAINTIFF'S EXHIBIT 191                           12

22   PLAINTIFF'S EXHIBIT 191                           13

23   PLAINTIFF'S EXHIBIT 7                             13

24   PLAINTIFF'S EXHIBIT 576                           25

25   PLAINTIFF'S EXHIBIT 576                           25

| | | |
|---|---|---|
| 1 | PLAINTIFF'S EXHIBIT 576 | 26 |
| 2 | PLAINTIFF'S EXHIBIT 191 | 26 |
| 3 | PLAINTIFF'S EXHIBIT 7 | 27 |
| 4 | PLAINTIFF'S EXHIBIT 7 | 35 |
| 5 | PLAINTIFF'S EXHIBIT 577 | 36 |
| 6 | PLAINTIFF'S EXHIBIT 577 | 36 |
| 7 | PLAINTIFF'S EXHIBIT 577 | 39 |
| 8 | PLAINTIFF'S EXHIBIT 7 | 40 |
| 9 | PLAINTIFF'S EXHIBIT 7 | 49 |
| 10 | PLAINTIFF'S EXHIBIT 574 | 54 |
| 11 | PLAINTIFF'S EXHIBIT 582 | 56 |
| 12 | PLAINTIFF'S EXHIBIT 582 | 56 |
| 13 | 582 | 57 |
| 14 | PLAINTIFF'S EXHIBIT 582 | 59 |
| 15 | EXHIBIT 582 | 62 |
| 16 | PLAINTIFF'S EXHIBIT 7 | 64 |
| 17 | PLAINTIFF'S EXHIBIT 8 | 103 |
| 18 | PLAINTIFF'S EXHIBIT 49 | 118 |
| 19 | PLAINTIFF'S EXHIBIT 9 | 143 |
| 20 | | |
| 21 | | |
| 22 | DEFENDANTS' EXHIBITS 56 AND 68 | 118 |
| 23 | DEFENDANTS' EXHIBIT 291 | 118 |
| 24 | | |
| 25 | | |

6

 1                (REPORTER'S NOTES CUMMINS V. SHINWOO,

 2   POST-TRIAL MOTIONS, 8:42 A.M., THURSDAY, OCTOBER 22,

 3   2009, BEAUMONT, TEXAS, HON. RON CLARK PRESIDING)

 4                (OPEN COURT, ALL PARTIES PRESENT)

 5                THE COURT:  All right.  I call *Cummins-Allison*

 6   *versus SBM Company*.  Is plaintiff ready?

 7                MR. HEARTFIELD:  Plaintiff is ready, your

 8   Honor.

 9                THE COURT:  All right.  And are defendants

10   ready?

11                MR. WARDEN:  Yes, your Honor.

12                THE COURT:  Okay.  We have a number of

13   different motions today.  Some of them, I know, are going

14   to require some evidence to be presented.  I don't know

15   if, especially in light of the weather, there are any

16   particular travel plans; but it occurs to me it might be

17   best to deal with those motions for which people need to

18   testify in case they have to leave.  I mean, some of the

19   things like the JMOLs are -- I don't think there is going

20   to be any additional evidence taken on those.  But the

21   correction of the inventorship, the inequitable conduct,

22   and perhaps the injunction may wind up -- may or may not

23   wind up taking some additional evidence.

24                So, along that line, are you prepared to go

25   forward with any -- I mean, is there any evidence that's

7

1  going to be taken or needed on this claim of inequitable

2  conduct on the '456 patent?  Do you have any witnesses on

3  that for either side?

4           MR. WARDEN:  Yes, your Honor.  We've

5  identified Mr. Rudisill as our only witness.

6           THE COURT:  Okay.  Well, then, why don't we

7  start with that -- well, actually you're going to be here

8  anyway.  Let me find out about the -- I think you're

9  going to be here anyway, aren't you?

10          MR. RUDISILL:  Yes, I am.

11          THE COURT:  Okay.  Then do we have -- let's

12 see.  Inventorship and -- the correction of the

13 inventorship is the other one where there might be a

14 number of people.

15          MR. RUDISILL:  Yes.  That would be the main

16 one.  It involves witnesses who might like to get out of

17 town this evening.

18          THE COURT:  Okay.  Then why don't we go ahead

19 and start with the correction of inventorship and that

20 would allow the witnesses to testify and then if they

21 don't want to remain around, they can try to get out

22 before we flood.  So, we'll change up a little bit.

23 Let's go with inventorship.  Who would be your first

24 witness on inventorship?

25          MR. RUDISILL:  Our first witness would be

1  Mr. Graves.

2          THE COURT:  Okay.

3          (The oath is administered.)

4          THE COURT:  All right.  And just very briefly

5  before we start and since it's not before a jury, I've

6  read what both sides have said.  But as I'm understanding

7  it, you're -- well, let me ask first:  How do you deal

8  with, I guess, their argument that you have one inventor

9  dead and one inventor missing?  Just general outline,

10  what should I be looking for here?

11          MR. RUDISILL:  Your Honor, both inventors are

12  dead, as it turns out, both Mr. Raterman and Mr. Stromme.

13  And we have a Death Certificate that we've obtained for

14  Mr. Raterman that we've put into evidence and there will

15  be some testimony about how he participated in the

16  invention and then the same for Mr. Stromme.

17          Mr. Stromme, we don't have the Death

18  Certificate yet.  We have a document that identifies some

19  of the particulars but the Death Certificate is being

20  obtained from the State of Illinois and they told us it

21  would be three to five days -- business days and I think

22  the last day is today.  So, we might or might not have

23  that in our hands today.

24          THE COURT:  You would be lucky to get a Death

25  Certificate that quickly out of most State agencies.

1  That's pretty quick.

2           MR. RUDISILL:  That's just what the people --

3           THE COURT:  Yeah.  I'm sure they try very

4  hard; but they're, I'm sure, bogged down.  I mean, my

5  experience on that is it's difficult for them to do that

6  quickly.

7           MR. RUDISILL:  We do have what's called the

8  "Social Security Death Index Search Results," which is

9  our Exhibit 589 in the binder.  That's the only thing we

10  have in hand at the moment.  And the Social Security

11  number on that record does match up with his Social

12  Security number in the Cummins employee records.

13           THE COURT:  All right.  Then go ahead and

14  we'll start with the witness, then, first.

15           MR. RUDISILL:  And on those two documents,

16  Mr. Knoll can testify about them; but we were hoping that

17  maybe they would just be stipulated to.  We can go either

18  way on that.

19           THE COURT:  Do you have them marked yet with

20  numbers or something for a record?

21           MR. RUDISILL:  Yes.  They're in the binder.

22  They are Exhibits 588 and 589, the last two in the

23  witness binder.

24           THE COURT:  All right.  Was he going to

25  testify anyway?

10

 1          MR. RUDISILL:  No.  That would be the only

 2  purpose.

 3          THE COURT:  All right.  Is there any objection

 4  to 588 for the purposes of this hearing?

 5          MR. GUTHRIE:  No, your Honor.

 6          THE COURT:  And what about 589?

 7          MR. GUTHRIE:  No, your Honor.

 8          THE COURT:  Okay.  Plaintiff's Exhibits 588

 9  and 589 are admitted for the purposes of this hearing.

10          Things that are admitted new as of today, of

11  course, would not be part of the trial record.  I want to

12  be very clear on that.  We're not going to have some

13  claim of error based on something that neither I nor the

14  jury saw during trial.  Now, I may commit an error today;

15  but it's not going to go retroactively.  I don't think

16  that would be fair in terms of saying the jury was wrong

17  based on some evidence they never saw.

18          Okay.  So, for purposes of this hearing, 588

19  and 589 are in.  And it appears that Mr. Raterman,

20  therefore, is shown on 588 to have died on November 13 of

21  1998.

22          MR. RUDISILL:  Correct.

23          THE COURT:  And Lars Stromme was shown to have

24  died on January 4, 2006.

25          All right.  Go ahead.

11

1          MR. RUDISILL:  All right.  Your Honor, just so

2    you know where we're going, we have, first of all, the

3    two surviving inventors that are proposed to be added to

4    the '456.  That's Mr. Graves and Mr. Bauch.

5          And then we'll have some brief testimony from

6    the two originally named inventors on the '456 patent,

7    which are Mr. Mennie and Mr. Jones.

8          THE COURT:  Okay.

9          MR. RUDISILL:  And, so, we're starting with

10   Mr. Graves.

11              DIRECT EXAMINATION OF BRADFORD GRAVES

12                CALLED ON BEHALF OF THE PLAINTIFF

13   BY MR. RUDISILL:

14   Q.    Mr. Graves, I know you've testified in this trial

15   before.  But would you briefly identify yourself for the

16   record?

17   A.    Yeah.  My name is Bradford Graves, and I'm an

18   engineer with Cummins-Allison.

19   Q.    Okay.  And you have the witness book there with a

20   few exhibits in it?

21   A.    Yes, I do.

22   Q.    I'd like to first ask you about Plaintiff's

23   Exhibit 191, which is a copy of the '196 patent.  Do you

24   have that?

25   A.    I do.

 1  Q.     And are you one of the inventors named on that

 2  patent?

 3  A.     Yes, I am.

 4  Q.     And what other inventors are named on that patent?

 5  A.     Donald Raterman, Aaron Bauch, and Lars Stromme.

 6  Q.     And what was the filing date for that patent?

 7  A.     That was filed May 19th, 1992.

 8  Q.     Okay.  And then the '456 patent has been marked as

 9  Plaintiff's Exhibit 7.  That's the first exhibit in your

10  binder.  Are you an inventor named on that patent?

11  A.     No, I'm not.

12  Q.     And who are the inventors named on that patent?

13  A.     William Jones and Douglas Mennie.

14  Q.     And what was the filing date?

15         THE COURT:  Could you hold up just one second,

16  counsel?

17         MR. RUDISILL:  Yes.

18         THE COURT:  Let me just make a note here.

19         Okay.  All right.  I've -- I couldn't find

20  one of the names on that '191 [sic] patent.  I see how

21  they do it.  They didn't -- it's not -- it's a run-on

22  sentence.  I missed it.  Okay.  Go ahead.

23         MR. RUDISILL:  Okay.  It's the '196, just for

24  the record, your Honor.

25         THE COURT:  I'm sorry.  Plaintiff's

13

1  Exhibit 191, the '196 patent.

2  BY MR. RUDISILL:

3  Q.     All right.  Then, Mr. Graves, would you turn back

4  to the '456 patent that was Plaintiff's Exhibit 191?  I'm

5  sorry.  Stick with the '456 patent which is Plaintiff's

6  Exhibit 7.

7          Would you take a look at claim 41 of that

8  patent?  And claim 41 is a dependent claim; so, I think

9  you'll also have to look at claim 35.

10  A.     That's right.

11  Q.     Have you reviewed that claim?

12  A.     I have.

13  Q.     And have you reviewed this patent in general?

14  A.     Yes, I have.

15  Q.     Is the subject matter of that claim 41 -- and I'm

16  just using that claim as an example.  Is the subject

17  matter of that claim described in the '196 patent?

18  A.     Yes, it is.

19  Q.     And just to touch on some of the details of the

20  claim, does the '196 patent describe denominating bills

21  at a speed of at least 800 bills a minute?

22  A.     Yes, it does.

23  Q.     And does it describe a bill-denominating process

24  in which the bills are transported with the wide edge

25  leading?

14

1   A.     Yes.

2   Q.     And does the '196 patent also describe the use of

3   two output pockets for receiving the bills?

4   A.     Yes, it does describe that.

5   Q.     Now --

6             THE COURT:  Did I miss, or did you tell me

7   where in the '196 those are described?  I mean, did you

8   give me -- I don't think I heard a column or line number

9   or anything else that shows --

10            MR. RUDISILL:  Okay.  We can do that.

11            THE COURT:   -- where that description was.

12  BY MR. RUDISILL:

13  Q.     Mr. Graves, could you go to the '196 patent and

14  find those items and...

15  A.     Well, in Column 18 -- I'm looking about line 34 --

16  it talks about diverting to a separate stacker bin.  So,

17  that would be the multiple pockets.

18  Q.     And maybe I could speed things up a little bit.

19  On the wide edge leading, would you take a look at the

20  first two figures of the drawings, Figure 1 and --

21  Figures 1 and 1B --

22            THE COURT:  Wait a minute.  And, again, I'm

23  sorry.  Maybe I'm a little slow this morning.  But I'm

24  looking at Column 18, line 34 -- all right.  Go ahead.

25                              *

1 BY MR. RUDISILL:

2 Q.    So, on the wide edge leading, Mr. Graves, I'm

3 suggesting you look at Figures 1 and 1B, the first two

4 sheets of drawings.

5 A.    Right.  That indicates that the bill is feeding

6 along the wide edge.

7 Q.    So, that just leaves us with the denominating at

8 800 bills a minute?

9 A.    Right.

10        If you look at claim 1, line 54 -- 53-54, it

11 states "at a rate in excess of about 800 bills per

12 minute."  That's in Column 31.

13 Q.    Okay.  Could you tell me, then, who invented the

14 subject matter of that particular claim 41 of the '456

15 patent?

16 A.    I would say that would be Donald Raterman, Aaron

17 Bauch, Lars Stromme, and myself.

18 Q.    And when did the four of you -- just in general,

19 when did the four of you make that invention?

20 A.    That started in the mid to late Eighties into the

21 early 1990s.

22 Q.    And where was that work done?

23 A.    The Cummins employees were working in Mount

24 Prospect, Illinois; and Aaron Bauch was working somewhere

25 up in the eastern part of the United States.

16

1  Q.     Were the four of you working together?

2  A.     We were working together, yes.

3  Q.     And can you tell me what -- were Mr. Raterman and

4  Mr. Stromme -- were they mechanical engineers?

5  A.     Yes, they were.

6  Q.     And what kind of engineers were you and Mr. Bauch?

7  A.     Mr. Bauch and myself are electrical engineers.

8  Q.     Can you describe generally how you worked with the

9  other three inventors in the making of this invention?

10 A.     Yes.  As far as Mr. Raterman and Mr. Stromme, they

11 would work together at Lars' computer making the designs.

12 Lars would have the drawings made and the parts made.  He

13 would assemble our test unit, and then he would provide

14 me with the test unit.

15        So, I worked in a lab, electrical software

16 lab, which was right next to Lars' mechanical lab; so,

17 there was a lot of back and forth.  So, he would bring in

18 his test equipment.  I would update the software and

19 would primarily be working on the transport bill feed and

20 control of the bill, and Mr. Raterman would be right

21 there looking at the latest design and finding out how

22 well it worked.

23        As far as Mr. Bauch, I spoke to him on the

24 phone.  I had some specific questions regarding his

25 algorithms.

1  Q.     And can you -- was Cummins located all in one

2  building at that time?

3  A.     Yes, we were.  We were considerably smaller than

4  we are now.

5  Q.     And were the facilities you just described where

6  you and Mr. Raterman and Mr. Stromme worked -- were they

7  fairly close to each other or --

8  A.     Yeah, we were.  As I mentioned the two labs were

9  right next to each other; and as far as where our

10 cubicles were, we were all in the same section of the

11 floor.  I was very close to Lars.  He and I both had

12 cubicles.  And then Don had an office on the wall that

13 faced the cubicles.  We were all very close.

14 Q.     And could you describe just, again, in general

15 what kind of equipment was in the mechanical lab?

16 A.     Well, the mechanical lab had everything for

17 building the machines; and Lars would assemble these

18 machines.  So, these were test units, test chassis, and

19 test transport mechanisms.

20 Q.     Did you use some kind of a drum?

21 A.     We also had a drum that was actually in the

22 electrical lab.  It was a drum that rotated and allowed

23 us to attach a bill so we could run the bill past our

24 sensors.

25 Q.     And can you tell me again in general who of these

1    four inventors contributed what to the invention we're

2    talking about?  And we're using still claims 41 and 35 of

3    the '456 --

4             (Interruption.)

5             THE COURT:  Let me -- and, again, since we

6    don't have a jury -- I'm trying to make sure I -- is it

7    necessary, for purposes of this priority date argument,

8    that every inventor on the '196 patent be added to or

9    corrected onto the '456 patent?

10            In other words, what happens if, for example,

11   I decide or find that the testimony does establish that

12   one of them -- say Mr. X -- should be added on; and that,

13   therefore, gives the link between -- or at least a link

14   of one inventor between one patent and the next?

15            Does that change -- if there has been no --

16   and it's been quite clear, as I understand it, that no

17   one is claiming invalidity due to incorrect inventorship.

18   This is an odd twist in this particular case and that

19   normally comes up the other way around.  Now we're just

20   talking about priority dates.

21            So, as a matter of law, am I correct that it

22   only takes one or two of them; it doesn't take all of

23   them?

24            MR. WARDEN:  You're correct, your Honor.

25   35 USC, Section 120, only requires one common inventor in

1  order to claim priority.

2         I think the only distinction that we would

3  make, though, is that our written description argument,

4  the argument that we presented at trial, doesn't rest on

5  a violation of 35 USC, Section 120.  In other words, the

6  written description of a separate stacker bin was

7  insufficient whether or not there is common inventorship.

8         THE COURT:  Well, you have two arguments,

9  then, right?  One, they are not entitled to it at all

10  because they don't have the common inventors; and then,

11  two, even if they do have the common inventors, it's not

12  enough because the description doesn't roll over.  Is

13  that correct?

14         MR. WARDEN:  That is correct, your Honor.

15         THE COURT:  Okay.  And, Mr. Rudisill, do you

16  agree with that analysis?

17         MR. RUDISILL:  I do, your Honor.

18         THE COURT:  Okay.  Then go ahead.

19  BY MR. RUDISILL:

20  Q.    All right.  Mr. Graves, of the four inventors that

21  you've identified who were working together back in the

22  years you identified, who contributed what to the subject

23  matter of claims 35 and 41 of the '456 patent?

24  A.    Well, the very first sentence, "a method of

25  evaluating currency bills," I attribute that to both

20

1  myself and Aaron Bauch.

2  Then there is a mention of, at line 17,

3  "transporting, under control of the evaluation device";

4  and that's where Lars Stromme and Don Raterman both

5  worked together with the paper feed.

6  There is also mention a little bit further

7  down on line 24, "800 bills per minute"; and I say that

8  all four of us were involved in getting the machine to

9  run at that speed.

10 Q.    Okay.  Let me go to the inventors on the '456

11 patent, the originally named inventors.  Does the four --

12 and you already mentioned that that's Mr. Mennie and

13 Mr. Jones, correct?

14 A.    That's correct.

15 Q.    Does the '456 patent -- well, let me ask you,

16 first of all:  How many claims does that '456 patent

17 contain?

18 A.    I believe it has 52 claims.

19 Q.    And have you reviewed all those claims?

20 A.    I have.

21 Q.    And can you identify any claims in that '456

22 patent that Mr. Mennie and Mr. Jones contributed to?

23 A.    Yeah.  I would say that claim 23 -- at the end of

24 claim 23, there is a description of the size; and both

25 Doug Mennie and Bill Jones contributed to ideas and

21

1  concepts relating to that.

2          There is also a claim 14 which includes some

3  authenticating concepts, and I worked closely with Doug

4  Mennie on that.

5  Q.    All right.  Now, when did you first learn of this

6  '456 patent?

7  A.    I learned of it in 2003.

8  Q.    And how did you learn about it?

9  A.    Our patent attorneys made me aware that I had been

10 omitted from that patent and it needed to be corrected.

11 Q.    And did you agree that you should be an inventor

12 added to that patent?

13 A.    Yeah.  I reviewed the '456 patent, and I did

14 agree.

15 Q.    And why is that?

16 A.    I'm basing that on the fact that the '456 has

17 claims which also are claimed or described in the '196

18 patent for which I am a named inventor.

19 Q.    And is that equally true for the other three

20 inventors you identified?

21 A.    Yeah.  I find that to be the same for all three --

22 all four of us, excuse me.

23 Q.    You and Mr. Raterman and Mr. Stromme and

24 Mr. Bauch?

25 A.    And Mr. Bauch, yes.

1  Q.    And did you sign any papers to have yourself added

2  as an inventor to the '456 patent?

3  A.    Yes, I did.  I submitted a declaration to the

4  Patent Office that I signed.

5  Q.    And when did you do that?  What year?

6  A.    That was in 2003.

7  Q.    All right.  Was there ever any reason why you

8  would not have wanted to be named as an inventor on the

9  '456 patent?

10  A.    No, there was not.

11  Q.    And does Cummins own the inventions claimed in

12  both the '196 and '456 patent?

13  A.    Yes, it does.

14        MR. RUDISILL:  That's all we have for

15  Mr. Graves, your Honor.  Pass the witness.

16        THE COURT:  All right.  Any cross?

17        MR. WARDEN:  Yes, your Honor.  I think we've

18  got just a couple of questions.

19        CROSS-EXAMINATION OF BRADFORD GRAVES

20  BY MR. WARDEN:

21  Q.    Mr. Graves, are we going to see any drawings or

22  diagrams that were made in the development of the

23  invention claimed in the '196 patent?

24  A.    Certainly not during my testimony, no.

25  Q.    Do you expect to see that sort of thing in

1  anyone's testimony today?

2  A.     I don't expect to, no.

3  Q.     Okay.  So, we're not going to see something like

4  an inventor's notebook or anything like that?

5  A.     No.

6  Q.     Are we going to see any written documentation

7  about who conceived what in the claims of the '456

8  patent?

9  A.     I don't believe so.

10  Q.     You talked about signing some papers in 2003.

11  That was a petition to correct inventorship of the '456

12  patent; is that correct?

13  A.     That's correct.

14  Q.     Now, did the Patent and Trademark Office -- did

15  they grant that petition to correct inventorship?

16  A.     I have recently heard that they did not; but at

17  the time in 2003, I was unaware.  When I signed the

18  document and our lawyer submitted it, as far as I was

19  concerned, the matter had been handled.

20  Q.     And I guess to make things a little bit more

21  clear, that was mid September of 2003?

22  A.     I don't know exactly when in 2003.

23  Q.     Okay.  Do you know if you or anyone else at

24  Cummins did anything else other than file this petition

25  in 2003 to correct the inventorship of the '456 patent?

24

 1  A.     Well, I was under the impression that Aaron Bauch

 2  also filed a similar declaration; but that's all that I

 3  knew of.

 4  Q.     And that was also in 2003?

 5  A.     That's right.

 6  Q.     Okay.  But you don't know if anyone did anything

 7  between 2003 and a couple of weeks ago here at trial?

 8  A.     That's right.  I don't know of anything.

 9  Q.     Okay.

10         MR. WARDEN:  We have no further questions,

11  your Honor.

12         THE COURT:  All right.  You may step down,

13  sir.

14         Who is next?

15         MR. RUDISILL:  Could I have one redirect?

16         THE COURT:  Sure.

17         MR. RUDISILL:  In the motion papers that were

18  filed, we had an exhibit -- and this is not in the

19  witness notebook, but as long as Mr. Warden brought it

20  up.  We did attach all of the papers that were filed in

21  the -- in 2003, and I'd like to show the witness the one

22  paper that he signed in that collection of papers that

23  were filed with the petition to the Patent Office.

24         THE COURT:  Do you want to approach?

25         MR. RUDISILL:  May I approach?

1           THE COURT:  Sure.

2           MR. RUDISILL:  We're trying to find an extra

3  copy.

4           THE COURT:  Okay.  Would it be attached to

5  your motion?

6           MR. RUDISILL:  Yes, it would.  It's

7  Plaintiff's Exhibit 576.  It was -- here is another copy

8  of it we've found, your Honor.  May I approach?

9           THE COURT:  Okay.  And I have a copy of your

10 motion.

11           Yeah, you may approach.  Certainly.

12           MR. RUDISILL:  Here is another copy of it.

13 That is what was attached to the motion.

14              REDIRECT EXAMINATION OF BRADFORD GRAVES

15 BY MR. RUDISILL:

16 Q.    Mr. Graves, have you had a chance to look at

17 Plaintiff's Exhibit 576?

18 A.    Yes, I have.

19 Q.    And is that the paper that you signed in 2003?

20 A.    Yes, it is.

21           MR. RUDISILL:  All right.  Nothing further.

22           MR. WARDEN:  Your Honor, one follow-up

23 question?

24           THE COURT:  Sure.

25                          *

Hearing on Post-Trial Motions, Volume 1

26

1              RECROSS-EXAMINATION OF BRADFORD GRAVES

2   BY MR. WARDEN:

3   Q.    Mr. Graves, what is the date on Plaintiff's

4   Exhibit 576?

5   A.    I signed it -- my date of signing was June 23rd,

6   2003.

7   Q.    Okay.  Thank you.

8              THE COURT:  All right.  You may step down.

9              Who is your next witness?

10             MR. RUDISILL:  Next witness is Mr. Bauch.

11             (The oath is administered.)

12             DIRECT EXAMINATION OF AARON BAUCH

13             CALLED ON BEHALF OF THE PLAINTIFF

14  BY MR. RUDISILL:

15  Q.    Mr. Bauch, I know you've testified before in the

16  trial in this case; but would you identify yourself?

17  A.    Sure.  My name is Aaron Bauch.  I'm a consultant.

18  I live in New Hampshire.

19  Q.    Okay.  And do you have the witness binder there in

20  front of you with a few exhibits?

21  A.    I do.

22  Q.    Would you turn first to Plaintiff's Exhibit 191,

23  which is the '196 patent?

24  A.    Yes.

25  Q.    Are you familiar with that patent?

1   A.     Yes, I am.

2   Q.     And are you one of the inventors named on that

3   patent?

4   A.     Yes, I am.

5   Q.     Along with what other co-inventors?

6   A.     Along with Brad Graves, Don Raterman, and Lars

7   Stromme.

8   Q.     And then would you go to the first exhibit in the

9   binder, which is Plaintiff's Exhibit 7, which is the '456

10  patent.  Can you identify that?

11  A.     Yes, I can.

12  Q.     And are you an inventor named on that patent?

13  A.     No, I am not.

14  Q.     All right.  Could you turn to claim 41 of the '456

15  patent, which is dependent on claim 35?

16  A.     Yes.

17  Q.     Are you familiar with that claim -- or those

18  claims, 35 and 41?

19  A.     Yes, I am.

20  Q.     And is the subject matter of that claim described

21  in the '196 patent?

22  A.     Yes.  I believe it is.

23  Q.     Okay.  And can you -- let me ask you specifically:

24  Does the '196 patent describe denominating bills at 800

25  bills a minute?

1  A.     Yes, it does.

2  Q.     And can you tell me where that is found in the

3  '196 patent?

4  A.     It is actually in the first claim of the '196

5  patent.  Is that sufficient, or would you like me to look

6  up the column number?

7  Q.     I think that's sufficient.

8         And does the '196 patent also describe

9  transporting the bills with the wide edge leading while

10 they are being denominated?

11 A.     Yes, it does.  And that's also noted in the first

12 claim of that patent.

13 Q.     All right.  And does the '196 patent describe

14 using two output pockets for receiving the bills?

15 A.     Yes, it does.

16 Q.     And where does it do that?

17 A.     One second.  (Perusing documents.)

18        That is in the body of the patent on --

19 Column 18 describes redirecting a bill to a second

20 pocket.  That's Column 18 around line, oh, 34 of the '196

21 patent.

22 Q.     Okay.  Thank you.

23        Who invented the subject matter of claims 35

24 and 41 of the '456 patent?

25 A.     It was actually a collaborative effort including

1  myself and several other inventors.

2  Q.     Who were the other inventors?

3  A.     I believe that would be Brad Graves, Lars Stromme,

4  and Don Raterman.

5  Q.     And when was that work done?

6  A.     My portion of that work was done in the middle

7  1980's, middle to late 1980s.  It was continued beyond

8  that by the Cummins employees up through the early 1990s

9  as far as I understand.

10 Q.     Let me ask you:  Where was your part of the work

11 done?

12 A.     My work was done in a lab that I had set up at my

13 home in Long Island, New York.

14 Q.     And can you describe, you know, what your setup

15 was?

16 A.     Sure.  I had a finished basement.  One room of

17 that basement was actually dedicated for my consulting

18 work, doing engineering design work.  So, I had

19 electronics test equipment, development systems for

20 developing microprocessor-based things, oscilloscopes,

21 basic electronic equipment.

22         And in working with Cummins, Cummins had

23 developed certain mechanical fixtures that I used for

24 development work.  I did some PC board designs.  Some of

25 that Cummins manufactured for me and sent it out so we

30

1  had basically similar setups both at my lab and back at

2  the Cummins factory where we could compare results as the

3  development work went on.

4  Q.    Did you have one of those drum devices that

5  Mr. Graves mentioned?

6  A.    Yes, I did.  It was basically a large cylinder

7  about maybe 10 or 12 inches in diameter, about 12 inches

8  wide; and it actually had very fine holes in it for a

9  vacuum holding mechanism.  So, it was connected to a

10 vacuum pump so that I could place bills on the drum.  It

11 would rotate.  I could put, you know, five or ten bills

12 on the base of the drum.

13         And then there was a pair of rods where the

14 scanhead was mounted in a stationary position; and I

15 could slide it back and forth across the base of the

16 bill, play with different positions on sensing on the

17 bill.  So, it's basically an experimental fixture; and

18 then that scanned information went into a computer where

19 I could run analyses and look for the best mechanism and

20 method to build the system.

21 Q.    And did you ever make any visits to the

22 Cummins-Allison facility in Illinois?

23 A.    Yes.  The first time I visited was, I believe, in

24 the spring of 1985 when we made a proposal to do this

25 development work.  Once Cummins agreed to our doing some

1  consulting work for them, I visited -- I believe it was

2  about once a quarter -- to provide status updates,

3  exchange information.  And between those visits, I was in

4  at least weekly, sometimes daily contact with Cummins'

5  engineers by phone, comparing results and sometimes

6  mailing or modeming over data results between myself and

7  the Cummins engineering staff.

8  Q.     Did you also have telephone discussions with them?

9  A.     Yes, I did.

10 Q.     Did you have any telephone discussions with

11 Mr. Graves, for example?

12 A.     Yes, I did.  Mr. Graves and I overlapped more

13 towards the end of my work with Cummins.  He took over

14 much of what I had been working on; and we talked from

15 time to time whenever he had questions about things that

16 I had put in the code, et cetera, and about modifications

17 that he might be making to the system.

18 Q.     Okay.  And did you also have any interactions with

19 Mr. Raterman and Mr. Stromme?

20 A.     Yes.  Mr. Raterman was both involved and also my

21 impression at the time was that he was very much the --

22 sort of the lead manager for the engineering team working

23 at Cummins.  So, he and I spoke fairly regularly about

24 progress and things that were going on.

25            Mr. Stromme and I mostly interacted when I was

1    visiting Cummins.  We would spend time in the lab there

2    where I could see the mechanical layout of the actual

3    transport that they were developing.

4             So, our work was somewhat separate.  My work

5    was primarily focused on the electronics and the

6    recognition subsystem.  The mechanical engineers were

7    working on the actual bill transport that this would

8    ultimately go into.  And really the combination of those

9    two was done by Mr. Graves and Mr. Stromme and

10   Mr. Raterman at Cummins; whereas, I was focused primarily

11   on just the recognition system.

12   Q.     All right.  So, is it fair to say that

13   Mr. Raterman and Mr. Stromme were concentrating on the

14   mechanical aspects?

15   A.     That is my understanding, yes.

16   Q.     And you and Mr. Graves on the electrical and

17   software aspects?

18   A.     Correct.

19   Q.     Now, who were the originally named inventors on

20   the '456 patent?

21   A.     That's Mr. Jones and Mr. Mennie.

22   Q.     And when did you first learn of that '456 patent?

23   A.     I learned of that in 19 -- I'm sorry -- 2003 when

24   Cummins' patent attorneys approached me, indicated that

25   they were trying to correct the patent and add me as an

 1  inventor.

 2  Q.    And did you agree with that proposal that you be

 3  added as an inventor?

 4  A.    Yes, I did.

 5  Q.    Why did you agree?

 6  A.    Because the subject matter of this patent includes

 7  a number of items that were the direct product of my work

 8  on this consulting work that I did for Cummins.

 9  Q.    And did Cummins own that -- any inventions coming

10  out of that work?

11  A.    Yes.  Cummins is listed as the assignee of that

12  patent.

13  Q.    And did you also agree that the other three

14  inventors should be added to the '456 patent?

15  A.    Yes, I did.

16  Q.    Was there ever any reason why you would not have

17  wanted to be named as an inventor on the '456 patent?

18  A.    No, there is not.

19          MR. RUDISILL:  Pass the witness, your Honor.

20              CROSS-EXAMINATION OF AARON BAUCH

21  BY MR. WARDEN:

22  Q.    Good morning, Mr. Bauch.

23  A.    Good morning.

24  Q.    Now, when was it that you first became involved in

25  the development of the JetScan products?

A.      My recollection, which I've sort of refreshed
based on some documents -- I had prepared a proposal for
Cummins that's dated, I believe, May of 1985.  I can't
tell you direct recollection, but clearly I spent some
time before that preparing that proposal.  So, it was
probably early in 1985 that I first started working on
trying to obtain that contract.

Q.      All right.  Now, did there ever come a time that
you completed your project of developing the JetScan
products?

A.      The -- basically that proposal outlined a
multiphased program.  The first two phases were really --
the first one was very much an experimental phase.  The
second, more of a prototype development.  And the third
phase would be the actual integration of that into a real
working product.

        And it was always the intent of my proposal
that the first two phases would be done by myself, the
third phase primarily done by Cummins.  But it's not a
clear, you know, it ended this day and that started.
Into that third phase, I was still available to Cummins
for discussions or whatever as they worked the
integration of the system.

Q.      And what period of time was that?  Do you recall?

A.      For the third phase?

1  Q.     Yes.

2  A.     I believe it was -- it began in the late Eighties.

3  Probably '86-'87 time frame --

4  Q.     Okay.

5  A.     -- is my recollection.

6  Q.     Now, you were paid for your efforts in this

7  process; is that right?

8  A.     Certainly.

9  Q.     Okay.  Do you recall when you stopped getting paid

10  by Cummins?

11  A.     I can't -- it was 20 years ago.

12  Q.     All right.  Now, you've got Plaintiff's Exhibit 7

13  there in your notebook; and that's the '456 patent?

14  A.     Yes, I do.

15  Q.     Okay.  That -- if we look at the first page of

16  that patent, we see that the application for the patent

17  was filed on April 4th of 1997; is that correct?

18  A.     Yes, that's correct.

19  Q.     Okay.  And the patent itself, up there on the top

20  right-hand side, it was issued in October of 1999; is

21  that right?

22  A.     That's the date on the patent.

23  Q.     Okay.  So, would it be fair to say that the

24  application for this patent was filed five or six years

25  after you stopped working for Cummins?

36

1  A.     Probably closer to ten years.

2  Q.     Ten years.  Okay.

3         Now, I'm going to show you, Mr. Bauch,

4  Plaintiff's Exhibit 577.

5         MR. WARDEN:  May I approach the witness, your

6  Honor?

7         THE COURT:  You may.

8  BY MR. WARDEN:

9  Q.     Mr. Bauch, I've handed you Plaintiff's

10 Exhibit 577.  Is that the document that you signed in

11 2003 in connection with the -- I guess the attempt to

12 correct the inventorship of the '456 patent?

13 A.     Yes.  I believe it is.

14 Q.     Okay.  And if we turn that document over and look

15 at the second page, is that document dated?

16 A.     Yes, it is.  My signature is dated July 28th,

17 2003.

18 Q.     Okay.  So, it would certainly be fair to assume

19 that you learned about the '456 patent at least as early

20 as July of 2003?

21 A.     Correct.

22 Q.     Now, earlier you testified about talking to some

23 of Cummins' employees or engineers and that you talked to

24 these folks on the phone --

25 A.     Yes.

1  Q.      -- from the East Coast; is that correct?

2  A.      That's correct.

3  Q.      Do you recall whether or not you talked to

4  Mr. Mennie or Mr. Jones about the development of the

5  JetScan products?

6  A.      I believe that Mr. Mennie was in several meetings

7  that we had in the boardroom there doing status updates.

8  I don't recall ever speaking to Mr. Mennie or Mr. Jones

9  on the phone during that time.

10  Q.      Okay.  But you recall working with them in person?

11  A.      In the context of status update meetings that I

12  would travel out to Cummins, there might be 10 or 15

13  people around a boardroom table.  Some of them were the

14  engineers who I was working with on relatively a

15  day-to-day basis.  Some of them were management of the

16  company, all people interested in the status of the

17  project.

18  Q.      Okay.  So, at these status update meetings, did

19  you ever actually talk to Mr. Mennie or Mr. Jones?

20  A.      I really couldn't be able to tell you

21  specifically.

22  Q.      You don't recall?

23  A.      I don't recall.

24  Q.      Do you recall any other potential interaction with

25  Mr. Mennie or Mr. Jones regarding the development of the

1  JetScan products?

2  A.     Not that I could recall right now, no.

3  Q.     Did you correspond in writing with Mr. Mennie or

4  Mr. Jones?

5  A.     It's possible.  I really -- I'm not sure.  I'd

6  have to, you know, look back through files.  I wouldn't

7  be surprised if that might have happened, but I really

8  don't know.

9  Q.     Okay.  But you don't plan on seeing an exhibit

10  like that at the hearing today, do you?

11  A.     Honestly, if you produce something, it would not

12  astound me; but I really don't recall.

13  Q.     All right.  Thank you.

14         You also talked about this experimental drum

15  fixture that you had back on the East Coast; is that

16  correct?

17  A.     That's correct.

18  Q.     Do you have any drawings or diagrams of that

19  experimental drum fixture?

20  A.     Not anymore.

21  Q.     Okay.  You had them at one time, though; is that

22  correct?

23  A.     Yes.

24  Q.     Okay.  Did you ever keep an inventor's notebook?

25  A.     At the time, I did.  I haven't been able to locate

1    it recently.

2    Q.     Okay.  Did you correspond in writing about your

3    development efforts with Mr. Graves, Mr. Raterman, or

4    Mr. Stromme?

5    A.     Primarily with Mr. Raterman.

6    Q.     Okay.  Do you still have copies of those letters

7    with Mr. Raterman?

8    A.     I don't think so.

9    Q.     Okay.  That was quite awhile ago.

10   A.     That was quite awhile ago.

11   Q.     Did you do anything after this document,

12   Plaintiff's Exhibit 577 -- and this was back in July of

13   2003.  Did you do anything after that point to try to

14   correct the inventorship of the '456 patent?

15   A.     No, I did not.

16   Q.     Do you know if Cummins or anyone else did anything

17   to try to correct the inventorship of the '456 patent

18   after that day?

19   A.     I would have no idea.  I assumed that Cummins'

20   patent attorneys, since they had brought it up to me in

21   the first place, that they were taking care of it.

22   Q.     Okay.  Thank you.

23          MR. RUDISILL:  Nothing further for this

24   witness.

25          THE COURT:  All right.  You may step down,

 1 | sir.

 2 |              Anything else?

 3 |              MR. RUDISILL:  We have Mr. Mennie and

 4 | Mr. Jones.

 5 |              THE COURT:  Okay.

 6 |              (The oath is administered.)

 7 |              <u>DIRECT EXAMINATION OF DOUG MENNIE</u>

 8 |              <u>CALLED ON BEHALF OF THE PLAINTIFF</u>

 9 | BY MR. RUDISILL:

10 | Q.     Mr. Mennie, would you identify yourself for the

11 | court, please?

12 | A.     Yes.  My name is Doug Mennie, and I am president

13 | of Cummins-Allison Corporation.

14 | Q.     And are you a named inventor on the '456 patent,

15 | which is Plaintiff's Exhibit 7 in the binder that you

16 | have there?

17 | A.     Yes, I am.

18 | Q.     And how many claims are there in that patent?

19 | A.     Fifty-two.

20 | Q.     And did you contribute to the subject matter of

21 | any of those claims in the '456 patent?

22 | A.     I did.

23 | Q.     And can you give us a couple of examples?

24 | A.     Claim 14 talks about counterfeit detection by

25 | denomination, and I -- as Brad had mentioned earlier, I

1  helped work with him on that.

2         And then there is some -- I think claim 24

3  talks about size.  So, I helped -- I was -- helped on

4  that, as well.

5  Q.    Now --

6         THE COURT:  All right.  Counsel, we've been

7  going about an hour; so, I'm going to take a break.  I'll

8  ask everyone to be back at quarter of.

9         (Recess, 9:36 a.m. to 9:54 a.m.)

10         (Open court, all parties present.)

11         THE COURT:  Go ahead, counsel.

12  BY MR. RUDISILL:

13  Q.    All right.  Mr. Mennie, were there any other

14  inventors that contributed -- other than you and

15  Mr. Jones is what I mean -- that contributed to the

16  subject matter of any of the '456 claims?

17  A.    Yes.

18  Q.    And who are those other inventors?

19  A.    Don Raterman, Lars Stromme, Aaron Bauch, and Brad

20  Graves.

21  Q.    And why were those four inventors not named

22  originally on the '456 patent?

23  A.    It was an oversight, a mistake that we made when

24  we filed that patent.

25  Q.    And when was that mistake discovered?

42

1   A.      In 2003.

2   Q.      And was anything done at that time to correct the

3   mistake?

4   A.      Yes.  A petition -- I'm not sure what you call

5   it exactly -- but was sent in to the Patent Office trying

6   to correct the inventorship.

7   Q.      Did you agree in 2003 when that mistake was

8   discovered that Brad Graves, Aaron Bauch, Don Raterman,

9   and Lars Stromme should be added as inventors to the '456

10  patent?

11  A.      Yes, I did.

12  Q.      Did any of them ever object to being added?

13  A.      No.

14  Q.      Have you reviewed claim 41, which is dependent on

15  claim 35, of the '456 patent?

16  A.      Yes, I have.

17  Q.      And who do you think invented the subject matter

18  of those claims?

19  A.      From reviewing it, it appears that it was Brad

20  Graves, Aaron Bauch, Lars Stromme, and Don Raterman.

21  Q.      And how do you know that?

22  A.      Because the subject matter in those claims is all

23  described in the '196 patent.

24  Q.      On which those four people are named inventors?

25  A.      Correct.

43

1    Q.    Do you know -- is Mr. Raterman still alive today?

2    A.    No, he's not.

3    Q.    And how do you know that?

4    A.    Well, we have the Death Certificate.  I also

5    attended his funeral.

6    Q.    And do you know if Lars Stromme is still alive

7    today?

8    A.    From what we've been able to find out, he is not

9    alive today.

10             MR. RUDISILL:  Pass the witness.

11             <u>CROSS-EXAMINATION OF DOUG MENNIE</u>

12   BY MR. WARDEN:

13   Q.    Good morning, Mr. Mennie.

14   A.    Good morning.

15   Q.    We talked a minute ago about Mr. Raterman.  You

16   say he's passed away?

17   A.    That's correct.

18   Q.    Do you recall what date it was?

19   A.    I think it -- you would have to refresh my memory,

20   but I think it was '98.

21   Q.    1998?

22   A.    Yeah.

23   Q.    I guess I'm assuming that Mr. Raterman -- he

24   retired from Cummins sometime before 1998?

25   A.    Yes.  And I may have the dates incorrect but I

1  think it was in '95 that he retired but he stayed on as a

2  consultant and kind of helped me because I was kind of

3  taking over that and kind of just the young guy; so, he

4  was kind of helping me as I took over.

5  Q.     Okay.  As part-time consultant --

6  A.     Yes.

7  Q.     -- between '95 and roughly 1998?

8  A.     Yes.

9  Q.     Okay.  Do you know when Mr. Stromme left Cummins?

10  A.     I don't recall exactly when he left Cummins.  It

11  was in the Nineties sometime.  I just -- I don't

12  remember.  I think it was mid -- I just -- I don't

13  remember.

14  Q.     Okay.  Do you know whether it was before the

15  application for the '456 patent in 1997 or after that

16  time?

17  A.     Again, I don't -- no, I don't remember.

18  Q.     Okay.  Well, do you know whether it was before the

19  '456 patent issued in '99 or after that time?

20  A.     I'm sorry.  I don't remember.  I don't.

21  Q.     Now, over what period of time were the inventions

22  described in the claims of the '456 patent developed by

23  you and some of these other folks at Cummins?

24  A.     Well, some of the -- there are two different time

25  periods.  Some of the claims, obviously, were done early.

45

1  As I described before, Mr. Bauch and Mr. Raterman and

2  Brad and Lars were involved in the -- like the claim 35

3  issues.  So, those were developed fairly early in the

4  process.

5         The claims such as -- we call it "counterfeit

6  by denomination," where you can set counterfeit levels by

7  denomination.  That was done after my involvement.  I got

8  involved in late 1990.  So, that was done after I got

9  involved; and I worked with Brad on that.

10  Q.    Now, you say the basic invention of claim 35, that

11  that was developed early on in the process; is that

12  correct?

13  A.    Well, the elements of those claims were developed

14  early on in the process.

15  Q.    Okay.  Do you recall what years that was?

16  A.    No.  As I said, I was not -- I didn't get real

17  involved in this until late 1990.  So, I don't know

18  exactly when all those things were done.

19  Q.    Okay.  When were you first employed by Cummins?

20  A.    1978.

21  Q.    All right.  What position did you have at Cummins

22  in the late Eighties and early Nineties?

23  A.    I was the -- I may have the dates wrong, but I

24  think at that time I was vice president of manufacturing.

25  Q.    Okay.

46

1  A.      I might have been director of manufacturing.

2  Q.      So, Cummins had a particular manufacturing

3  department or --

4  A.      Yes.

5  Q.      -- manufacturing division?

6  A.      Yes.  We not only design all of the products that

7  we sell, we also manufacture them in Mount Prospect.

8  Q.      Okay.  Do you recall, you know, back in the late

9  Eighties and early Nineties how many people worked in the

10 manufacturing department or manufacturing division?

11 A.      Much fewer than are today.  I would -- and this

12 would be a guess; but I would say, if I had to guess,

13 probably between 50 and 70 in the manufacturing group.

14 Q.      And you were their supervisor or the leader of

15 that group?

16 A.      That's correct.

17 Q.      Now, what sort of interaction did you have with

18 Mr. Raterman during the development of the -- I guess

19 the -- any of the inventions claimed by the '456 patent?

20 A.      Well, my involvement with Mr. Raterman started in

21 1990 when I became -- I was project leader for this

22 project.  I was appointed that in late 1990.  And, so, I

23 was involved with him from pretty much that point forward

24 until he retired and even actually a couple of years

25 after that, after he worked as a consultant.

1  Q.      You worked fairly closely with Mr. Raterman?  And

2  I apologize for mispronouncing his name all of the time.

3  A.      Yes, I did work fairly closely with him.

4  Q.      Okay.  How about Mr. Graves?  Did you work closely

5  with Mr. Graves during that period?

6  A.      Yeah.  I think, as the previous witnesses have

7  described, it was a collaborative effort between a group

8  of people trying to do this.  So, yes.  I sat -- we were

9  much smaller then.  I think there were only 10 or 15

10 people in engineering.  So, we sat very close together;

11 and we worked together every day.

12 Q.      Okay.  And the same holds true for Mr. Stromme?

13 A.      That's correct, yes.

14 Q.      Okay.  How about Mr. Bauch?  What sort of

15 interaction did you have with Mr. Bauch during that

16 period?

17 A.      By the time I got involved, Aaron had really kind

18 of backed out.  So, I think -- I remember hearing his

19 name.  I may have been in a phone call with him, on a

20 conference call as he described.  I just -- very little,

21 I would say, after I got involved.

22 Q.      Do you recall meeting him at all during that

23 period?

24 A.      I do not recall meeting him directly.

25 Q.      Do you recall any particular conversation with

48

1  Mr. Bauch during that period?

2  A.    I do not recall a particular conversation, no.

3  Q.    Or any communication with him at all?

4  A.    I don't recall any specific communication.

5  Q.    Now, certainly at least at one point Cummins had

6  written documentation of what went on in the conception

7  or the development of the inventions claimed by the '456

8  patent.  Would that be fair to say?

9  A.    Certainly there would be documentation.  You know,

10  there's blueprints, everything you need to make

11  something.  So, yes, there would have to be documentation

12  for those things.

13  Q.    Do you know if you kept an inventor's notebook at

14  the time?

15  A.    No, I did not.

16  Q.    Okay.  But did you take notes during the

17  conception or the development of any of the inventions

18  claimed by the '456 patent?

19  A.    We had meetings periodically, and I took notes at

20  those meetings.  I'm not -- I don't know if I took notes

21  specifically to the claims in '456.

22  Q.    Okay.  Do you recall seeing drawings or diagrams

23  of the invention in the process of development?

24  A.    Yes.  There were drawings as we were developing

25  the machine.  There were drawings that Mr. Stromme was

1  making, yes.  I do recall seeing those.

2  Q.    And I guess this would have been the early

3  Eighties or -- I'm sorry -- the late Eighties or early

4  Nineties?

5  A.    Not for the -- I'm trying to remember.  He was

6  making -- he obviously made drawings for some of the

7  items described in the '456 claims in the early Eighties,

8  the things that he worked on.  Some of the things were

9  done at a later date.  Things that Bill Jones and I were

10  involved in were done at a later date, probably in --

11  starting in '93-'94 time frame.

12  Q.    Okay.  Now, the '456 patent, the application for

13  that one, that was filed in 1997; is that correct?

14        We can look at Plaintiff's Exhibit 7.

15  A.    I believe you're correct.  Let me just look and

16  make sure I don't make a mistake.

17        (Perusing document.)  That's correct, yes.

18  Q.    And the patent itself issued in 1999?

19  A.    Correct.

20  Q.    You talked about, you know, there being a time

21  that there was an error recognized in the inventorship of

22  the '456 patent.

23  A.    Yes.

24  Q.    Okay.  Do you know when the error was first

25  recognized?

1   A.     I don't know when the error was first recognized.

2   Q.     Okay.  Well, certainly you signed a declaration or

3   signed an oath in connection with the application for the

4   '456 patent.

5   A.     Yeah.  By 2003, I knew it was.  I just don't

6   remember when the first time it was recognized.

7   Q.     Well, at the time the application for the '456

8   patent was filed, you were certainly aware that it named

9   only you and Mr. Jones as inventors; is that correct?

10  A.     Yes, I was aware that it named myself and

11  Mr. Jones.

12  Q.     And you were aware that it did not name

13  Mr. Raterman, Mr. Graves, or Mr. Stromme?

14  A.     I don't think I was aware of that until it was --

15  I was made aware of that but -- I'm not sure at the time

16  that that patent was filed that I was actually aware that

17  they weren't on it.

18  Q.     Okay.  You don't recall whether at the time you

19  were aware that those men were missing from the patent

20  application?

21  A.     I don't specifically recall that, no.

22  Q.     And you don't recall whether at any point between

23  1997 and 2003 -- recall recognizing this error in the

24  inventorship of the '456 patent?

25  A.     I do not.

1  Q.     Okay.  But you do recall recognizing the error in

2  2003?

3  A.     I do.

4  Q.     Do you know who prepared the application for the

5  '456 patent?

6  A.     I know it was -- I don't know who they were at the

7  time, but Steve Rudisill's firm.  I think it was Jenkins

8  and Gilchrist at the time.

9  Q.     Okay.  Now, was Mr. Rudisill -- was he in charge

10 of that patent application?

11 A.     I don't recall.  I just don't recall.

12 Q.     Okay.  Was Mr. Rudisill generally at the time in

13 charge of Cummins' patent applications?

14 A.     He was certainly involved and, I would say, kind

15 of oversaw the Cummins account.

16 Q.     Okay.  So, it would be fair to say he was the

17 leader of Cummins' outside patent prosecution?

18 A.     As far as our outside patent prosecution, he was

19 the main guy.

20 Q.     And that goes for the period, you know, 1997 to

21 2003; is that correct?

22 A.     Yes.

23 Q.     Is that still true today?

24 A.     You know, I don't know the hierarchy of their

25 firm; but usually when we have an issue, we go to Steve.

52

1  Q.     All right.  Now, sitting here today, do you know

2  what caused this mistake in the inventorship of the '456

3  patent?

4  A.     You know, I -- basically I have to take the blame.

5  I was in charge at that time.  You know, Mr. Raterman had

6  done that for years.  He was passing it off to me, and it

7  was just a mistake on my part.  There was no specific

8  thing that caused it.  I just made an error.

9  Q.     Now, you say Mr. Raterman had "done that" for

10 years.  What were you --

11 A.     Oh, he had done most of the patent prosecution

12 and -- not even the patent prosecution, but he had

13 managed the patents for Cummins.  That was before we had

14 our own in-house counsel.  So, Don was doing a lot of

15 that.

16        And then when he got -- as I said, he was a

17 consultant; and he was helping me a lot.  And a lot of

18 the things that he did was with the patent portfolio.

19 And then he got very ill and, so, I was taking on more of

20 that and, so, I just made an error.

21 Q.     Okay.  Now, you know, by 1997, the application for

22 the '456 patent, that certainly wasn't Cummins' first

23 go-round with patent applications, was it?

24 A.     It wasn't Cummins' first go-round, no.

25 Q.     There were many, many patent applications before

53

1  that time; is that correct?

2  A.     That is correct.

3  Q.     And, in fact, there were many patent applications

4  before that time that listed Mr. Raterman, Mr. Graves,

5  Mr. Stromme, and Mr. Bauch; is that correct?

6  A.     I don't know if there were many, but there were

7  certainly some that listed those inventors.

8  Q.     Okay.  And this was all the way back to February

9  of 1990?

10 A.     I would trust that that's correct.  I don't know

11 that for a fact.

12 Q.     Back in 1997 when this patent application was

13 filed, did Cummins or Cummins' management consider

14 patents a priority of the business?

15 A.     I think we -- yes.  I would think we've always

16 thought of patents as a priority in our business.

17 Q.     Okay.  Now, we discussed attempting to correct the

18 error in inventorship of the '456 patent; and that was in

19 September of 2003?

20 A.     I think that's what I've heard, yes.

21 Q.     And that was a petition filed at the Patent Office

22 to try to correct the inventorship?

23 A.     I don't know what it's called; but if that's what

24 it's called, yes.  We submitted some paperwork to the

25 Patent Office to get it corrected.

1  Q.    Okay.

2              MR. WARDEN:  May I approach the witness, your

3  Honor?

4              THE COURT:  Please.

5  BY MR. WARDEN:

6  Q.    Mr. Mennie, I'm going to hand you Plaintiff's

7  Exhibit 574.  Do you recognize that document as the paper

8  that you signed in connection with trying to correct the

9  inventorship back in 2003?

10  A.    Yes, I do.

11  Q.    Okay.  And is the document dated on the backside

12  there?

13  A.    Yes, it is.

14  Q.    Okay.  What's the date?

15  A.    June 23rd, 2003.

16  Q.    June 23rd, 2003.

17              So, certainly by that time you were aware that

18  there was an error in naming inventors on the '456

19  patent; is that right?

20  A.    Yeah.

21  Q.    Now, did the Patent Office do anything about the

22  error in naming inventors of the '456 patent?

23  A.    Well, again, from what I understand -- I was not

24  directly involved other than signing the declaration

25  saying that, yes, there had been a mistake.  The

1  paperwork was sent in to the Patent Office, and from what

2  I found out is that the Patent Office did not issue the

3  correction due to some problems with the two dead

4  inventors.

5  Q.     Okay.  Do you know when the Patent Office made

6  that decision?

7  A.     I do not, no.

8              THE COURT:  Hold on one second, counsel.

9              (Discussion off the record between the court

10  and law clerk.)

11  BY MR. WARDEN:

12  Q.     Mr. Mennie, do you know if anyone followed up with

13  the Patent Office about this correction of inventorship

14  for the '456 patent after the petition was filed in

15  September of 2003?

16  A.     No, I don't know.

17  Q.     Okay.  But at some point, though, the Patent

18  Office made its decision and denied the petition; is that

19  correct?

20  A.     I believe that's correct.  I don't know for sure.

21  Q.     Okay.  Well, certainly you didn't follow up with

22  the Patent Office.

23  A.     That's correct.  I did not.

24              MR. WARDEN:  May I approach the witness, your

25  Honor?

56

1            THE COURT:  Go ahead.

2   BY MR. WARDEN:

3   Q.    Mr. Mennie, I'd like to show you Plaintiff's

4   Exhibit 582.  Do you recognize that document, Mr. Mennie?

5   A.    I do not.

6   Q.    Okay.  The document is -- it's got an October 7th,

7   2009, date.  Do you see that?

8   A.    Yes, I do.

9   Q.    Okay.  And do you see in the upper left corner

10  where --

11           THE COURT:  Since we're not in front of a

12  jury, maybe I could just see this document.  This isn't a

13  big surprise.  What is it?

14           MR. WARDEN:  Yes, your Honor.  This is the --

15           THE COURT:  I don't recall that you gave me

16  copies of your -- maybe you did, but I don't -- did you

17  already give me copies of your exhibits, or is this just

18  a new one?

19           MR. WARDEN:  This one is actually Plaintiff's

20  Exhibit 582.

21           THE COURT:  Okay.

22           MR. WARDEN:  And we've got a complete set we

23  can give you.

24           And actually, your Honor, yes.  We've got a

25  complete set up there for the court.

57

1          THE COURT:  All right.  Oh, okay.  I've pulled

2   it up on the screen.  Go ahead.

3          MR. WARDEN:  Okay.

4          THE COURT:  This is the order or the final

5   ruling, I guess, of the PTO?

6          MR. WARDEN:  Yes, your Honor.

7          THE COURT:  All right.  Any objection to it

8   coming in?  I mean, it's a government document for what

9   it's worth --

10          MR. RUDISILL:  No objection.

11          THE COURT:  Okay.  So, 582 is in.  Go ahead.

12   I mean, what -- it says what it says.  It was dismissed.

13          MR. WARDEN:  Yes, your Honor.  It says

14   "dismissed."

15   BY MR. WARDEN:

16   Q.    But I guess my question, Mr. Mennie:  Do you know

17   why all of a sudden here on October 7th of 2009 the

18   Patent Office is making a decision on this petition filed

19   back in 2003?

20   A.    Well, I think, from what I've -- again, from what

21   I've been told by my patent attorneys is that we thought

22   this had been handled by the Patent Office; and we came

23   to find out that they hadn't made a final ruling on it.

24   Q.    Okay.  So, someone -- during trial in this case a

25   couple weeks ago, someone called the Patent Office and

1  prompted this decision on the petition?

2  A.    As far as I know, that's correct.

3  Q.    Okay.  So, apparently --

4         THE COURT:  As a matter of law, counsel --

5  and, again, since we're not in front of a jury, I'll just

6  go ahead and ask:  Does it make any difference when they

7  dismiss it procedurally because of their procedures?  And

8  I think they say in there it should have been filed a

9  different way.  Does that have really any bearing on my

10 decision?

11        MR. WARDEN:  Only, I think, to the extent,

12 your Honor, that it shows how quickly, once they follow

13 up with the Patent Office, that the Patent Office makes a

14 decision on the petition.

15        THE COURT:  Well, isn't that partly the reason

16 that -- I know when I was appealing -- I mean, I did a

17 lot of appellate work; and I never called up the Court of

18 Appeals and said, "Where the heck is the opinion?  Why

19 aren't you guys working fast?"  Because they would say,

20 "Fine.  You're going to get an opinion, and it's no."

21        I mean, I would imagine the PTO might be the

22 same way.  If you get nasty with them, you get your

23 answer all right; and it's whatever you don't want.  As a

24 practical matter, the fact that they moved quickly to

25 slap somebody who is bugging them, what -- how should I

1 weigh that in my consideration of the factors in the

2 case?

3          MR. WARDEN:  Yes, your Honor.  The fact that

4 if Cummins had sought at some point after 2003 to prompt

5 the Patent Office to make a decision one way or the

6 other, the decision would have been made and probably

7 would have been made quickly.  And at that point Cummins,

8 you know, if it didn't like the decision, if it was the

9 same as we have here in Plaintiff's Exhibit 582, they

10 certainly could have filed a lawsuit.  And, in fact, we

11 see in their motion to correct the --

12          THE COURT:  But who does that prejudice?  It's

13 themselves, isn't it?  They suddenly wind up in an

14 awkward position because they took some time.  How does

15 that -- I guess you're looking at -- what -- the factor

16 of prejudice somehow in all of this?

17          MR. WARDEN:  No, your Honor.  I don't think

18 it -- at least I can't see any way that that bears on

19 prejudice.

20          THE COURT:  What does it bear on, then, from

21 your point of view?  How does it help your case, I guess?

22          MR. WARDEN:  Well, it does bear on the

23 unreasonableness of the delay.  I think, you know, we're

24 talking about laches.  And if we're looking at a period

25 of at least six years where they delayed making this

1  claim for correction of inventorship, that laches is

2  presumed to apply.

3          THE COURT:  Well, do you have any cases where

4  the term of laches continues to run after somebody files

5  an action?  I mean, normally laches -- it doesn't happen

6  so much in Federal courts anymore, but I can remember in

7  State courts -- well, in fact, the first firm I went to,

8  they handed me a file.  The case had been hanging around

9  for 11 years which is what happened to new lawyers.  You

10  got the dog cases, the ones that had been around for 11

11  or 12 years.  And the oldest one, I think, was 17 years

12  that I had to handle once.

13          Judges just took a long time, but there was

14  no -- you couldn't raise laches because it had been in

15  front of the judge all that time.  What are you going to

16  do?  Tell the judge he's lazy or something?  That doesn't

17  get you very far.

18          MR. WARDEN:  Yes, your Honor.  I think --

19          THE COURT:  I guess what I'm trying to get at

20  more specifically is:  What of the many factors that I'm

21  to consider -- what does this piece of evidence go to?

22  How does it help you other than if they had pushed at the

23  PTO, they might have gotten an answer quicker?  The

24  answer was against them.  So, how does it help you if

25  they had gotten this answer more quickly?

1          MR. WARDEN:  Certainly, your Honor, I think we

2    can, you know -- aside from any process of the Patent

3    Office Cummins could have, even while this was pending,

4    filed another lawsuit, filed a lawsuit specifically to

5    correct inventorship, even on September 15th of 2003, the

6    same date that they filed in the Patent Office.

7          THE COURT:  And how does that help you,

8    though?  What factor in my analysis does that go to when

9    I look at it and I say, "Okay.  You could have filed a

10   lawsuit.  Instead, you chose to take another avenue

11   offered by Congress and file with the PTO"?  It's one of

12   the odd circumstances where a party has a choice.  They

13   can go to Federal court, or they can go to the PTO.

14   Congress gives you two options; you pick one, for

15   whatever reason.

16          Is there any authority for the proposition

17   that somehow the term of the period of laches continues

18   or becomes extended or becomes more unreasonable because

19   you take one option offered by Congress instead of the

20   other?

21          I mean, if they had ruled on the merits, then

22   maybe I could look at it and say, "Okay.  Their ruling on

23   the merits is at least instructive, perhaps not binding

24   on me, but at least there is some instructive analysis

25   here I can look at."

1         This is under their rules; so, tell me --

2         MR. WARDEN:  Right, your Honor.  I think what

3  I was driving at with the look at this decision was going

4  back to the original petition to correct inventorship and

5  establishing that as the absolute latest time that the

6  plaintiff -- that Cummins could claim they could have or

7  should have filed a claim to correct inventorship.

8         THE COURT:  Well, the day they did it, yeah.

9  I mean, is that what you're saying?  The day they did it

10  is the last day they should have done it?

11         MR. WARDEN:  Well, they could very well have,

12  you know, filed a claim in court as well at the same

13  time.

14         THE COURT:  Okay.  Well, go ahead.

15         MR. WARDEN:  All right.  Your Honor, I think

16  we've covered this Exhibit 582 here.

17  BY MR. WARDEN:

18  Q.    Mr. Mennie, I guess the last question I'll have

19  for you is:  Do you know between 2003 and, I guess, today

20  whether Cummins has done anything else to try to correct

21  the inventorship of the '456 patent?

22  A.    I'm not aware of anything other than what we've

23  talked about today, no.

24  Q.    Okay.  Thank you.

25         MR. RUDISILL:  Just one question on redirect.

1          <u>REDIRECT EXAMINATION OF DOUG MENNIE</u>

2   BY MR. RUDISILL:

3   Q.     Mr. Mennie, Mr. Warden had asked you about whether

4   any drawings had been prepared on the -- I think it was

5   the '196 subject matter.

6   A.     Yes.

7   Q.     Would you take a look at the '196 patent?

8   A.     (Complying).

9   Q.     It has a filing date of 1992, right?

10  A.     That's correct.

11  Q.     And this patent does include a bunch of drawings,

12  doesn't it?

13  A.     Yes, it does.

14         MR. RUDISILL:  That's all I have.

15         <u>RECROSS-EXAMINATION OF DOUG MENNIE</u>

16  BY MR. WARDEN:

17  Q.     Mr. Mennie, you didn't prepare those drawings, did

18  you?

19  A.     No, I did not.

20  Q.     Do you know who prepared them?

21  A.     I would imagine that -- it's usually a

22  collaborative effort.  You know, sometimes Lars and those

23  guys prepare and give them to patent attorneys.

24  Sometimes patent attorneys prepare some of them.  So, I

25  don't know who prepared what; but I would imagine a lot

64

1  of the mechanical drawings in there maybe Lars probably

2  prepared and gave them to the patent attorneys.

3  Q.    Do you actually recognize any of the drawings in

4  the '196 patent as having been prepared by any of the

5  inventors?

6  A.    I could not specifically say that they were done

7  by the inventors.

8  Q.    Thank you.

9           MR. RUDISILL:  Nothing further.

10           THE COURT:  All right.  You may step down.

11           Next witness?

12           MR. RUDISILL:  Mr. Jones.

13           (The oath is administered.)

14           DIRECT EXAMINATION OF WILLIAM JONES

15           CALLED ON BEHALF OF THE PLAINTIFF

16  BY MR. RUDISILL:

17  Q.    Mr. Jones, would you just identify yourself for

18  the court, please.

19  A.    I'm William Jones, chairman of Cummins-Allison.

20  Q.    And are you a named inventor on the '456 patent,

21  which is Plaintiff's Exhibit 7 in the binder in front of

22  you?

23  A.    Yes, I am.

24  Q.    Now, you know from the testimony we've heard today

25  that this patent has a number of claims in it.  I just

1 wanted to ask you:  Did you contribute to the subject

2 matter of any of those claims in '456?

3 A.     Yes, I did.

4 Q.     Could you give us a couple examples?

5 A.     The end of claim 23, it says "wherein said

6 currency evaluation device has a height not exceeding

7 about 17 and a half inches, a width not exceeding about

8 13 and a half inches, and a depth not exceeding about 15

9 inches."

10         Then at claim 24 it says, "wherein the

11 currency evaluating device has a volume not exceeding

12 2.05 feet."

13         And then claim 42, "The method of claim 35

14 wherein the evaluating device has a height not exceeding

15 about 17 and a half inches, a width not exceeding about

16 13 and a half inches, and a depth not exceeding about 15

17 inches."

18 Q.     So, those are claims that you contributed to?

19 A.     Yes.

20 Q.     And did you work with Mr. Mennie in coming up with

21 the invention of those claims?

22 A.     Well, in those days I was -- one of the things I

23 was in charge of was product management, in charge of the

24 branches of sales and the service and the marketing.  I

25 had product management; so, I was actively involved in

1 technologies and products we were developing.

2          And I worked closely with Mr. Mennie, also

3 with Lars and Don Raterman.  I sat next to Don.  Lars was

4 just down the hall from me.  So, I met with them quite

5 frequently.  The JetScan was a very important technology

6 for us at the time to try to grow the business.

7 Q.     Okay.  Thank you.

8          Did any other inventors contribute to the

9 subject matter of any of the claims of the '456 patent?

10 A.     Yes.  Mr. Aaron Bauch, Brad Graves, Lars Stromme,

11 and Don Raterman as well as Doug Mennie.

12 Q.     And those four inventors were not named on --

13 originally on the '456 patent; is that correct?

14 A.     That's correct.

15 Q.     And do you know why?

16 A.     It was a mistake.  It was an error.

17 Q.     And do you know when that mistake was discovered?

18 A.     It was discovered in 2003.

19 Q.     And do you know whether anything was done to

20 correct it at that time?

21 A.     Well, I know that we asked the other inventors to

22 sign -- I don't know what the paperwork is, but we sent a

23 notice to the Patent Office about the problem of

24 inventorship.

25 Q.     Did you agree at that time that Messrs. Graves,

67

1  Raterman, Bauch, and Stromme should be added to the '456

2  patent?

3  A.    Yes, I did.

4  Q.    Do you know whether any of them objected to being

5  added as inventors to that patent?

6  A.    Well, to my knowledge they did not object.

7         MR. RUDISILL:  Pass the witness.

8         CROSS-EXAMINATION OF WILLIAM JONES

9  BY MR. WARDEN:

10 Q.    Mr. Jones, did you -- there was a period of time

11 in the late Eighties or early Nineties that you left

12 Cummins and you --

13 A.    That's correct.  I left from about mid '88 to mid

14 1990.

15 Q.    And you returned to Cummins after mid 1990; is

16 that right?

17 A.    About mid 1990, I believe, is when I returned.

18 Q.    Okay.  Now, what was your job in, I guess, the

19 late Eighties and early Nineties?

20 A.    Again, when I left, I was in charge primarily of

21 the branches of sales and the service.  I was also in

22 charge of marketing, also in charge of product

23 management.  Product management is in charge of

24 identifying new products and what we're going to take to

25 the market.

1  Q.     Okay.

2  A.     I assumed the same jobs when I returned.

3  Q.     Now, you mentioned the fact that you contributed

4  to the particular size of the machine claimed in the '456

5  patent; is that right?

6  A.     Yes.

7  Q.     Okay.  Can you tell us just what you did to

8  contribute to those particular size limitations of those

9  claims?

10 A.     Sure.  It was a collaborative effort, but one

11 thing -- going back all the way to the Seventies when I

12 worked for the company even when I was in school, we made

13 check processing equipment.  And these were very complex

14 machines with very complex transport mechanisms because

15 you had to not only move the checks forward but leftward

16 because you had to read the MICR line.

17         And one of the things you learn about moving

18 paper is the longer the transport path and you have to

19 make curves and turns, it adds to the complexity, the

20 expense, the cost, and the size of a mechanism.  And with

21 this new technology we developed -- one of the things we

22 wanted to do, of course, was develop tabletop machines.

23         And if you go to a teller line, the

24 countertops are yea high (indicating).  And you have to

25 think in terms of how -- what people's reaches are.  And

1  we recognized if we could make a small multipocket

2  machine to sit on the counter of a teller line, we could

3  start putting these machines in a teller line.  The prior

4  art, they were all very large machines.  They would

5  either have to be on a stand or floor standing, and

6  that's not going to be used in the branch of a bank.

7          So, I had a lot of yin and yang, particularly

8  with Don and Lars, on trying to get a machine small

9  enough to have multiple pockets and, yet, be of a small

10  enough dimension.  And one way I remember Lars trying to

11  do that was to have actually -- to get the height down,

12  make the paper path go way to the back and then come way

13  forward again.  And that made it lower, but it also made

14  it way too wide.

15          And I said to Lars as we were collaborating

16  and some of the others, "Why don't we just make it like a

17  waterfall effect down the front of the machine?  And then

18  we can open this machine like a clamshell."  Because you

19  don't want the tellers accessing the machines from the

20  back.  A lot of these machines are against a wall.

21  That's just not going to work.  And it's kind of a

22  conceptual thing, a basic breakthrough in getting this

23  machine small enough.  You can imagine like waterfalls

24  over a bridge.

25          And because we were going with the wide edge

1   lead, we could get this compact enough to get it under

2   what I thought had to be about 20 inches because if you

3   get a shorter person, a reach of more than about 20

4   inches on this countertop is not going to be practical.

5   Q.     Okay.  You talked about, I guess, the concept of

6   using a waterfall effect in the transport --

7   A.     Well, you can imagine it comes in the feeder, goes

8   around; and then it just, like, drops straight down.

9   It's a very simple paper path.  It seems obvious.  But it

10  was not obvious; it was difficult.  Simplicity is

11  difficult.

12  Q.     Okay.  Do you recall when you came up with this

13  concept of using the --

14  A.     Well, it was collaborative.  It was not just me.

15  Lars participated, Don, and Doug Mennie as well.

16  Q.     Okay.  Do you recall what time that was?

17  A.     Oh, gosh, those discussions were going on -- we

18  were struggling with that probably from about '93 through

19  '95 or '96 off and on.  I can't remember exactly when.

20  Q.     Just sometime between 1993 and 1996, that's the

21  best of your recollection?

22  A.     Yes.

23  Q.     Okay.  Did Cummins eventually make one of these

24  machines that had the multiple pockets and the waterfall

25  effect?

1  A.    Yes.

2  Q.    Do you know when that was?

3  A.    That machine, I think, was released into

4  production in -- I think 1997.

5  Q.    Okay.  Now, certainly I guess sometime in this

6  three-year period between '93 and '96 where there was a

7  collaborative effort between all of you -- certainly

8  there were drawings or sketches or diagrams of this

9  waterfall effect in the transport path --

10  A.    Lars made various drawings, various different

11  things we tried over that period of time.

12  Q.    Okay.  And did you keep an inventor's notebook?

13  A.    No.  I didn't keep an inventor's notebook.

14  Q.    Okay.  Did you work on or contribute anything to

15  the claims of the '456 patent before you started working

16  on this concept of the waterfall effect?

17  A.    Well, I think that was my contribution.

18  Q.    But there was -- this is beginning maybe 1993?

19  A.    Well, there were discussions about multipocket

20  machines.  I have it in some of my documents, mostly in

21  business plans at the time about developing multipocket

22  products.  I participated as a product manager in the

23  discussions with engineering as well upon when I returned

24  in 1990.

25  Q.    Okay.  So, maybe even before 1993, there were some

1 business plans or ideas to come out with a

2 multiple-pocket machine?

3 A.    There were.

4 Q.    Okay.  Now, I guess at the time, you know,

5 sometime before 1993 -- I would assume this was after

6 1990; is that correct?

7 A.    What's --

8 Q.    Sometime between 1990 and 1993.

9 A.    Is...

10 Q.    That was the time that you may have came up with

11 business plans or the idea that maybe Cummins should come

12 out with a multiple-pocket machine?

13 A.    Well, in October of 1990, business plan for '91,

14 there was discussions about the multiple-pocket machines.

15 Q.    Okay.  Did the business plan include a discussion

16 of the waterfall effect in the transport --

17 A.    No, no, no specifics about how that would be

18 achieved.

19 Q.    Okay.  All it does is mention the concept of

20 trying to come out with a multiple-pocket machine?

21 A.    We had a vision to develop a family of products,

22 not just a single-pocket but multiple-pocket machines,

23 over time.

24 Q.    Okay.  Well, certainly there were multiple-pocket

25 machines before that time in the marketplace, wasn't

1  there?

2  A.     Yes, there were.

3  Q.     And certainly before that time the -- you know,

4  for example, one of the products that we saw at trial,

5  the CF-400 Toshiba or the Mosler CF-400 existed at that

6  time; is that correct?

7  A.     The Mosler machine existed, the very large Glory

8  machine.  None of those would fit on a countertop for a

9  teller.

10  Q.     Okay.  You also talked about a clamshell concept

11  that you contributed to the --

12  A.     It's collaborative.  It's just a concept.  Again,

13  the teller -- simplicity is very important, and these

14  machines are -- there is often walls behind them.  So,

15  having back access to clear jams is not a good way to go.

16  This clamshell, you -- I don't know how to explain it.

17  But you open the front of the machine, it goes forward

18  like this (indicating) and then you can see the entire

19  transport path and you can clear jams quite easily.

20  Q.     Okay.  Is that something you had seen in other

21  products previously in the market?

22  A.     No, not to my knowledge.

23  Q.     You didn't see anything like that in any of the

24  Mosler/Toshiba products?

25  A.     Those had pretty complex paper paths.

1  Q.     I'm talking about the clamshell design.  Did you

2  see --

3  A.     No.

4  Q.     -- a clamshell design --

5  A.     No, sir.

6  Q.     -- in those products?

7  A.     No.

8  Q.     Okay.  Mr. Jones, I guess the last question I'll

9  ask you is:  After the '456 patent issued in 1999, is

10 there anything that Cummins did -- other than trying to

11 correct it in 2003 -- between '99 and now to try to

12 correct the inventorship of the '456 patent?

13 A.     Other than 2003?

14 Q.     That's correct.

15 A.     No, sir.  I have no knowledge.

16 Q.     Okay.  Thank you.

17 A.     Thank you.

18         MR. RUDISILL:  Nothing else.

19         THE COURT:  All right.  You may step down,

20 sir.

21         THE WITNESS:  Thank you, sir.

22         THE COURT:  Anything else?

23         MR. RUDISILL:  No, sir.

24         THE COURT:  All right.  Just to be sure I've

25 noted this down correctly.  But of the witnesses you

1  presented, Mr. Bauch was one of your experts; and the

2  rest are all still employees of Cummins?

3          MR. RUDISILL:  That's correct.

4          THE COURT:  Okay.  An obvious concern I have

5  is the lack of any documentary corroboration.  Do you

6  have a case that the prior patent itself, this '196, can

7  be sufficient?  I mean, you go through all of the policy

8  considerations involved in laches and why we require

9  corroboration; and one of those is -- is that over the

10 passage of time evidence is lost, memories fade, so on

11 and -- you know, I mean, it's almost a classic.

12          And here we have this case where there don't

13 seem to be any pictures or examples of the drum

14 mechanism, any pictures or examples of the testing, any

15 reports, internal memorandum, letters.  The only document

16 that I see is the '196 patent itself.  Do you have a case

17 where that -- any case where something like that in and

18 of itself was held to be sufficient?

19          There are some cases that an abandoned

20 application for a patent were insufficient.  So, have you

21 found one where a single prior patent that's being relied

22 upon was sufficient corroboration?

23          MR. RUDISILL:  We don't have such a case at

24 the moment, your Honor.  I'm not sure we've looked for a

25 case like that.

1          THE COURT:  All right.  Have defendants found

2   a case to the contrary or anything -- I mean, that seems

3   to be -- you would agree with me that they've got at

4   least that.  They've got this '196 patent, and then I've

5   got to decide is that sufficient.  But do you have a case

6   that says that is or is not sufficient?

7          MR. WARDEN:  No, your Honor.  We haven't seen

8   anything like that, either.

9          THE COURT:  All right.  I've listened to the

10  testimony and tried to follow it on this '196 patent as

11  containing the elements that would show that they were

12  prior inventors.

13          And help me out again if you would,

14  Mr. Rudisill.  You've got the -- and I'm going through

15  the '456 patent.  You pointed out where the element of

16  800 bills per minute is contained at Column 31, about

17  line 54, in claim 1, right?

18          MR. RUDISILL:  Of the '196 patent?

19          THE COURT:  Of the '196, right.

20          MR. RUDISILL:  I could be wrong.  I thought it

21  was Column 18.

22          THE COURT:  Okay.  The -- well, that may also

23  be in Column 18.  We're talking about the 800 bills.

24  Column 18 has, I think, the diverting to a separate

25  stacker bin.

 1            MR. RUDISILL:  Okay.  Yes.  You're correct.

 2            THE COURT:  And it also, along with a diagram,

 3  has scanning along the wide dimension -- I'm sorry --

 4  scanning along the narrow dimension.  So, we have that

 5  element in there.

 6            Where does it talk about or indicate the

 7  element that's set out in claim 41 of the '456 patent,

 8  namely, the "counting the bills under control of the

 9  evaluation device, the counting device comprising one or

10  more counters keeping track of the value of bills

11  discriminated"?  Where is that described in the '196?

12            MR. RUDISILL:  Well, first of all, I want to

13  mention the 800 bills a minute is -- I think the

14  witnesses referred to the claims.  It's also in Column 5

15  at line 60.

16            THE COURT:  Okay.  All right.  Well, let's

17  assume I'm willing to give you that -- or I agree with

18  you that 800 bills a minute is talked about in the '196.

19            MR. RUDISILL:  Okay.

20            THE COURT:  Okay.  And I think in Column 18

21  there, there is a discussion about it's -- and also the

22  diagram -- it's going along and you're scanning the

23  narrow dimension, not the wide dimension.

24            And I think you've probably got in the '196

25  the receiving a stack of bills to count and evaluate.

1  That's in there.

2          But tell me about what's in claim 41.  Where

3  is that in the '196 patent, the element that's set out in

4  claim 41 of the '456 patent?

5          MR. RUDISILL:  May I have a minute, your

6  Honor?

7          THE COURT:  Sure.

8          MR. RUDISILL:  Your Honor, we have one section

9  we've identified at the --

10          THE COURT:  All right.

11          MR. RUDISILL:  It's really the last full

12  paragraph in Column 3.

13          THE COURT:  Okay.

14          MR. RUDISILL:  It refers to presenting "the

15  aggregate total of bills that have been identified at the

16  end of a scan run" --

17          THE COURT:  Do you have a line number?

18          MR. RUDISILL:  Let's see.  Let's start with

19  the sentence beginning at line 59.  "Also in accordance

20  with this invention" -- or maybe start at line 54 of

21  Column 3.

22          THE COURT:  All right.  Let me ask defendants.

23  Let's say I decide that as a matter of law and my reading

24  of the cases, there has to be some corroboration more

25  than the mere testimony of these people that have

1  testified because all of them are either inventors or

2  people who are claiming to be inventors and all of them

3  have an interest.  We have several employees who are

4  obviously interested and then their paid expert who is

5  obviously interested; so, I want some corroboration.

6          You clearly carefully pointed out they haven't

7  brought in any documents other than the '196 patent.

8  Now, if the '196 patent discloses what's in claim 35 of

9  the '456, then even if part of what's in 41 was done by

10  one of the two people named on the '456 patent, Mr. Jones

11  or Mr. Mennie, why isn't that enough to show that those

12  individuals, or at least some of them -- Mr. Bauch or

13  Mr. Graves or both -- haven't contributed?

14          In other words, they basically -- claim 35 is

15  just basically a takeoff on the -- this would seem to be

16  their strongest argument.  Claim 35 of the '456 patent is

17  just a takeoff on the '196 patent.  We added in the

18  additional limitation of claim 41.  We should have put

19  Mr. Bauch and Mr. Graves in as inventors; we didn't.

20  We're asking to have it corrected now.

21          Tell me what's wrong with that argument.

22          MR. WARDEN:  Yes, your Honor.  I think there

23  are two basic, probably, concerns that we have there.  By

24  itself the fact that one patent with one group of

25  inventors has certain limitations that also appear in

 1   another patent naming another group of inventors -- I

 2   think that fact doesn't -- isn't even, you know,

 3   circumstantial evidence, that the two patents -- the

 4   invention there was actually the joint invention of, you

 5   know, some combination of these inventors.

 6          And I think that probably the key here on the

 7   issue of corroboration is that this, you know, joint

 8   inventorship to get all these inventors on the patent, it

 9   requires, you know, collaborative effort to some extent

10   and that the corroboration requirement requires

11   corroboration not only that, you know, someone invented

12   some aspect and another person invented another aspect of

13   the claimed invention but that there was collaboration.

14          And with this requirement for corroboration, I

15   think the case law actually describes it as it requires

16   corroborating evidence of a contemporaneous disclosure

17   that would enable one skilled in the art to make the

18   invention.

19          And I think there is still a disconnect here

20   in our case that the '196 patent is a contemporaneous

21   disclosure of any of these particular inventors.

22   Obviously I talked to one of the witnesses; and they

23   mentioned the fact that, you know, "It wasn't our

24   drawings."  They at some point signed an oath saying that

25   "This is our invention."  But it wasn't contemporaneous

1   with the act of invention, the conception --

2           THE COURT:  Well, I'll agree with you that

3   these affidavits are not contemporaneous.  That's why I'm

4   focusing -- plaintiffs haven't pointed to me to -- and

5   I'll welcome it, but I haven't seen anything other than

6   the '196 patent as being a contemporaneous writing back

7   to that early date that they're trying to claim.  So,

8   that's what we're focusing on.  There is no point --

9   let's just assume right now I'm not worried about the

10  affidavits and I'm not -- but I am concerned about the

11  testimony, and I'm concerned about all of the cases that

12  talk about the need for corroboration.  So, let's focus

13  on why the '196 patent, the only corroborating

14  contemporaneous piece of evidence that I've seen so far,

15  is or is not sufficient.

16          MR. WARDEN:  Yes, sir.  Two points.  I can't

17  say that those drawings are contemporaneous with the

18  invention.  The invention is the conception, the

19  completion of the mental part of the invention.  And I

20  don't think we've heard testimony that there is a link

21  between the patent drawings and when or how or why this

22  invention was conceived.

23          THE COURT:  Conceived or reduced to practice?

24          MR. WARDEN:  Well, I think conception is the

25  key issue, your Honor.  The reduction to practice might

1  very well have been carried out by someone else or even a

2  patent attorney who constructively reduced it to practice

3  in preparing the patent drawings and the description in

4  the patent.  And, of course, a patent attorney is not the

5  inventor in that case.

6           I think certainly standing by itself --

7           THE COURT:  Let me ask you another question

8  along this -- or slightly different that may apply.  If

9  I'm recalling the damages testimony correctly -- and I

10 may actually have this backwards because we were looking

11 for the slides from both sides.

12          But do I recall correctly that the experts

13 agreed that there would be one measure of damages if the

14 jury found infringement and failed to find invalidity on

15 three patents plus '503 but a lower amount if for some

16 reason '503 was not to be infringed?  Is that how the

17 damages went?

18          MR. HEARTFIELD:  There was a slight reduction

19 if only the '503 was found to infringe.

20          THE COURT:  If only the '503.  So, if it's

21 only the '503 that's found, then you have a reduction.

22 If it's the '503 plus any of the others, then it's the

23 total amount.

24          MR. HEARTFIELD:  That's correct.

25          THE COURT:  And, Mr. Truncale, you were, I

1  think, handling the --

2           MR. TRUNCALE:  That's correct, your Honor.

3           THE COURT:  Okay.  So, given that, I think it

4  is correct that defendant has to prevail on JMOL on -- or

5  to throw the verdict into doubt, at the very least has

6  to -- I'm sorry -- well, you may have other -- I'll set

7  aside any other motion you may have filed about the

8  damages.

9           But in terms of having a finding of liability

10 to underlie the damages, is it correct that you're going

11 to have to prevail on JMOL on the '806 and the '456 and

12 the '354?  I mean, you get a total when you have to

13 prevail on all of them.  But to at least throw it into

14 doubt on the total damages, you've got to get all three

15 of those, don't you?

16          MR. WARDEN:  I believe that's essentially

17 correct, your Honor, if the only patent that remains is

18 one of these particular patents.  There may be issues

19 that arise because the patents claim different aspects of

20 the invention.  One claim is authenticating --

21          THE COURT:  Well, except that the damages

22 expert presented it -- both experts, for that matter,

23 agreed; and there was no attempt to distinguish or -- in

24 fact, I think I asked counsel about this, you know, do we

25 want to have damages for each item.  And it was basically

1  agreed that it was going to be either the -- we had the

2  three patents, any one of those claims plus the '503 as

3  the total; and then, alternatively, the jury could -- or,

4  for that matter, the court -- could toss out the three

5  patents, the noncounterfeit patents, and then go with the

6  '503.

7          I don't see, the way it's been presented and

8  argued and both experts agreeing, that you can -- you've

9  got to prevail on all of your JMOLs -- you have to

10  prevail on JMOL on '806, '456, and '354 at a minimum to

11  cast doubt on the damages verdict, I think.  If not, tell

12  me why not.

13          MR. WARDEN:  Yes.  Yes, your Honor.  You're

14  essentially correct.  Of course, at the same time we've

15  also got the Patent Office still in the process of

16  reexamining the '806 patent.  That reexamination is still

17  pending.

18          THE COURT:  Well, what happens with them --

19  once I issue my judgment, I guess they can keep doing

20  what they're doing; but I'm not going to wait for them

21  to --

22          MR. WARDEN:  Yes, your Honor.

23          THE COURT:  -- to rule.  I mean, that

24  doesn't --

25          Okay.  All right.  I'll give you one last

85

1  shot, then.  Tell me why, under the law of the cases --

2  assume for your argument that all of the testimony I've

3  heard so far I consider to be from interested witnesses,

4  perhaps very interested witnesses, intimately involved

5  with this case.  The *Barbed-Wire* case by the Supreme

6  Court indicates that I should look at that with a great

7  deal of suspicion.  And as you've been pointing out in

8  cross-examination, there is no contemporaneous evidence,

9  although there easily could have been had any of it been

10  saved.  But we do have the '196 patent; so, what do I do

11  with that?

12          MR. WARDEN:  Yes, your Honor.  I think if

13  we're looking at that as potential corroborating

14  evidence, I think it doesn't corroborate the fact that

15  Mr. Mennie, Mr. Jones, Mr. Graves, Mr. Raterman, and

16  Mr. Bauch all worked together, that they collaborated,

17  which is, you know, one of the requirements of joint

18  invention -- that they collaborated to conceive the

19  invention.

20          THE COURT:  And specifically in this case,

21  we're talking the invention being -- and here's where we

22  all sometimes get sloppy.  Every claim is an invention.

23  What we're talking about is the invention set out in

24  claim 41 of the '456 patent.

25          MR. WARDEN:  Yes, your Honor.  I think we need

1  to be a little bit careful, though, because if any one of

2  the claims of the '456 patent -- if this group of, you

3  know -- what is it -- six purported inventors jointly

4  conceived of any one of those claims, that they're joint

5  inventors for the purpose of the '456 patent.  We can't

6  at this point parse out individual claims.  We've got to

7  take a look at all of the claims.

8            With this particular claim, claim 41 --

9            THE COURT:  So, your argument -- I mean, you'd

10  say that although we're looking at claim 41 and the

11  priority date to be assigned -- and this is a

12  continuation-in-part, not a straight-on total

13  continuation -- that the priority date goes back to 1992

14  because some other claim in the '456 patent can show

15  relationship back to then?

16            MR. WARDEN:  No, your Honor.  I think it's

17  just a basic concept of defining who should be an

18  inventor on a patent.  It's the fact that if they

19  contributed in some not insignificant manner to the

20  conception of any one of the claims, well, then they

21  ought to be an inventor on the patent.

22            THE COURT:  Yeah.  But isn't this -- I mean --

23  all right.  Maybe I'm going to the next step, then.  Does

24  that help -- in terms of priority, does it have to be a

25  showing that -- the four one?  Or once they get it on any

1   one of the claims, they get it on all of them?

2           MR. WARDEN:  No, your Honor, the -- well, what

3   has to be shown on claim 41?  In order to -- priority is

4   determined on a claim-by-claim basis.  And for claim 41

5   to have priority, not only must there be joint

6   inventorship or at least one common inventor -- and this

7   is under Section 120 -- that there also has got to be

8   this -- the prior invention, and the prior application

9   has to satisfy the written description requirement.  It's

10  kind of a two-pronged analysis with respect to claim 41.

11          THE COURT:  Would you agree, Mr. Rudisill?

12          MR. RUDISILL:  Well, I'm not sure I clearly

13  understood what counsel was saying.  At one point I

14  thought he said you had to show that all six inventors

15  were inventors of claim 41.  I don't think that's true.

16          THE COURT:  Well, I think what he's saying is

17  if you can show a couple of them, say Mr. Graves and

18  Mr. Bauch, should have been included because of their

19  contributions to 35, then you get the correction for

20  them.

21          But then the second part is you've got to show

22  that 41 -- to allow 41 to take advantage -- and that

23  might be great for 35 getting the 1992 priority date.

24  You're concerned with claim 41 of the '456 patent.  But

25  the next step in the analysis is going to be is 41

88

 1 | disclosed in the '196.

 2 | MR. RUDISILL:  Right.  And I thought that's

 3 | what we addressed, and we do have another section in the

 4 | '196 that supports that.  It's in --

 5 | THE COURT:  Okay.  But do you agree with his

 6 | analysis on that as far as how I should be tracking this

 7 | along?  I first decide on the correction.  That can be on

 8 | claim 35 or any other claim.  And then I've got to look

 9 | at is 41 then entitled to take advantage of that.

10 | MR. RUDISILL:  I think that's correct.

11 | THE COURT:  Okay.

12 | MR. RUDISILL:  Your Honor, did you want the

13 | other reference that we found on the claim 41 language?

14 | THE COURT:  Yes, please.

15 | MR. RUDISILL:  Just for the record, it's

16 | Column 8, the paragraph beginning at line 42.  It talks

17 | about the counting and totaling.

18 | THE COURT:  All right.  Any further argument

19 | or evidence from plaintiff?

20 | MR. RUDISILL:  No, sir.

21 | THE COURT:  From defendant?

22 | MR. WARDEN:  No, your Honor.

23 | I think the point with corroborating evidence

24 | that we're focused on here is that it needs to

25 | corroborate collaboration and has got to be

1  contemporaneous with the conception.  And I think that's

2  where, you know, something like the '196 patent

3  doesn't -- it fails to corroborate those two particular

4  aspects, contemporaneous with the conception and that

5  there was collaboration, as opposed to independent

6  efforts or working at different times, different places,

7  no knowledge of one another's work.  What we're looking

8  for is corroboration of the collaboration.

9            THE COURT:  What's your authority for that?

10            MR. WARDEN:  I believe it's the *Eli Lilly* case

11  cited in our brief, your Honor.  It says, quote, joint

12  inventorship under Section 116 can only arise when

13  collaboration or concerted effort occurs, that is, when

14  the inventors have some open line of communication during

15  or in temporal proximity to their inventive efforts.

16            And the collaboration requirement

17  that would -- we've got a couple of cases cited there,

18  and one of them is the *BJ Services* case in the Federal

19  Circuit.

20            THE COURT:  But don't we -- are those cases

21  where someone is trying to -- what was the context of

22  those cases?  And that's the problem.  Because you can

23  have a case where someone is trying to declare a patent

24  invalid for failure to name the inventors.  You can

25  claim -- you can also have a case where someone has hired

1  somebody and they say, "Well, I'm one of the inventors;

2  and I've already cut a deal with defendants to allow them

3  to use it" and you've got that.  And then you've got a --

4  but you haven't done that in this case.  You haven't

5  tried to claim the patent is invalid.  They're just

6  coming in trying to correct.

7           Why does there have to be -- I mean, we've

8  got -- obviously these people are working at this

9  company.  The only one I've heard so far who wasn't an

10 employee was Mr. Bauch.  The rest of them are all

11 employees.  They come out with a patent that includes,

12 say, claim 35 which seems to -- you know, that they argue

13 is pretty clearly shown in the '196; and then they come

14 in and say, "Well, we should have named a couple of other

15 employees there."

16           That gives us the relation back to 1992.  We

17 want our correction.  Now we go to the next step, is it

18 disclosed -- is claim 41 disclosed in full -- claim 41

19 disclosed in the '196.  But that particular analysis

20 doesn't require collaboration, does it?

21           MR. WARDEN:  No, your Honor.  That's

22 defendants' burden by clear and convincing evidence.

23 That's a standard written description --

24           THE COURT:  Right.  So, the collaboration part

25 only goes, for purposes of this example, let's say, to

1    what happened on claim 35, right?

2              I mean, let's assume I'm going to focus on

3    claim 35 and claim 41.  I'm not going to give plaintiffs

4    anything else.  They're going to have to win on showing

5    me that 35 -- that these other people were somehow

6    involved in there.  But you're saying that it's not

7    enough for Mr. Graves and Mr. Bauch to have basically

8    developed everything that was needed for claim 35 and

9    then described it in '196.  You're saying there has to be

10   some showing of collaboration between those two and

11   either Jones or Mennie?

12             MR. WARDEN:  Yes.  Yes, your Honor.  I think

13   we -- as we were speaking, I think we pulled up a case

14   that addresses our particular situation, that the -- this

15   is a case called --

16             THE COURT:  Do you have the cite?

17             MR. WARDEN:  Yes, your Honor.

18             THE COURT:  Go ahead and if you'll --

19             MR. WARDEN:  It's called *Lacks Industries

20   versus McKechnie Vehicle Components*," and the cite for

21   that is 322 F.3d 1335 at page 1349.  That's the Federal

22   Circuit from 2003.

23             And here the court found that

24   cross-corroboration, or testimony by multiple witnesses,

25   by interested parties must be corroborated by documentary

1  evidence, that the oral testimony alone is insufficient.

2  It looks like the documents that these folks introduced

3  to try to show collaboration were minutes of meetings

4  and, I guess, a couple of memorandums, and a separate

5  patent.

6          And here the court found, I guess, that the

7  documents were too general and incomplete to act as

8  corroboration, that they contained no identification of

9  the affiliation of the author, no connection between the

10  project discussed, and no description of, I guess, the

11  particular invention.  And the Federal Circuit, I guess,

12  found that the testimony was uncorroborated.

13          I guess if the court is focused on claim 41

14  and the --

15          THE COURT:  Well, that's the only one they've

16  cited in the '456.  I mean, you're not going to give them

17  any other claims, are you?

18          MR. WARDEN:  No, your Honor.  We're certainly

19  not.

20          If the court is focused on that claim for the

21  inventorship analysis --

22          THE COURT:  Well, actually the inventorship

23  analysis is really -- their best argument seems to be

24  claim 35, isn't it?

25          MR. WARDEN:  Yes, your Honor, the independent

1  claim from which claim --

2          THE COURT:  Right.

3          MR. WARDEN:  -- 41 depends.

4          THE COURT:  But I think you've already agreed

5  with me that if they can show that Mr. Bauch and

6  Mr. Graves contributed to or almost, in fact, disclosed

7  everything that's in claim 35 back when they helped write

8  the '196 -- and maybe Lars and Raterman, too -- then they

9  get their correction of inventorship.

10         And, so, then the next question comes up --

11  well, except that you're saying now there has to be a

12  collaboration requirement in there, also.  And that's

13  what I'm trying to find out is the collaboration.

14         MR. WARDEN:  Yes, your Honor.  And I think the

15  inventorship issue is -- there are probably more -- it's

16  probably more complex than just that because in this

17  particular case we saw that Mr. Mennie and Mr. Jones

18  testified that they weren't part of or didn't contribute

19  to the conception of claim 35.  So, we've certainly got

20  to look further than just claim 35 in order to establish

21  joint invention.

22         THE COURT:  All right.  Back to this *Lacks*

23  *Industries* case that you called up, tell me where it is

24  that goes into the collaboration as opposed to

25  corroboration.

1          MR. WARDEN:  I'm sorry.  I guess the case

2    talks about corroboration.

3          THE COURT:  Okay.

4          MR. WARDEN:  I actually am seeing it now for

5    the first time also, your Honor.

6          THE COURT:  All right.  I'm not finding

7    collaboration being an issue there, if you can point me

8    to that.

9          Well, let me ask plaintiffs.  I've got this

10   *Eli Lilly* case, *Eli Lilly and Company versus Aradigm*,

11   376 F.3d 1352, Fed Circuit 2004.  And looking at page

12   1359 -- I'm sorry, 1-3-5-9 -- the court says, "It is,

13   however, uncontroversial that the alleged joint inventor

14   seeking to be listed on a patent must demonstrate that

15   his labors were co-joined with the efforts of the named

16   inventors."  And then it talks about "must have some open

17   line of communication.  There must be some element of

18   joint behavior such as collaboration or working under

19   common direction."

20         So, what's the best evidence that you've given

21   me when you were presenting this testimony that something

22   like that happened?  I don't recall testimony from

23   Mr. Jones and Mr. Mennie talking about them using or

24   building upon the work of the other two in connection

25   with claim 41.

1      MR. RUDISILL:  Yes.  Your Honor, we don't

2  think that Mr. Mennie and Mr. Jones need to be part of

3  the joint inventorship of claim 41.

4      THE COURT:  Or 35, for that matter, or

5  anything -- I mean, point to me -- I mean, you've got --

6  I think you're getting realtime there, also.  But -- or

7  refresh my memory on the testimony that shows that there

8  was any collaboration between those two who are named on

9  the '456 and the four who were named on the '196.

10      MR. RUDISILL:  Yes, but not with respect to

11  claims 35 and 41.  But there was testimony with respect

12  to other claims such as the authenticating claims that

13  Mr. Graves said -- both Mr. Graves and Mr. Mennie said

14  they had collaborated with each other with respect to the

15  invention of those claims, the authenticating.

16      THE COURT:  Okay.  What else?

17      MR. RUDISILL:  I think Mr. Jones said that he

18  had collaborated with Mr. Stromme and maybe Mr. Raterman

19  on getting the multipocket machine down to a small size.

20  Now, again, that's not claim 35 or 41; it's other claims

21  of the patent.  But that's sufficient under the law.  You

22  don't have to have every -- all six inventors being joint

23  inventors of every claim.  And we did not say that

24  Mr. Jones and Mr. Mennie were part of the joint

25  inventorship of claims 35 or 41.  That's just the

1    original four inventors.

2            And by the way, that did start back in -- I

3    mean, except for the speed element of claim 35, that

4    joint invention was first described in the '111

5    application filed in 1990, which is the parent of the

6    1992 CIP that resulted in the '196 patent.

7            THE COURT:  All right.

8            Okay.  35 USC, Section 256, as we know, allows

9    for correction of designated inventors; and it can be

10   done either by -- correction under the statutes can be

11   done either by the Patent Office or specifically by the

12   court under Section 256

13           There is a general presumption that the

14   inventors named on the patent are the true and only

15   inventors.  We see that in *Ethicon*, *Inc., versus United*

16   *States Surgical Corporation* at 135 F.3d 1456, page 1460,

17   Fed Circuit 1998.  And, so, according to that case, the

18   alleged co-inventor, or co-inventors, must prove their

19   contribution to the conception of the claims by clear and

20   convincing evidence.

21           And, of course, I don't think the court needs

22   to belabor what "conception" is, being the touchstone of

23   the inventorship and that each joint inventor must

24   generally contribute to the conception of the

25   invention -- that's also set out in the *Ethicon* case --

1  and that a joint inventor doesn't -- one is not a joint

2  inventor just because that joint inventor merely assists

3  one of the inventors.

4        Here we have the odd case in that we've got

5  two inventors on the '456 and, I think, four inventors on

6  the '196, two of whom are now dead.  The '196 having been

7  applied for on May 19th, 1992, and then issued on

8  March 15, 1994.  Whereas, the '456 application didn't

9  occur until three years after, on April 4th of 1997; and

10  it didn't actually issue until 1999.

11        One of the rules that comes through again and

12  again is that a party claiming prior inventorship must

13  have evidence of corroboration.  And we see that very

14  clearly in the *Sandt Technology versus Resco Metal &*

15  *Plastics Corporation* at 264 F.3d 1344, page 1351 and '52;

16  and that's Fed Circuit 2001.

17        And this follows a long line of cases where we

18  look at the kinds of things that have been found to be

19  proper corroboration evidence.  And I think a lot of this

20  comes from the very early case, the one that's known as

21  the "*Barbed-Wire* case," *Washburn & Moen Manufacturing*

22  *Company versus Beat 'Em All* -- that's "Beat 'Em," not an

23  M; it's E-M -- *Beat 'Em All Barbed-Wire Company* at

24  12 S.Ct. 448 back in 1892.

25        And in that case the Supreme Court was

1   obviously not impressed at all with, I think, as many as

2   six witnesses claiming to have seen earlier versions of

3   the barbed wire when the person claiming that he had been

4   the inventor had no documentary evidence, had, in fact,

5   applied for another patent which the Supreme Court

6   describes as a comparatively worthless contrivance, and

7   basically rejected the idea that that was proper

8   evidence.

9           Those witnesses weren't enough, and I think

10  the reason for that is that there is obviously a

11  tremendous incentive for a witness years later to change

12  testimony.  For one purpose -- well, you have the first

13  problem that's recognized in the doctrine of laches which

14  will also come up in this matter, is that people's

15  memories fade.  They tend to forget.

16          And then you have the incentive to remember

17  things the way you want to remember them because there is

18  a lot of money, in this case some $11 million at stake

19  just on the judgment alone.  And all of the witnesses I

20  heard testify today are interested.  They are either

21  employees of the company -- in fact, one, Mr. Jones, is a

22  very high member of the company -- and then Mr. Bauch who

23  has been a consultant of the company and a paid expert in

24  this case.

25          So, obviously the higher courts caution me to

1   look at this very, very carefully and look for

2   corroboration.

3           In the *Sandt* case the court looked at a number

4   of items; and all of these cases talk about when you're

5   looking at corroboration, you're -- and analyzing this

6   under a rule of reason.  And the courts give a number of

7   different -- including *Sandt Tech* -- a number of

8   different factors that could be looked at such as the

9   relationship between the corroborating witness, the time

10  period between the event and the trial, the interest of

11  the corroborating witness in the subject matter,

12  contradiction or impeachment of the witness' testimony.

13          In going over these, it appears that in this

14  particular case Factor 1, the relationship between the

15  corroborating witness and an alleged prior inventor,

16  their interests are all co-joined; and that works against

17  plaintiff in this case.  As I said before, they're all

18  either employees or a paid expert.

19          The time period between the event and the

20  trial, very long, which has caused its own problems; and

21  that works against the plaintiff in this case.

22          The interest of the corroborating witness in

23  the subject matter, that works against plaintiff in this

24  case because they are obviously interested.

25          Contradiction or impeachment of the witness'

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 100 of 199 PageID #:  8885
Hearing on Post-Trial Motions, Volume 1

100

1 testimony, very little to none.  That worked in favor of

2 plaintiff.

3          The witness' familiarity with the subject

4 matter of the patented invention and the prior use,

5 Mr. Bauch especially is very familiar with all aspects;

6 and so are the others.  I mean, this is their line of

7 work.  That would tend to work -- weigh in favor of the

8 plaintiff.

9          The probability that a prior use could occur

10 considering the state of the art at the time -- and that

11 particular factor was phrased that way, I think, in a

12 case where the issue was prior use to create invalidity.

13 Plaintiff's own arguments may hurt them here because I

14 think they were relying very heavily in their secondary

15 considerations of nonobviousness, which I'll be getting

16 into later, that it is very difficult to come up with and

17 make -- invent a machine and then reduce it to practice

18 so it actually worked.  And there was a huge demand; and

19 that indicates that, therefore, the fact that it's easy

20 to imagine now, it wasn't so easy to imagine back then.

21 So, that Factor 6 works against plaintiff.

22          As does factor 7, the probability that a prior

23 use could occur considering the state of the art at the

24 time.

25          And then the impact of the invention on the

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 101 of 199  PageID #:  8886
Hearing on Post-Trial Motions, Volume 1

101

1  industry and the commercial value, plaintiff themselves

2  put in a great deal of effort to show that.

3         So, it appears, then, that the corroboration

4  by other than the witnesses' testimony starts to become

5  even more important.  In the case called -- and these are

6  going over some cases cited in the *Sandt Technology* case.

7  The case of *Finnigan Corporation versus International*

8  *Trade Corporation*, 180 F.3d 1354, Fed Circuit 1999, there

9  was an attempt to corroborate with a diagram in an

10  article; and the court found that wasn't enough, just

11  this diagram.

12         (Off-the-record discussion between the court

13  and law clerk.)

14         THE COURT:  I mean, the *Finnigan* case did say

15  it's not an impossible burden; but the court found that

16  that one was enough.

17         There is a case called -- I was looking for

18  the citation to the *Juicy Whip* case.  These were some

19  sketches, as I recall, drawn during depositions.  But

20  those were not contemporaneous; those were sketches that

21  they drew during the depositions.  And that wasn't enough

22  to corroborate because it was not contemporaneous.

23         (REPORTER'S NOTE:  The following citation is

24  being inserted into the record upon request of the court

25  and approval of all parties.  *Juicy Whip, Inc. versus*

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 102 of 199 PageID #:  8887
Hearing on Post-Trial Motions, Volume 1

102

1  *Orange Bang, Inc.*, 292 F.3d 728, Fed Circuit 2002.)

2        THE COURT:  And then the -- another case, the

3  *Woodland Trust versus Flowertree Nursery*, 148 F.3d 1368,

4  Fed Circuit 1998.  And if I'm recalling that one

5  correctly, it relied very heavily on the *Barbed-Wire* case

6  and said that oral testimony was not enough.

7        It has become quite clear that there was --

8  there is no other evidence other than the '196 patent

9  itself; and I think that causes plaintiff two problems,

10  one, should laches apply at this point.  We have an

11  application that was filed in 1992, and the patent issues

12  in 1994 with four individuals.  And then another patent,

13  the one that's in question here, is filed in 1997,

14  April 4th of 1997.  It's issued in 1999, but there is not

15  an attempt to correct it until 2003.

16        What's the exhibit with that application, the

17  2003 application for correction to the Patent Office?

18  What was the date that was filed?

19        MR. WARDEN:  September 15th, 2003, your Honor.

20        THE COURT:  Is that correct?

21        MR. RUDISILL:  I think that's the correct

22  date.

23        THE COURT:  Okay.  So -- and do you happen to

24  have the exhibit number, just for record purposes?

25        MR. RUDISILL:  Looks like it's a series of

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 103 of 199  PageID #:  8888
Hearing on Post-Trial Motions, Volume 1

103

1  exhibits.

2              THE COURT:  Well, just the first

3  application -- the earliest application that was made to

4  correct.

5              MR. WARDEN:  It's at the very end of

6  Plaintiff's Exhibit 8, your Honor.

7              THE COURT:  Okay.  Plaintiff's Exhibit 8.  I'm

8  just doing this for record purposes to make it easier to

9  find.

10             MR. RUDISILL:  That's correct.

11             THE COURT:  Okay.  So, that makes it over the

12  six-year period of time.  There hasn't been much excuse

13  given for why all this went on.  I mean, obviously the

14  Cummins -- the assignee of the patent and the people who

15  wound up -- Mr. Jones and Mr. Mennie who wound up being

16  named as the inventors on the '456 patent and the

17  Cummins-Allison Corporation itself would know that these

18  other individuals had worked with them, worked for them,

19  had been on this prior patent.  There was really no --

20  other than it is a mistake, that's not a whole lot of a

21  reason if you're looking at this from a laches point of

22  view.

23             So, it does seem to the court that there is an

24  unreasonable and unexcused delay in bringing a claim for

25  correction of inventorship.  I don't think defendant is

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 104 of 199 PageID #: 8889
Hearing on Post-Trial Motions, Volume 1

104

1  correct saying that that period then extends to when they

2  brought it in this court.  They brought it in the

3  other -- the other option they had.

4        And then the question becomes material

5  prejudice, economic or evidentiary.  There has been some

6  indication of economic prejudice in this case, namely,

7  the other -- the attempts by SBM to determine whether or

8  not there is validity or invalidity.  But clearly there

9  is evidentiary prejudice set out by the fact that

10  although there has been testimony that there were

11  diagrams, there were notebooks, there were physical

12  items, none of that is available today.

13        And oddly enough, I saw no indication that any

14  of it was presented to the Patent Office in 2003, which

15  was six years ago.  Makes you wonder what happened to all

16  of this because that was quite a bit closer to the time

17  in question.

18        But even -- so, I do find that there has been

19  this -- there was a delay in bringing the claim, that it

20  has caused to some degree economic prejudice to defendant

21  in their decisions.  But more precisely, there is

22  evidentiary prejudice because the evidence is not

23  available.

24        So, then I have to go ahead and decide whether

25  or not the delay and prejudice requires that the claim

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 105 of 199   PageID #:  8890
Hearing on Post-Trial Motions, Volume 1

105

1   for correction of inventorship be barred.  Here, of

2   course, we run into the policy that the waiver or loss of

3   rights granted by a patent because of a mistake is

4   generally to be avoided, if possible.  There are cases

5   upholding that, that you would normally tend to not want

6   to take away the rights granted by a patent.  Although

7   usually that is in terms of someone trying to come in and

8   invalidate a patent, I think the same law has to apply

9   both ways.  In this case it is being brought in by the

10  co-inventors themselves.

11          And, so, then we get back to this

12  corroboration problem; and, so, what I'm looking at,

13  then, is all that's left is the '196 patent itself.

14  There is no other corroborating evidence.  I have not

15  seen cases that address the precise issue.  I have found

16  a case that says an abandoned patent application could be

17  evidence of conception; it's insufficient to corroborate

18  testimony that the alleged prior inventor reduced the

19  invention to practice.  And this was stated in the *Martek*

20  *Biosciences Corporation versus Nutrinova, Inc.*, 579 F.3d

21  1363, Fed Circuit 2009; and I believe that was around

22  page 1374 to 1375 -- page 1375 of that particular case is

23  where that came.

24          And the *Sandt* case itself that I was talking

25  about had four different pieces of evidence that was

106

1  involved, including a patent application, a

2  contemporaneous letter, and invoices to purchase

3  housings, and then an affidavit; and that was found to be

4  enough.

5          However, we then get into the issue raised by

6  the *Eli Lilly and Company versus Aradigm Corporation*

7  case; and that's at 376 F.3d 1352, Fed Circuit 2004,

8  specifically at page 1359, where the court points out

9  that a joint inventor seeking to be listed must

10 demonstrate that his labors were co-joined with the

11 efforts of the named inventors.  And the court

12 specifically says that there must be some concerted

13 effort.  "Jointly" is not mere surplusage.  There must be

14 some joint behavior such as collaboration or working in a

15 common direction or working together, seeing or hearing

16 another's suggestion.

17         Keeping in mind that the burden is on

18 plaintiff, while I might think it is likely that they are

19 all at Cummins and, therefore, they probably saw each

20 other's work or they might have seen each other's work, I

21 did not hear very clear testimony from either Mr. Jones

22 or Mr. Mennie that they specifically worked with or

23 relied upon work done earlier by Raterman, Graves,

24 Stromme, or Bauch.

25         I mean, there was some discussion about, yes,

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 107 of 199 PageID #: 8892
Hearing on Post-Trial Motions, Volume 1

107

1  Mr. Stromme did the diagrams or might have done the

2  diagrams or Mr. Raterman might have done this or

3  Mr. Graves might have done that.  But I don't recall, and

4  counsel wasn't able to point me to, any testimony where

5  either Mr. Jones or Mr. Mennie said, "Here's where we

6  relied upon" or "We went back and looked at their work."

7  Because reading *Eli Lilly* generously, that might even be

8  enough, that they looked at past work, looked at past

9  reports, relied upon it, and then used that.

10          I didn't hear that testimony in here; and,

11  again, the burden -- the burden is clear and convincing

12  evidence on the plaintiff to show that the Patent Office

13  was wrong in determining who the inventors were and to

14  overcome that presumption.  The court finds very

15  definitely that it was not clear and convincing, but I

16  don't even think it rises to a preponderance of the

17  evidence standard that there was this kind of

18  collaboration as set out in the *Eli Lilly* case.

19          So, I don't find that the '196 patent standing

20  by itself, even with the testimony, is sufficient

21  evidence to corroborate the joint inventorship so that

22  there would be the correction.  I don't think there is

23  clear and -- I find there is not clear and convincing

24  evidence that the earlier four people contributed to the

25  conception of those claims.  It definitely doesn't meet

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 108 of 199 PageID #:  8893
Hearing on Post-Trial Motions, Volume 1

108

1  the clear and convincing standard, and I don't find that

2  it meets even the preponderance of the evidence standard

3  as to any of those four earlier individuals.

4          There is a final issue about correction under

5  256 isn't automatic; there has to be a demonstration by

6  Cummins that the error occurred without any deceptive

7  intent on the part of the unnamed inventor or even the

8  inventors.

9          I don't think there is any indication of any

10 deceptive intent on the part of Cummins.  No indication,

11 for example, that the two who were named got big bonuses

12 and they managed to cut the others out or something like

13 that under company policy.  So, I don't find any showing

14 of deceptive intent, should that be found.

15         But, finally, based on -- or in the final

16 analysis, for the reasons I stated -- first of all

17 because I think this is a case where laches should apply;

18 but even if it doesn't, the failure to show corroborating

19 evidence leads me to conclude that correction should not

20 be granted.  There is not joint inventorship here.

21         And as I said before, the '196, although it

22 might come close and it does seem to disclose -- good

23 argument could be made that it might disclose the 35 --

24 what's in the 35 claim of the '456 patent -- there is not

25 the evidence of the collaboration that is required under

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 109 of 199 PageID #:  8894
Hearing on Post-Trial Motions, Volume 1

109

1   the *Eli Lilly* case.  So, I am going to deny the motion to

2   correct inventorship.

3           I think that then has -- I'm sorry.  Is there

4   anything on that particular issue, either a finding of

5   fact or area of finding of fact or conclusion of law,

6   that the plaintiff thinks needs to be made by the court

7   to perfect its record?  If there is some part of this

8   discussion that I've missed, let me know.

9           MR. RUDISILL:  I guess nothing.

10          THE COURT:  All right.  From defendants' point

11  of view, any area of finding of fact or conclusion of law

12  that you think I have not considered or not addressed?

13          MR. WARDEN:  No, your Honor.

14          THE COURT:  Okay.  It's almost 12:00.  We're

15  going to break for lunch.  But I would note that this

16  appears that it's going to have an impact on the

17  discussions, then, on the motion for JMOL dealing with

18  priority date on the '456 patent.  Both sides might take

19  a look at their arguments on that if there are some

20  things that we can reduce or eliminate.

21          Obviously I'll follow along with my same

22  ruling on that.  I can't recall off the top of my head --

23  I've got it here in my notes -- if this eliminates it

24  entirely or it still needs to be dealt with.  But counsel

25  may want to think about that or even discuss it with each

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 110 of 199 PageID #: 8895
Hearing on Post-Trial Motions, Volume 1

110

1    other to determine what goes forward from there.

2    Obviously nobody has to agree with my ruling; but given

3    that ruling, I'm not going to change it when I go into

4    the priority date analysis.

5            We're going to be in recess, then; and I'll

6    ask you to be back at 1:15.

7            (Recess, 11:54 a.m. to 1:05 p.m.)

8            (Open court, all parties present.)

9            THE COURT:  All right.  Are we ready?

10           MR. HEARTFIELD:  Your Honor, if I could?

11           THE COURT:  Okay.

12           MR. HEARTFIELD:  I've been visiting with the

13   defendants about some of the impact on the inventorship

14   issues; and, so, as we appreciate it, by not allowing

15   correction on the inventorship, we lose our preferred

16   priority date.

17           THE COURT:  Correct.

18           MR. HEARTFIELD:  And then it ends up going to

19   the date the application was filed, in --

20           '95?

21           MR. RUDISILL:  '97.

22           MR. HEARTFIELD:  -- '97.

23           THE COURT:  Okay.

24           MR. HEARTFIELD:  And it seems that then --

25   we're trying to find a way to enter into a stipulation

1  with the defendants where the issue of invalidity of the

2  '456 is preserved on appeal in light of the Glory-100

3  that was seen at the Transit Authority.

4          And then if we can find a way to enter into

5  that kind of stipulation, preserving those issues for

6  appeal related to the inventorship, then the defendants

7  would forego presentation of evidence on inequitable

8  conduct and preserving their rights, if it ever came

9  back, to later, you know, reassert that affirmative

10 defense.

11         THE COURT:  All right.  Well, can you come up

12 with such an agreement, do you think?

13         MR. HEARTFIELD:  I think we can.  I just --

14 you know, that's right now my best way to articulate it;

15 and I'm trying to just ask the court for a little bit of

16 time so I can, you know, put a finer point on it.

17         THE COURT:  Okay.  So, let me understand.  You

18 obviously want to -- "obvious" is a bad word in this

19 context.

20         You, the plaintiffs, would like to be able to

21 appeal my ruling on the priority date, the corroboration,

22 the -- well, I guess -- and that really comes down to the

23 motion to correct inventorship and my findings as to

24 laches, lack of corroboration, and lack of evidence as to

25 collaboration.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 112 of 199  PageID #:  8897
Hearing on Post-Trial Motions, Volume 1

112

1            If you were able to prevail on that, then the

2    defendants would still want to be able to push forward

3    and say that -- well, if you prevailed on that one, then

4    you get the 1992 and Glory is not prior art.  If the

5    higher court upholds my ruling on that, then the question

6    comes down is Glory prior art.  Now, by date, it would

7    clearly be prior.  It's prior to 1997 because it was -- I

8    think the evidence there was uncontested.

9            Is there an issue then as to whether Glory

10   does, in fact, contain each of the elements, thus -- I

11   mean, I actually kind of wondered why it wasn't put in as

12   anticipating prior art.  It wasn't pled that way,

13   evidently.  But I think you can have obviousness with one

14   or more; it doesn't have to be.

15           So, is that your point?  I guess I'm just

16   trying to understand where we are or how -- you would

17   still -- I mean, they're going to want to argue, then,

18   that Glory makes it obvious or almost anticipates; so,

19   it's invalid.  And I guess then they also want, for

20   future purposes, to -- although that's only three

21   months -- argue that the conduct before the PTO was

22   inequitable in the rehearing.

23           We never did come up with a case that said

24   because someone -- if someone is inequitable in a

25   rehearing, it somehow taints the past, did we?

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 113 of 199 PageID #:  8898
Hearing on Post-Trial Motions, Volume 1

113

1        MR. ROGERS:  No.  We were hoping that you

2   would be the first to -- the case would become the

3   seminal case.  So, I think that's where we left off.

4        THE COURT:  Okay.  So, where are on the

5   agreement?  We can go on to other issues.

6        MR. ROGERS:  Well, let me see if we can nail

7   this down.  I think we can.  It will narrow the issues.

8        But the way I understood it was based upon the

9   court's ruling on the denial of the motion to correct

10  inventorship, that the plaintiff would stipulate that

11  they are not entitled to priority that they were trying

12  to get and they would be stuck with the --

13        THE COURT:  Application date.

14        MR. ROGERS:  -- filing date of the '456.  And,

15  therefore, because of the intervening prior art, the

16  GFR-100, they would stipulate to invalidity of the '456

17  patent.  And then as a part of that, we would agree --

18  the defendants would agree to defer the inequitable

19  conduct presentation of evidence in defense, that it

20  would only be necessary if their appeal of the

21  priority -- the court's inventorship correction decision

22  was reversed and then it came back to this court.

23        Is that...

24        THE COURT:  Is that pretty much what the

25  agreement would be, then?

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 114 of 199 PageID #:  8899
Hearing on Post-Trial Motions, Volume 1

114

1          MR. HEARTFIELD:  All of those issues would

2     have to be appealable, as well.  I mean, we're not

3     stipulating forever that it's --

4          THE COURT:  Well, I guess what I'm wondering

5     is if I don't rule on inequitable conduct -- if I don't

6     rule on inequitable conduct, how can anybody appeal?  If

7     I don't rule on Glory -- in other words, grant JMOL or

8     don't grant JMOL on the Glory obviousness -- because the

9     jury failed to find obviousness; so, I would have to

10    grant some kind of JMOL for it to be a change; or there

11    would be an appeal on the jury's verdict, one way or the

12    other.

13         MR. ROGERS:  Well, the way I understood the

14    proposed agreement was they would be not only

15    stipulating -- based upon the court's denial of the

16    correction of inventorship, the plaintiff would be

17    stipulating that they are not entitled to the earlier

18    priority date; and they would also need to stipulate,

19    then, the GFR-100 obviousness or anticipation issue.

20         Otherwise, you're correct, we would -- if we

21    don't have a stipulation from the plaintiff on the

22    invalidity based upon the GFR-100, then we would be

23    moving forward with our JMOL on that issue and then also

24    move forward with the inequitable conduct.  But we were

25    finding a way to -- we would defer the inequitable

1  conduct issue, but the GFR-100 would be a stipulation.

2  The effect of the priority date -- the effect of the --

3  there's two effects that there would be a stipulation on,

4  two effects from the denial of the --

5          THE COURT:  Let me see if this makes sense.

6  Do the two of you want to go out and talk about this a

7  little bit and see if there is something that you can

8  actually agree to that's going to actually save some

9  time?  Keeping in mind when I look at time, I also look

10 at the -- you know, if it's -- if there is a decent

11 chance I'm going to have to come back and do it anyway or

12 the higher court is likely to say, "Send it back and do

13 it anyway," we might as well do it now.

14          I mean, if that's a -- I don't know --

15 50 percent chance, you know, 50 percent likelihood, it

16 seems preferable to give the higher court the whole ball

17 of wax and then they are in a position then hopefully to

18 reverse and render if they're going to reverse or affirm

19 if they're going to affirm and avoid the "We'll have to

20 remand because the court didn't consider it."

21          So, if a couple of attorneys from each side or

22 an attorney on each side wants to go discuss that while

23 we take up some of these other issues, that's fine with

24 me.  I was going to go up into inequitable conduct next

25 because that was the one that might have some other

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 116 of 199   PageID #:  8901
Hearing on Post-Trial Motions, Volume 1

116

 1  evidence, but we could hold off on that and take up some

 2  of the other issues.  How would you like to do it?

 3           MR. HEARTFIELD:  I'm agreeable to that.

 4           THE COURT:  Okay.

 5           MR. ROGERS:  I don't want to leave the room.

 6  I don't want to miss anything.

 7           MR. HEARTFIELD:  I think that --

 8           MR. ROGERS:  Could we do it on the next break?

 9           MR. HEARTFIELD:  -- we can get it worked out.

10           THE COURT:  Well, if you think you can do it

11  on a break, sure.

12           MR. HEARTFIELD:  Let's do that, your Honor.

13           THE COURT:  All right.  In that case, just to

14  clear things up, there are a number of motions on the

15  part of defendant for JMOL as to willfulness that were

16  still pending.  However, the jury failed to find

17  willfulness; so, the defendants' motions are denied as

18  moot.

19           I don't recall a motion for JMOL -- is there a

20  pending motion from plaintiff to find willfulness?

21           MR. RUDISILL:  I don't think so.

22           THE COURT:  I don't think so.  Okay.

23           MR. WARDEN:  I don't recall anyone's motions

24  along --

25           THE COURT:  Okay.  So, I think the defendants'

1  motions for the court to find lack of willfulness as a

2  matter of law is moot.  That's what the jury -- the jury

3  failed to find it.

4          I will note for the record that I think there

5  is substantial evidence to support the jury's finding, in

6  particular the testimony of Mr. You and the gentleman

7  from Amro, the other -- Amro-Asian company, Mr. Siddiqui.

8  Especially Mr. You, I thought, was quite credible.  He

9  could have been mistaken, as the jury found out, as to

10 whether or not he was infringing; but he was quite

11 credible in his belief that he was copying or using fax

12 technology from his previous employer, that he was using

13 different algorithms which -- at one point I think he

14 almost recognized that the plaintiff's system might even

15 be slightly better and, therefore, he had to do more

16 checking and so forth.

17         There was discussion of them looking at the

18 patents.  There was evidence that they didn't go and get

19 their own patent opinion, but that is not the be-all and

20 end-all in this area of the law.  And Mr. Siddiqui did,

21 in fact, have some consultation with -- and I can't

22 remember if it was one of his -- the people he was

23 supplying to or -- there was another company that he had

24 worked with or worked for.  Their lawyers had looked at

25 it.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 118 of 199 PageID #:  8903
Hearing on Post-Trial Motions, Volume 1

118

1      So, all in all, when you take a look at what

2  is involved in willfulness -- and in particular with

3  Mr. Siddiqui when he talked about looking at the patents,

4  looked at the technology, he seemed familiar with the

5  patents.  It didn't seem to be something he was making

6  up.  Plaintiff's Exhibit 49, the letter that he wrote --

7  or it was an email that he wrote.  He actually set out

8  the proper steps for claim analysis and then what it went

9  through.

10      His references to manuals and other technology

11 that was there, such as Defendants' Exhibits 56 and 68,

12 Defendants' Exhibit 291 that Toshiba -- I think that --

13 and then you take a look at Mr. You who talked about

14 looking at technology from any number of Asian

15 manufacturers.  He might have almost admitted that he

16 copied from some of them.  But their patent laws are

17 different, and that's not what concerns here.  The

18 question is was he looking at the Cummins, and he seemed

19 pretty definite on that.

20      It doesn't seem that there could be a -- and

21 the jury did not find and I think it is supported that

22 there wasn't sufficient evidence to find objective

23 recklessness, although that's the threshold test.

24      And then the idea that there was -- or to put

25 it differently, I don't think there would have been

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 119 of 199 PageID #:  8904
Hearing on Post-Trial Motions, Volume 1

119

1  sufficient evidence to find that there was an objectively

2  defined risk that was either known or so obvious that it

3  should have been known, especially not on any kind of a

4  clear and convincing standard.

5         So, that takes care of the willfulness.

6         Then we have the '806 patent.  If I recall

7  correctly, the defendants' motions for JMOL on claims 58,

8  85, and 120 of the '806 patent were denied on the record,

9  at least as to noninfringement, and that the plaintiff's

10  motions for JMOL for infringement was granted.  Is that

11  what counsel remember?  Because I think it was clear that

12  there was -- that the accused devices practiced what was

13  taught in claim 58, 85 and 120 of the '806.  Is that how

14  you recall the record on defense side?

15         MR. WARDEN:  That's how I recall it, your

16  Honor.

17         THE COURT:  Okay.

18         MR. FOOTE:  Yes, your Honor.

19         THE COURT:  Okay.  So, infringement is out of

20  the way; and then what we have left, then, is defendants'

21  JMOL for obviousness on these.  And what I recall -- and

22  I'll give you a chance to add -- is that defendants

23  relied on the Jones and O'Maley patents and then the

24  Mosler CF-400 Parts Catalog and Toshiba CF-401

25  Specification plus Emery's testimony that it would have

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 120 of 199 PageID #:  8905
Hearing on Post-Trial Motions, Volume 1

120

1  been obvious to increase speed.  Is there any other --

2  that would have been, in summary, the basis for your

3  JMOL, isn't it?

4            MR. WARDEN:  That's correct, your Honor.

5            THE COURT:  Those two combinations.

6            MR. WARDEN:  Yes.

7            THE COURT:  Okay.  Plaintiff, I think, had a

8  JMOL that the Mosler CF-400 currency sorter catalog and

9  the Specifications were not printed publications.  I

10  think, given the instructions, that that actually would

11  wind up being moot because the jury went ahead and agreed

12  with your position.  So, your motion -- I don't -- I

13  mean, it may not have been as a matter of law whether

14  they were printed publication; but the jury sure found

15  it.  So, for the record and to be sure all motions are

16  taken care of, I'm going to deny plaintiff's motion on

17  printed publication as moot.  The jury has already gone

18  with you on that one.

19            As far as whether or not JMOL should be

20  granted as to the invalidity, in view of the jury's

21  failure to find...

22            (Discussion off the record between the court

23  and law clerk.)

24            THE COURT:  Okay.  I'll note, of course -- and

25  I don't think I've gone into this -- for the record, that

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 121 of 199 PageID #:  8906
Hearing on Post-Trial Motions, Volume 1

121

1   a judgment as a matter of law is granted where there is

2   no legally sufficient evidentiary basis for a reasonable

3   jury to find for the party on an issue.  We see that in

4   the *Reeves versus Sanderson Plumbing* case, 530 U.S. 133,

5   page 150, 2000.

6            I think many of the cases are misleading in

7   that they always talk about there must be substantial

8   evidence to support a jury's finding.  But when a party

9   has the burden of proof and there is no evidence at all

10   presented and the jury fails to find on that issue, then

11   I think the jury's verdict can be upheld.  It's almost so

12   basic as to not be said.

13            But almost every case I've seen says there

14   must be evidence to uphold the jury's verdict and I think

15   that's misleading because if party X has the burden of

16   proof and both parties sit quiet the whole time and no

17   evidence is presented, at the end of the case the jury

18   says no, it hasn't been proved, there doesn't have to be

19   evidence supporting the jury's verdict.  There is no

20   evidence at all.

21            But I'm not on an appellate court, and I can't

22   correct the way they always say it that way.  But I think

23   it's important because in this case the burden of proof

24   was on defendants by clear and convincing evidence, which

25   means that there has to be clear and convincing evidence

1  to show that the jury was wrong.  In effect, there has to

2  be a showing of that.  And if the jury found there was

3  not clear and convincing evidence, it may just be they

4  found no evidence at all.

5        But looking at the -- in this particular case,

6  the '806 and these others, obviousness ones, of course

7  the determination of whether something is obvious is a

8  legal conclusion based on underlying facts.  And the jury

9  was instructed, I think adequately, on the facts that

10  they were to look at; and they were instructed on the

11  level of ordinary skill in the art and to look at the

12  differences.

13        And then we have the objective evidence of

14  nonobviousness.  So, we have, first of all, Mr. Emery

15  saying that every element is there for the '806 and that

16  it would have been obvious to increase the speed.  But

17  the big question there in the court's mind under

18  nonobviousness, if it was so obvious to increase the

19  speed, why wasn't it done earlier?

20        There was a good deal of testimony this is

21  just not a matter of speeding up the drum and rotating to

22  make the paper move faster.  Each bill had to be held in

23  place for one-sixth or one-tenth of a second and then

24  moved along and while it was there for that one-sixth or

25  one-tenth of a second, depending on how fast the thing

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 123 of 199 PageID #:  8908
Hearing on Post-Trial Motions, Volume 1

123

1  was moving, a reading had to be taken so that the bill

2  couldn't be moving too much and it couldn't be slanted

3  too much -- it's light coming and reflecting off -- and

4  that that seemed to be really the true essence of this

5  invention is moving it through at that kind of speed and

6  still getting accurate readings out of it.

7           There was plenty of evidence that there were

8  machines who could move paper faster than 800 bills a

9  minute or 1,000 bills a minute; but there was not

10 evidence that anything prior had managed to move them at

11 that speed and, at the same time, take these highly

12 accurate readings with the light scan --

13          I'm sorry.  Were you going to add something

14 or --

15          MR. WARDEN:  No, your Honor.  I'm just

16 listening.

17          THE COURT:  Okay.  Well, you were standing.  I

18 just wanted to be sure.  I wasn't going to cut you off.

19          The next item, of course, on secondary

20 conditions of nonobviousness is when this came out, there

21 was testimony -- well, first of all, it was controverted

22 whether it would have been easy to increase it because as

23 Mr. Bauch pointed out, the increase in speed would be

24 something on the order of 33 percent.  There was some

25 disagreement there between the experts; but I think

124

1    mathematically or arithmetically, Mr. Bauch might have

2    been a little more correct.  That's a pretty heavy

3    increase in speed, not a token 5 or 10 percent increase.

4    You go from 600 bills a minute under old art to 800 bills

5    a minute under this, that sure looks to me to be about a

6    third increase, a 33 percent increase.

7              And then there is the question of -- and there

8    was testimony from a couple of witnesses -- at least one

9    witness about -- I think Mr. Mennie was the one who

10   testified on this; and I think this would have been on

11   the afternoon of the sixth day, October 5th -- that there

12   was very good reaction from the customers when those

13   machines came out.  So -- and that's one of the factors

14   of nonobviousness is the acceptance in the marketplace.

15             And then there is the commercial success in

16   the marketplace related to the patented art.  It wasn't

17   just that they were pretty machines, that they were fast,

18   accurate machines, which is how they were patented.  So,

19   I think that while there was -- that the defendants did

20   try to present some testimony -- or presented testimony

21   through Mr. Emery to the contrary, especially given the

22   fact that they had the burden of proof by clear and

23   convincing evidence, that the jury's failure to find

24   invalidity on the '806 is supported.

25             It's supported by -- directly, I think, by the

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 125 of 199 PageID #: 8910
Hearing on Post-Trial Motions, Volume 1

125

1  testimony of Mr. Bauch and then by the secondary

2  considerations of nonobviousness, in particular, the

3  long-felt need but nobody had one.  It finally does come

4  out.  It's highly commercially successful.  It's well

5  received in the market.  I mean, I don't recall any

6  testimony, for example, of it went contrary to whatever

7  the people wanted or had unexpected results.  But you

8  don't have to get every single one of the secondary

9  conditions of nonobviousness.  Several of them were

10  there.  So, I'm going to deny the JMOL as to the '806

11  patent on invalidity.

12         And then we also had -- well, the

13  noninfringement was already denied.  Obviousness -- I

14  think that takes care of the '806.  Any further areas as

15  far as findings of fact or conclusions of law that the

16  plaintiffs think are needed to preserve any kind of

17  record as far as the motions on the '806?

18         MR. FOOTE:  No, your Honor.

19         THE COURT:  Defendants?  Any area that I may

20  have missed or failed to address in your motion?

21         MR. WARDEN:  None that I can think of, your

22  Honor.

23         THE COURT:  All right.  Then we go to the

24  '503.  All right.  So, we have defendants' judgment as a

25  matter of law for noninfringement of the '503 patent,

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 126 of 199 PageID #:  8911
Hearing on Post-Trial Motions, Volume 1

126

1 claim 15.  This, of course, is the claim dealing with the

2 basically counterfeit detection.  And Stevenson was, if I

3 recall, one of the main witnesses that plaintiff had

4 about the -- giving the opinion that the SB-1000+, the

5 SB-1000 SF, the SB-1100, and the SB-1800 infringed

6 claim 15 of the '503 patent.

7          Again here -- and I'm not going to recite the

8 standard for review of a JMOL again.  That's set out at

9 great length.  I don't think there is a need for me to

10 repeat myself or even go into more detail.

11          But, again, the plaintiff had the burden of

12 proof by preponderance of the evidence on this.  So, here

13 we are looking at did the plaintiffs present substantial

14 evidence, in other words, enough evidence that at least

15 reasonable persons could disagree about it.  We have the

16 testimony of --

17          Is it Dr. Stevenson or mister?

18          MR. RUDISILL:  Doctor.

19          THE COURT:  -- Dr. Stevenson that he found

20 that each of those products did, in fact, infringe

21 claim 15.  And this occurred actually on the, I believe,

22 second day of trial, maybe in the morning.  He pointed

23 out, for example, that the SBM machines had the screen

24 and keyboard that performed the function of selection,

25 and he pointed out that that was in the patent.  He

1  pointed out there was storage.  He points out that the

2  arguments dealing with different uses of light don't bar

3  it from infringing.

4          The big issue here, I think, probably goes to

5  the difference in algorithms.  And Dr. Stevenson went

6  through his opinion -- it was under cross-examination;

7  and then, of course, there was contrary evidence, I think

8  from Mr. You especially, on this infringement area.

9          And I'll have to point out that one of the

10  problems we have here, of course, is the language

11  problem.  The jury, I think, is entitled to rely on what

12  they hear.  And I will note that even though I had

13  studied these patents and the information in the briefs

14  and I've spent a good deal of my life overseas and I'm

15  very, very used to listening to people from other

16  countries and, in my experience, can probably pick up

17  strange accents better than most Americans, I was having

18  a great deal of trouble understanding Mr. You; and I

19  think I understood most of what he said.

20          I will also note for the record that the court

21  reporter, who I think is one of the best in the

22  business -- that transcript looks much clearer than what

23  was heard because she also -- and I'll note this for the

24  record -- reads the tech synopsis, reads quite a number

25  of the patents, will read the information, looks things

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 128 of 199 PageID #:  8913
Hearing on Post-Trial Motions, Volume 1

128

1 up, asks questions of lawyers and the law clerks

2 afterwards to make sure that record reads very clearly.

3 And it would almost be -- I don't know how to handle this

4 problem.  It's come up before when the transcript sounds

5 better than the witness actually testified.  That

6 transcript was probably a clearer rendition of what

7 Mr. You said than many of the jurors could understand

8 because she does have the ability to go do that, and she

9 had studied the items in advance.

10          But, nevertheless, I think the jury is

11 entitled to make credibility determinations.  They

12 obviously did not simply ignore Mr. You because they went

13 ahead and went with defendants on the willfulness issue.

14 They were -- this jury worked for 11 hours after we

15 released them.  They worked long and hard at it; and I

16 find no indication that they ignored his testimony

17 entirely because they did, in fact, go ahead and rule for

18 defendants on willfulness -- or failed to find for

19 plaintiffs on willfulness is the correct way of putting

20 it.

21          But in the end, I think the jury is entitled

22 to weigh the testimony of Mr. Stevenson, weigh the

23 testimony of Mr. You -- and I think Mr. Emery came in on

24 it some -- and make their decision.  So, I believe there

25 was enough evidence in the record to support the finding

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 129 of 199 PageID #:  8914
Hearing on Post-Trial Motions, Volume 1

129

1  of infringement as to the '503, claim 15.

2          Then we have the motion for JMOL on

3  obviousness of the '503 patent, claim 15.  And here we

4  have Mr. Emery -- the big evidence -- and I think

5  defendant relied on the JetScan 4061.  That was sold

6  April 20th, 1993.  In this particular case, if I recall,

7  the priority date of the patent is agreed being June 23,

8  1995; so, the JetScan 4061 was at a prior date.  The

9  questions is:  Is it prior invalidating art?  Again, a

10 problem with our terminology.  All prior art is not

11 necessarily prior invalidating art.

12         But Mr. Emery testified that claim 15 was

13 obvious in light of the 4061.  There was

14 cross-examination by Mr. Foote pointing out that claim 15

15 requires one or more detectors for retrieving a plurality

16 of types of characteristic information.  The JetScan only

17 used magnetic, not magnetic and light -- ultraviolet or

18 other kinds of light detectors.

19         Of course, in this particular case, since

20 we're talking about obviousness, the burden is on

21 defendant by clear and convincing evidence.  I think the

22 jury is entitled to look at that pretty rigorous

23 cross-examination of Mr. Emery and weigh his testimony

24 and decide whether or not they accepted it to a clear and

25 convincing standard.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 130 of 199 PageID #:  8915
Hearing on Post-Trial Motions, Volume 1

130

1          There was an issue there; I'll grant that.

2   But I believe that the jury was entitled to find that it

3   wasn't clear and convincing on that point, that there was

4   a question about magnetic versus ultraviolet and so

5   forth.  And it doesn't do for later on for different

6   testimony or different things than they were told to be

7   brought forward and say, "Oh, they made a mistake."  So,

8   I'm going to deny the JMOL for obviousness as to the

9   '503.

10          Finally, there was a plaintiff's JMOL for

11  validity of the '503.  I'll deny that as moot.  Again, I

12  think that was something that the -- it's obviousness.

13  While, yes, in the end it's going to be a matter of law

14  that's based on the underlying factual determinations and

15  I think I have to give some weight to what the jury

16  found -- that's why I submitted it to the jury.  I wasn't

17  going to grant JMOL of validity to plaintiff.  I'll deny

18  their motion as moot, and I'm going to deny defendants'

19  motion that it was obvious on the grounds stated.

20          All right.  From plaintiff's point of view,

21  any other factor -- either finding of fact or conclusion

22  of law -- that you think I need to address as far as the

23  '503?

24          MR. RUDISILL:  No, sir.

25          THE COURT:  From defendants' point of view?

1           MR. WARDEN:  Yes, your Honor.  I guess I'd

2  like to go back to one of the limitations in the '503

3  patent.

4           THE COURT:  Okay.

5           MR. WARDEN:  This is claim 15.  I think what

6  we're focused on here for our JMOL is this means for

7  comparing limitation.  And what we're saying in our

8  motion for judgment as a matter of law is that there

9  was -- wasn't any legally sufficient evidentiary basis to

10  find infringement.  Of course, infringement is

11  plaintiff's burden in this case.

12           And the reason for that is because

13  Dr. Stevenson, when he testified as to this means for

14  comparing limitation from claim 15 of the '503 patent, he

15  only testified that the defendants' accused machines

16  performed one half of one sentence of a portion of an

17  algorithm in the '503 patent.

18           And then if we look at even the whole sentence

19  of that portion of one algorithm, even that whole

20  sentence, defendants' machines clearly don't perform the

21  whole sentence, much less do they perform the whole

22  algorithm.

23           I think this is -- it appears to be a matter

24  of Dr. Stevenson mistakenly assuming his own claim

25  construction for this means for comparing limitation.

132

1  Now, on that basis, there was no sufficient evidence for

2  the jury to find infringement, to satisfy the plaintiff's

3  burden.

4         THE COURT:  Okay.  So, what we're looking at

5  here is the court's definition of means for comparing.

6  We have the function, which I think was pretty

7  straightforward; and then there is the structure which I

8  said had to be the microprocessor 12 executing at least

9  one of the algorithms described in Column 12, line 41,

10 through Column 13, line 9, and Column 18, line 45 through

11 Column 19, line 67, correct?

12         MR. WARDEN:  That is correct, your Honor.

13         THE COURT:  Okay.  And, so, the issue was --

14         MR. WARDEN:  I guess the issue, if I could

15 paraphrase it for the court, is whether Dr. Stevenson

16 even put on evidence that defendants' accused machines

17 perform even one of those algorithms.

18         THE COURT:  Well, take a look, for example --

19 and this, you know, obviously -- and I will grant both

20 sides that on almost any one of my rulings, arguments

21 might go the other way.  But here we're talking about was

22 there substantial evidence to support the jury's finding.

23         And if you take a look at Column 12 of the

24 '503 patent -- and I'm looking starting at line 41.

25 You've got total magnetic thresholds of various

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 133 of 199   PageID #:  8918
Hearing on Post-Trial Motions, Volume 1

133

1  denominations.  You've got various degrees of sensitivity

2  selectable.  The information there is set out.  But if we

3  go down through this, I don't see that his testimony

4  could not be accepted as performing the algorithm.

5            Now, I understand that there are some

6  different mathematical differences; but there was -- but

7  what his testimony was was -- if I recall -- was that the

8  exact arithmetic differences -- and you were talking, I

9  think, about multiplication and division; and he was

10  talking about subtraction or *vice versa*.  I mean, there

11  were slight differences there.  His testimony was -- is

12  that it was insubstantial.

13            There was some cross-examination about isn't

14  this a little bit more complicated; and I remember

15  counsel worked at trying to make it appear more

16  complicated by showing the mathematical calculations that

17  might be set up, in other words, the more precise

18  formulas that one might have to use.

19            MR. WARDEN:  Your Honor, I --

20            THE COURT:  But the fact that you can depict

21  these on a sheet of paper in very complicated-looking --

22  or formulas that look very complicated to those who are

23  not used to math when the experts are saying, well,

24  actually that's pretty simple, that's just, you know,

25  symbolism for something that's similar, I believe that

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 134 of 199 PageID #:  8919
Hearing on Post-Trial Motions, Volume 1

134

1   there is enough there.  I'm not saying you don't have an

2   argument, but I'm just saying that it seems to me that I

3   listened to the testimony.

4           They're entitled to listen to the witnesses

5   and decide which of them they believe when one

6   mathematician or engineer says something is insubstantial

7   or a difference is insubstantial or they say that this is

8   a very similar or an insubstantially different

9   mathematical operation.

10          I'm not sure what else -- I mean, I think I

11  understand the point you're making.  And it was obviously

12  the big point at trial was that the algorithms are

13  different; therefore, we must not infringe.

14          MR. WARDEN:  Yes, your Honor.  The issue about

15  different mathematical steps or the different math

16  symbols, I believe the court's referring to the signal

17  processing means limitation; and that comes from the '354

18  patent, claim 55.

19          THE COURT:  All right.

20          MR. WARDEN:  Regarding claim 15 of the '503

21  patent, I guess the court first mentioned the Table 1

22  discussion here.  And Dr. Stevenson never -- he never

23  testified about any aspect of Table 1.  The only place

24  that Dr. Stevenson testified, the only algorithm or

25  portion of algorithm that Dr. Stevenson testified to was

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 135 of 199 PageID #:  8920
Hearing on Post-Trial Motions, Volume 1

135

1 at Column 19, lines 61 through 67 of the '503 patent.

2 And there is a sentence there beginning at line 61 that

3 says, "In performing the UV test according to one

4 embodiment, the no bill reflectance value is subtracted

5 from reflecting UV reflectances voltages associated with

6 the scanning of a particular bill; and this difference is

7 compared against the appropriate threshold such as those

8 in Table 3."

9          Dr. Stevenson's testimony was that he didn't

10 even consider -- when we look at this particular

11 sentence -- he didn't even consider the whole sentence.

12 Dr. Stevenson testified that all defendants' machines

13 did, the algorithm used in defendants' accused products,

14 that they just compared one value to another value, not

15 that defendants' -- not even that defendants' machines

16 compared a difference or a subtracted difference in

17 values.  And, your Honor, that was virtually the only

18 evidence of this means for comparing limitation.  In

19 essence, it turns it into an essentially claim

20 construction issue.

21          THE COURT:  All right.  And I'm looking at --

22 and, again, this would have been the rough transcript;

23 but it would have been on September 29th.  So, this would

24 have been the afternoon of the second day when

25 Dr. Stevenson was testifying; and he was talking about

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 136 of 199   PageID #:  8921
Hearing on Post-Trial Motions, Volume 1

136

1  the averaging process.  And I also think --

2         Okay.  The trial transcript at pages 355 -- I

3  think this is -- yeah -- page 355, line 4, through about

4  page 359, line 16.  He went through the source code

5  trying to identify identical structure in the plaintiff's

6  products performing the function and talks about

7  differences in details which he said were insubstantial.

8         And I guess, you know, your argument is that,

9  well, this -- and he's focusing in this one area, the

10 subtraction being different than what they have.  And I

11 think there is evidence there that the jury could believe

12 that it is basically a very insubstantial difference on

13 that part of the algorithm.  I mean, I do understand; and

14 it was at least pretty clear to me that that was a main

15 part of your attack.  But in the end, it seems that the

16 jury is entitled to believe that.

17        So, I think that there is testimony from him

18 on this point; and the question is whether the jury is

19 entitled to believe that testimony or whether other

20 mathematicians can now come in, testify to me or to a

21 higher court, and try to make different proofs based

22 purely as what you're saying as claim construction or as

23 a matter of law.

24        Do I, as a matter of law, now go back -- and I

25 guess after the hiring of a mathematician/technical

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 137 of 199 PageID #:  8922
Hearing on Post-Trial Motions, Volume 1

137

1  advisor -- go in, run through the mathematics, and make a

2  determination?  It is perhaps possible that it is that

3  clear to a mathematician.  It wasn't made that clear

4  through the testimony before the jury.  And, again, since

5  this is infringement, it is a matter of fact for the

6  jury.

7          I don't know how much better or clearer than

8  that I can say it.  I think I understand the argument

9  you're making.  But I think there is a difference between

10 saying, "Well, this is a matter of claim construction"

11 which was not asked for of the court prior to trial and

12 then saying that, "Well, mathematically you ought to be

13 able to take notice that mathematically it's different,"

14 when it went to the jury on the basis of examination,

15 cross-examination, and maybe some rebuttal testimony.

16         MR. WARDEN:  Yes, your Honor.  I think our --

17 boiled down to its essence, I think our argument is that

18 there was no legally sufficient evidence as a matter of

19 law because Dr. Stevenson did not follow the court's

20 claim construction.

21         THE COURT:  Okay.  And I will disagree with

22 that.

23         MR. WARDEN:  Yes, your Honor.

24         THE COURT:  I mean, your point is preserved;

25 and it's not -- I guess my question is:  Are there any

1 other findings you want to make?  I've tried to set out

2 the portions of the transcript and record that I've

3 looked at --

4 　　　　　　MR. WARDEN:  Yes, your Honor.

5 　　　　　　THE COURT:  -- when I was reviewing this to

6 show where I think it comes in.

7 　　　　　　MR. WARDEN:  Yes, sir.

8 　　　　　　THE COURT:  And it's possible that the

9 plaintiffs have other portions of the record to point

10 out.  But it doesn't appear to me to be so clear as to

11 say, well, there was nothing the jury could have gone on

12 or no substantial evidence, as that's defined, that the

13 jury could have gone on to uphold their verdict.

14 　　　　　　MR. WARDEN:  Yes, your Honor.  There are two

15 real quick points that --

16 　　　　　　THE COURT:  Okay.

17 　　　　　　MR. WARDEN:  -- that we'd like to make.

18 　　　　　　The one is, first, even with respect to this

19 Table 3 algorithm that Dr. Stevenson testified, we

20 pointed out at trial that this Table 3 algorithm requires

21 two tests, a UV test and a fluorescent test.

22 　　　　　　And we also pointed out -- and this is the

23 testimony of Mr. You, uncontroverted testimony -- that

24 the accused products entirely lack fluorescent sensors --

25 and this is the accused SB-1000 and 1000+ products --

1   that they entirely lack one of the required sensors of

2   the Table 3 algorithm, the only algorithm that

3   Dr. Stevenson discussed at trial.

4           And with all candor, your Honor, the SB-1100

5   and 1800 products do have one of these fluorescent

6   sensors.

7           THE COURT:  All right.

8           MR. WARDEN:  Absent some evidence that the

9   accused products, the 1000 and 1000+, have at least a

10  fluorescent sensor or substantially similar sensor, the

11  products can't infringe as a matter of law; and no

12  reasonable jury could find infringement.

13          THE COURT:  Okay.  I understand the argument

14  you're making.  Are there any other findings of fact,

15  though, that you want me -- I mean, an area that I've

16  missed entirely?  I mean, I understand that I may have

17  ruled against you --

18          MR. WARDEN:  Yes, your Honor.

19          THE COURT:  -- on an area.  But is there some

20  argument you've made that I did not address at all?

21          MR. WARDEN:  There may only be one more.

22          THE COURT:  Okay.

23          MR. WARDEN:  And that's with respect to the

24  issue of validity for claim 15 of the '503 patent.

25          THE COURT:  Right.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 140 of 199 PageID #:  8925
Hearing on Post-Trial Motions, Volume 1

140

1            MR. WARDEN:  I'll just make this for purposes

2    of the record here.

3            The only evidence of nonobviousness that the

4    plaintiff put on -- and, again, this is, you know, what

5    the courts refer to as "secondary indicia of

6    nonobviousness," for example, commercial success, praise

7    by others, copying, all of these factors that there was a

8    lot of testimony about at trial.

9            Well, if we look at the requirements under the

10   case law, in order for these secondary indicia to have

11   some relevance to the issue of obviousness, there has to

12   be some nexus or some connection between the claim

13   limitations and the secondary indicia of nonobviousness.

14   There has to be some connection between commercial

15   success and the claim limitations.  There has to be some

16   connection between copying and the claim limitations.

17           And for this particular claim more than any

18   others, claim 15 of the '503 patent, there was no

19   testimony that had a nexus to claim 15 of the '503

20   patent.

21           Commercial success, your Honor, was based on

22   small size, fast speed -- I don't know if there was

23   another one, but those are the only ones that I recall.

24   Copying was, again, you know, small size and fast speed.

25   But we never did see any of these secondary indicia of

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 141 of 199 PageID #: 8926
Hearing on Post-Trial Motions, Volume 1

141

1  nonobviousness that relate to or that have some nexus to

2  the counterfeit detection techniques in claim 15.  That

3  was the only point that we wanted to raise with respect

4  to invalidity, and this is claim 15.

5          THE COURT:  Right off the -- and I think one

6  of the things that perhaps I'm -- actually, I think I'm

7  remembering it correctly.  There was discussion about

8  this particular machine's ability to pull out -- or to

9  detect, if I recall, what are called the "supernotes,"

10  the very sophisticated counterfeits, praised for that,

11  the ability to do that.

12          And, again, I think the -- I mean, the

13  commercial success on these machines with them having --

14  what -- 80 to 85 percent -- 80 percent of the market and

15  you having -- what was it -- 80 percent, 15 percent, and

16  everybody else gets 5 or something like this?  That's a

17  pretty good indication of commercial success.

18          In terms of the copying or attempts to --

19  unsuccessful attempts by others to design around, for

20  example, although I didn't allow it into the jury so it's

21  not for the jury's consideration, fair amount of evidence

22  that I did keep out about other companies attempting to

23  do the same thing and then having to back out.

24          Now, of course, there's all kinds of reasons

25  they could back out; but I've got to say I disagree on

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 142 of 199 PageID #: 8927
Hearing on Post-Trial Motions, Volume 1

142

1    the idea that there are no secondary considerations of

2    nonobviousness that would not come into play here.

3            MR. WARDEN:  Yes, your Honor.

4            THE COURT:  Okay.  And, in particular, I think

5    they're -- I can't pull to mind right now who talked

6    about the ability.  It was one of, I believe, the

7    plaintiff's early witnesses that talked about the ability

8    to pick up those supernotes and so forth.

9            All right.  So, that takes care of the '806

10   and the '503; and then we have the '354.  And, again,

11   this patent was covered in some detail by Mr. Bauch, as I

12   recall.  Now, as far as defendants' motion for

13   noninfringement, that's a question of fact.  Plaintiff

14   has the burden of proof by preponderance of the evidence.

15   The question is was there substantial evidence, enough

16   evidence so that reasonable minds could differ, to

17   support the jury's finding of infringement.

18           I think that Mr. Bauch went into this in great

19   detail.  I think Mr. DiBlasio covered it to some degree.

20   Mr. You, I think, tried to testify about profiles being

21   stored in the CPU, that there were 64 master patterns and

22   a difference in how many places on the bill that his

23   system took data from.  And it started off with talking

24   about 70,000 points; but in actuality it was quite a bit

25   lower than that.  And, so, they're taking it from several

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 143 of 199 PageID #:  8928
Hearing on Post-Trial Motions, Volume 1

143

1  places; and they're doing more comparisons.  And then

2  again we get to that same algorithm problem.

3          But, again, we have -- and this would have

4  been on the morning of the third day, September 30th,

5  with Mr. Bauch testifying going over Plaintiff's

6  Exhibit 9 and claim 55.  And he talked about running the

7  machine himself, putting the bills in the hopper; gave

8  evidence about while a lot of points may be scanned, it

9  is really reduced down to quite a smaller number; and

10  gave testimony that the comparison basically winds up

11  pretty much -- well, that it compares just like the

12  patent.  The SBM products, the accused products, are

13  comparing the same way that is taught or in a way that is

14  equivalent to what is taught in the patent.

15          And, in fact, that's what the jury winds up

16  finding is that it is an equivalent method.  Even if the

17  algorithm may be not exactly the same, it is an

18  equivalent method going -- or an equivalent device that

19  is using equivalent elements or steps to go through it.

20          As Mr. Bauch pointed out on that same day

21  about these are both -- I mean, the patent teaches and

22  the accused devices perform a relatively simple

23  mathematical operation and then take the points and come

24  up with the comparisons.  And he talks about the methods

25  essentially doing a very, very similar function, taking

1  two sets of data, performing the mathematical operation.

2          So, I think that there is substantial evidence

3  based on the testimony of Mr. Bauch, which I thought was

4  more detailed and more understandable than the testimony

5  of Mr. Graves and Mr. DiBlasio who gave their opinions.

6  Although those opinions might have been a little

7  conclusory, Mr. Bauch's was in quite a bit more detail.

8          When we get into the validity, here we're back

9  to a priority date question and this question on

10  dimensions.  If I'm recalling what we're talking about

11  here on your JMOL, you're trying to say that the earlier

12  specification doesn't disclose the dimensions?  Is

13  that your argument?

14          MR. WARDEN:  Yes, your Honor.  I think the way

15  it came out at trial was that there are two different

16  things going on for invalidity of the '354 patent,

17  claim 55.  One was based on this earlier priority date

18  issue, and we were asserting that -- or plaintiff

19  initially asserted that claim 55 had a priority date all

20  the way back to February of 1990, the original

21  great-great-grandfather patent application.

22          And at trial at some point, the plaintiff made

23  the alternative argument that, no, it should be June --

24  what was it -- March 7th of 1995.  So, there was a switch

25  in priority dates there; and that is actually what

145

1  prompted the focus, instead of the JetScan 4062, on the

2  JetScan 4061.

3       So, if the court recalls, this is the shift in

4  prior art, shift in priority date that kind of caught

5  everyone off-guard at trial.  I think that required, you

6  know, addressing kind of on the fly.

7       THE COURT:  Well, what is it you're saying is

8  the basis for JMOL of invalidity on the '354?

9       MR. WARDEN:  Yes, your Honor.  It's because

10 the JetScan 4061 was acknowledged to be on sale by

11 April 20th of 1993 which, given the plaintiff's admitted

12 priority date, makes it prior art to the JetScan 4061 as

13 prior art.  And we walked Mr. Emery through every

14 limitation of claim 55 of the '354 patent and found it

15 present in the JetScan 4061.

16      Now, one real key distinction on the

17 invalidity analysis of this claim 55 -- and this was the

18 signal processing means limitation -- is that plaintiff

19 stipulated that the JetScan 4061 included the signal

20 processing means, this means-plus-function correlation

21 algorithm -- that the JetScan 4061 included that

22 limitation, which left the issue essentially whether the

23 JetScan 4061 had a depth that was about five times the

24 smaller cross-sectional dimension of the bill and whether

25 the JetScan 4061 had a width that was about twice the

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 146 of 199 PageID #: 8931
Hearing on Post-Trial Motions, Volume 1

146

1  longer dimension of the smallest-dimensioned bill.  In

2  essence, that's 12 by 13 inches, whether the JetScan 4061

3  had a housing that was about 12 by 13 inches.

4          And we submitted -- when the jury deliberated,

5  at the court's instruction they didn't take the machines

6  that were on the left here, the actual --

7          THE COURT:  No, no, no, no, no.  I said they

8  could have them.  I didn't say they couldn't.  Don't

9  leave that in the record.  It wasn't in my court's

10  instruction to say they couldn't have the machines.  If

11  they wanted to see them, just ask for them; and they

12  would go down there.

13          MR. WARDEN:  Absolutely correct, your Honor.

14  And the court instructed us, you know, for the

15  convenience of jurors, to take pictures of those machines

16  so that they could refer to those as well.

17          If we could display something on the screen,

18  we've got the photograph of the JetScan 4061 that was

19  taken to the jury with the five dollar bills in depth and

20  the two dollar bills in width.  And this is essentially,

21  your Honor -- this is the only question that the jury had

22  to answer.  And what we're saying is that no reasonable

23  juror could say that that machine is not five times the

24  height of a bill and two times the width.

25          The reason I'm, you know, pointing to this

1  particular picture is because when Cummins argued about

2  infringement, whether defendants' accused products

3  satisfied this same claim limitation, here's the slide

4  that the plaintiff showed to the jury and suggested that

5  defendants' accused products satisfy that same

6  limitation.

7          In light of these two slides, your Honor, we

8  really don't think that any reasonable juror should not

9  have found that claim is invalid.

10          THE COURT:  Well, aren't you -- this is what I

11  started off with.  Aren't you assuming that they're not

12  entitled to the -- okay.  I'm sorry.

13          Okay.

14          MR. WARDEN:  At trial the plaintiff --

15          THE COURT:  The JetScan 4061 comes in in April

16  of 1993; and the earliest priority date the plaintiff

17  asserted was March 7, 1995?

18          MR. WARDEN:  That is correct, your Honor.

19          THE COURT:  Is that what I'm remembering, that

20  the earliest priority date that you asserted was 1995?

21          MR. RUDISILL:  (Moving head up and down.)

22          THE COURT:  Okay.  You've got the size there.

23  Tell me again why it practices all of the other elements.

24  And I remember a stipulation about the 4062, but I don't

25  remember the 4061 being stipulated as doing all of the

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 148 of 199 PageID #:  8933
Hearing on Post-Trial Motions, Volume 1

148

1   elements.

2          MR. WARDEN:  Your Honor, it didn't pertain to

3   all of the elements.  The stipulation with respect to the

4   4061 was that it performed the signal processing means --

5          THE COURT:  Okay.

6          MR. WARDEN:  -- limitation, that it has a

7   microprocessor performing the correlation algorithm,

8   et cetera, et cetera, from the '354 patent.

9          THE COURT:  And, so, then what I've got to

10  look at is Emery's testimony that you went through with

11  him that it had all of the other elements, right?

12         MR. WARDEN:  Well, in essence, your Honor.

13  Between this photograph and the signal processing means

14  limitation, that was all of the elements.

15         THE COURT:  What about the denomination

16  discriminating unit for retrieving characteristic pattern

17  information from one or more bills?  What about a memory

18  for storing master characteristic pattern information

19  associated with each genuine bill which the system is

20  capable of denominating?  Don't all of those things have

21  to be in there?

22         MR. WARDEN:  Yes.  Yes, they do, your Honor.

23  If we look at Mr. Emery's testimony, this was a currency

24  denominating machine; and the purpose and the function of

25  this machine was to denominate currency.  It's got to

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 149 of 199   PageID #:  8934
Hearing on Post-Trial Motions, Volume 1

149

1  have a denomination discriminating unit, and there was no

2  particular construction given to that limitation.  It

3  means what it says and says what it means.

4          THE COURT:  And this may be -- because I

5  remember making notes of this at the time and so did my

6  clerk and this may be the case where the court will have

7  to deal with clear and convincing to whom.

8          Is it evidence clearly and convincingly

9  presented to the jury or conclusory remarks made by an

10 expert presented to the jury that wise lawyers and judges

11 know because they've been studying these patents for a

12 long, long time and they kind of know what's going on in

13 those machines?

14         My analysis -- and I kind of wondered about it

15 because I think at the end you probably had eight hours

16 left or seven hours left.  The other side had eight hours

17 left.  Mr. Emery went through that 4061 in a very

18 conclusory fashion.  It was, "Yep, it has this.  It has

19 that.  They stipulated to this and you can look at these

20 dollar bills on this picture and you can see they've got

21 that and, therefore, it's invalidating."  There was no --

22 I don't even remember him talking about what was inside

23 the machine, how it ran, what was there, "I took it

24 apart," "I ran it," or anything like that.

25         I will grant you that if at a trial the judge

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 150 of 199 PageID #: 8935
Hearing on Post-Trial Motions, Volume 1

150

1  is supposed to apply knowledge that he can divine or

2  figure out which is not explained -- but that is not

3  explained to the jury, that your motion is probably good.

4  But if I'm to base it on how it was explained to the

5  jury, the quick way it was explained to the jury, and

6  base it solely on that, I'm going to have to deny the

7  motion.

8          And I think in this particular case if one

9  takes a close look at how this one was presented to the

10 jury by Mr. Emery, it was in such a cursory, conclusory

11 fashion that while, yes, you've got the stipulation as to

12 that signal processing means and you've got -- the

13 pictures, I think, make it pretty clear on five bills by

14 two bills -- that for some reason -- and I don't know

15 why -- the rest of it went -- no detail at all was given

16 on that to the jury.  They had to just simply decide that

17 they were going to believe him almost *ipse dixit* because

18 he's an expert and we have to believe him.  He said it's

19 so; therefore, it is so.

20         And I did not see in his testimony -- and I

21 remember this, you know, pretty clearly from the trial

22 because at the time I thought, well, I've gone ahead and

23 ruled and allowed you to bring in the 4061 after all of

24 this argument.  I'd probably almost decided that

25 particular issue.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 151 of 199 PageID #:  8936
Hearing on Post-Trial Motions, Volume 1

151

1        But then the last piece wasn't put in in front

2  of the jury; and the burden on invalidity is clear and

3  convincing, not preponderance of the evidence and not

4  what the judge just happens to think or the law clerk who

5  is an engineer happens to think because she's been

6  studying this stuff in great detail.  It's how it's

7  presented.

8        So, while granting you depending on how that

9  is to be decided is going to make a difference in the

10  case, I'm going to deny the motion for JMOL on that

11  point; and perhaps we'll get some guidance as to how a

12  court is supposed to decide these motions, because I'm

13  not doing it -- this is not on summary judgment.

14        And it's almost similar to the case where a

15  book is put in evidence, the witnesses focus on pages 67

16  through 75 of the book, the judge has read the whole book

17  and sees it's invalid based on pages 1 through 10, and

18  then the jury is never told about pages 1 through 10.

19  That's an analogy.  It's not quite right -- or quite

20  correct.

21        But I'm going to go ahead and deny that motion

22  for JMOL on that basis.  I don't think that it was

23  presented -- those other terms were clearly and

24  convincingly presented to the jury.  It seemed like he

25  almost assumed that since it's in there, all I've got to

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 152 of 199 PageID #:  8937
Hearing on Post-Trial Motions, Volume 1

152

1  do is show these pictures of the bills, we've got it, we

2  win.  And, so, I'm going to go ahead and deny the motion

3  for JMOL on the claim 55 of the '354 patent.

4           And I'll admit that is probably one of your

5  strongest arguments on that, but I'm doing this almost

6  entirely based on the clear and convincing standard and

7  to whom must the clear and convincing evidence be

8  presented.

9           Okay.  Any other argument or issue that you've

10  made or raised that you need findings of fact or

11  conclusions of law on the '354?

12           MR. WARDEN:  Yes, your Honor.  The only things

13  that we'll point out there is that the court should

14  recall that this was a change midstream in Mr. Emery's

15  testimony.

16           THE COURT:  Well, I understand; but you asked

17  for it.  I mean, you asked me to do this; and, so --

18           MR. WARDEN:  Yes, your Honor.

19           THE COURT:  -- I granted it to you.  And to

20  now say, "Oh, gee, judge, you shouldn't have allowed us

21  to talk about it at all" doesn't help you much.

22           MR. WARDEN:  No, your Honor.  I'm sorry.  Part

23  of the process in negotiating a stipulation with respect

24  to the signal processing means was that if the court

25  looks at that signal processing means, the function and

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 153 of 199 PageID #:  8938
Hearing on Post-Trial Motions, Volume 1

153

1  the structure for the signal processing means, that the

2  other limitations are derivative of the signal processing

3  means.  In other words, if the signal processing means is

4  present, the other limitations are also present.

5         In fact, if I recall correctly, the court even

6  brought that question up in the process of making the

7  switch in priority dates.  And I'd have to go back to the

8  transcript and look at that one.

9         The only other thing I would mention for the

10 record, your Honor, is that there still -- defendants

11 have still got the issue of the JetScan 4062, the JMOL

12 with respect to the JetScan 4062 as well.

13        THE COURT:  Okay.  Well, let's make it very

14 clear.  I understand -- and I think the jury probably

15 did, too -- that that last element about signal

16 processing means for comparing was stipulated.  What I'm

17 saying, though, is that not -- and I'm also saying that

18 the size of the machine, five bills by two bills, is

19 probably established clearly and convincingly.

20        But there are some other elements, namely -- I

21 think it's Elements 4 and 5, a denomination

22 discriminating unit for retrieving characteristic pattern

23 information from one or more bills and a memory for

24 storing master characteristic pattern information

25 associated with each genuine bill which a system is

154

1  capable of denominating.

2         What you're asking me to do, I think, is

3  because of my familiarity learned from all of my study in

4  this case -- is to just know, like perhaps one of skill

5  in the art might know -- and I can't say that I do, but I

6  think this is what you're asking me to do -- that this is

7  of course a denomination discriminating unit and of

8  course it has one of these and of course they retrieve

9  characteristic pattern information from one or more bills

10  and of course it has a memory and so on and so forth.

11         And that's what I'm saying I did not hear

12  existed in the 4061.  And to just simply assume it and

13  then tell the -- and hold the jury to the standard of

14  assuming it when it's your burden to convince them of it

15  by clear and convincing evidence I don't think is enough.

16         Now, again, I'll grant you this is probably a

17  strong argument and you could go the other way and a

18  higher court might very well go the other way.  But I

19  think that needs to be -- we may need some guidance along

20  that line.  Do we just make those kind of assumptions

21  when we have jury trials, or do we require a party with

22  that kind of a heavy burden to take the time to go

23  through it?

24         MR. WARDEN:  The defendants, you know, aren't

25  asking the court to make that assumption.  It's plain

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 155 of 199 PageID #:  8940
Hearing on Post-Trial Motions, Volume 1

155

1  from reading the signal processing means limitation, if

2  we compare that fourth limitation, denomination

3  discriminating unit for retrieving characteristic pattern

4  information from one or more bills, well, part of the

5  signal processing means is for comparing said retrieved

6  characteristic pattern information with master

7  characteristic pattern information stored with at least

8  one genuine bill.  Each of these -- you know, the fourth

9  and fifth limitations are implied by the signal

10 processing means.  It doesn't take an assumption that the

11 limitations are present.

12          THE COURT:  All right.  I'm going to deny the

13 JMOL.  You have your argument --

14          MR. WARDEN:  Yes, your Honor.

15          THE COURT:  -- on that particular one.

16          Okay.  Anything else, then, left on the '354

17 patent, claim 55?  Any other issue that I need to find on

18 that or a finding of fact that you want on that?

19          MR. WARDEN:  Yes, your Honor.  I'm pointing

20 out that there still is an outstanding JMOL on the

21 JetScan 4062.

22          THE COURT:  Well, let's see.  I've got a

23 listing that the plaintiffs made a motion that 4062 is

24 not prior art.  I think that's moot.  Was there an actual

25 JMOL that 4062 is invalidating prior art?

 1          MR. WARDEN:  Yes, your Honor.

 2          THE COURT:  And I guess that would depend on

 3  them -- basically that is the priority issue.  In other

 4  words, if they are not entitled to the earlier priority

 5  date, you would win on that one because there was

 6  evidence that the 4062 practiced every element of the

 7  claim, correct?

 8          MR. WARDEN:  Yes, your Honor.  That comes

 9  straight from the infringement contentions.

10          THE COURT:  Okay.  And, so, let me ask

11  plaintiffs:  How do I deal with the fact that you're

12  asking for the earlier priority date on that earlier

13  patent and it doesn't have that dimension limitation into

14  it other than if you try to read it off the diagrams?

15          MR. FOOTE:  Your Honor, I didn't find in their

16  JMOL motion a motion on 4062.

17          (Discussion off the record between the court

18  and law clerk.)

19          THE COURT:  Okay.  It was one of the oral

20  motions made at trial on JMOL.

21          Was it renewed at the end of the trial?

22          It may not have been briefed, but I think the

23  motions I'm going over are the ones that were made orally

24  because I said I would reserve those.  I guess the

25  question might be was it made -- when was it made?  At

1   the end of trial or at the end of...

2           MR. WARDEN:  It would have been made as part

3   of defendants' case; so, it would have come at the end of

4   trial here.  We're searching the transcript right now,

5   your Honor.

6           THE COURT:  All right.  Well, let me -- let's

7   hold that one up until I can find what it is and --

8           MR. WARDEN:  Yes, your Honor.

9           THE COURT:  As I said before, I didn't recall

10  it being made.  Ms. Mullendore tells me that, yeah, there

11  was one made.  She recalls one being made at some point.

12  I guess I need to know exactly what it was and when it

13  was made.

14          Let's see.  That's the '354.  I think we've

15  done the -- well, let me go through one item fairly

16  quickly.  It hasn't been brought up directly, but it was

17  raised in the pretrial.  And then we'll go ahead and take

18  a break and you can talk about those other issues.

19  That's the issues -- both sides had asked for attorneys'

20  fees, and under Section 285 the court can award

21  reasonable attorneys' fees to a prevailing party if the

22  case is declared exceptional.

23          So, the first thing I've got to do is decide

24  whether it is exceptional.  The plaintiffs would have the

25  burden of proof on this.  That's the *Perricone versus*

158

1  *Medicis Pharmaceutical Corporation*, 432 F.3d 1368,

2  page 1380, Fed Circuit 2005.

3          Other than the evidence of what's happened at

4  trial and my familiarity with what's gone on, is there

5  any other fact or factors that -- or are plaintiffs even

6  asking for a declaration of this being an exceptional

7  case?  It was in the Pretrial Order so...

8          MR. FOOTE:  I don't recall filing a motion for

9  fees.

10          THE COURT:  Okay.

11          MR. FOOTE:  But if that's the question up, we

12  are not going to pursue it.

13          THE COURT:  Okay.  All right.  Then that's

14  basically moot.

15          And given the split decision of the jury, no

16  willfulness and so forth and then the professional

17  conduct of counsel on both sides and the closeness of the

18  case, I would agree that this wouldn't be an exceptional

19  case; so, attorneys' fees would not be warranted.

20          All right.  Let's go ahead and take a break

21  until 3:15.  If you're going to discuss some of these

22  other issues, we'll do that; and then we've also got the

23  issue of injunction to deal with.  I think I've dealt

24  with the JMOLs on each of the patents, haven't I?

25          MR. HEARTFIELD:  I believe so.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 159 of 199 PageID #:  8944
Hearing on Post-Trial Motions, Volume 1

159

1          MR. WARDEN:  Yes, your Honor.

2          THE COURT:  Okay.

3          (Recess, 3:00 p.m. to 3:17 p.m.)

4          (Open court, all parties present.)

5          THE COURT:  All right.  Have you found where

6   you made a motion for JMOL of invalidity of the 4062?  So

7   far, I have only been able to find where you made a

8   motion for priority date but nowhere where you asked to

9   have it declared invalid.  There is a difference, because

10  I can only rule on what I'm asked.

11         MR. WARDEN:  Yes, your Honor.  I believe there

12  is both of them here.

13         THE COURT:  Okay.  Do you have a transcript

14  page and line number?

15         MR. WARDEN:  Yes, your Honor.  I've got it

16  marked.  I'm looking at the motion for judgment as a

17  matter of law on the priority issue, and I'm continuing

18  to look back here.  Okay.  And I believe we're looking at

19  page 1453, at line 23.

20         THE COURT:  Okay.  Hold on.

21         And I guess plaintiffs ought to be taking a

22  look, if you've got a transcript, to see if you agree.

23         MR. WARDEN:  I could put it on the screen,

24  your Honor, if that would --

25         THE COURT:  All right.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 160 of 199 PageID #:  8945
Hearing on Post-Trial Motions, Volume 1

160

1          MR. WARDEN:  -- help anybody out.

2          It's starting on line 23 after we finished

3    discussing the priority issue and asking for judgment as

4    a matter of law on the priority issue.

5          THE COURT:  Let's go to next page.

6          Okay.  All right.  So, let me ask plaintiffs,

7    then.  We've got the 4062.  I think we've got a statement

8    from plaintiffs, almost an admission, but somewhere that

9    the 4062 does, in fact, practice all of the claims of the

10   '354.  I think that's correct.

11         If the priority date is not this earlier one

12   because the dimensions were not disclosed, then why

13   wouldn't that be prior invalidating art?

14         MR. FOOTE:  Well, your Honor, could we turn to

15   the transcript, 1352 and 1353?

16         THE COURT:  All right.

17         MR. FOOTE:  As I understand it, on the

18   priority date of March 7th, 1995, they have essentially

19   admitted that there is no invalidity issue.

20         THE COURT:  Okay.  The 4062 isn't a year prior

21   to that other date; it's a few months.  So, it doesn't

22   work.  I thought we went through that -- and I think

23   Mr. Foote is correct -- at pages 1352 and 1353.

24         MR. WARDEN:  Yes, your Honor.  It would be our

25   contention that the claim 55 of the '354 patent is not

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 161 of 199   PageID #:  8946
Hearing on Post-Trial Motions, Volume 1

161

1  even entitled to the priority date of March 7th of 1995,

2  that the only date that the '354 patent is entitled to is

3  the actual filing date.  That's where those dimensions

4  first appear, your Honor, is during the prosecution of

5  the application itself, the one that led to the issuance

6  of the '354 patent.

7          THE COURT:  All right.  Tell me again where

8  your motion was, your motion for JMOL on invalidity.

9  What page was it?

10          MR. WARDEN:  Yes, your Honor.  It's 1453 and

11  1454.  And that's in conjunction with the discussion of

12  JMOL on the priority date issue a few pages previous.

13          THE COURT:  Well, your motion is (reading)

14  with the new priority date coming in -- that's the one

15  that you're now saying we shouldn't look at, but that's

16  what you said -- (reading) with the new priority date

17  coming in, we still have the JetScan 4062.  But I don't

18  think that's correct because it's less than a year.  And

19  then you say that an earlier determination with the new

20  priority date of March 7, 1995, the 4061 becomes admitted

21  prior art.  So, your motion...

22          All right.  Let me hear from plaintiffs.

23  We've got this 4062.  Unless you get the earlier priority

24  date of an earlier patent, doesn't that become

25  invalidating prior art, just based on what's actually

162

1  stated in the -- that it practices all of the claims?

2          MR. FOOTE:  Well, here are the facts as I see

3  it.

4          One, the 4062 was sold on November 28th, 1994.

5  The priority date that your Honor told the jury was our

6  priority date for this patent was March 7th, 1995; and we

7  have substantial evidence in the record to support that

8  date.  Therefore, as the defendant stated, either

9  Mr. Emery or Mr. Warden, that on page 1352 and '3 -- I

10  think it was Mr. Emery.

11          Question, at the bottom of '52:  "Is the

12  JetScan 4060 *[sic]* going to work for the plaintiff's new

13  priority date, March 7th, 1995?"

14          Answer:  "Not entirely because the applicant

15  has a year in which to file a patent, so the critical

16  date is November 28th, 1993, before which a machine would

17  need to pre-exist."

18          Now, if you use the priority date of

19  March 7th, 1995, then the critical date is March 7th,

20  1994.  And the 4062 was sold November 28th, 1994, after

21  that critical date.

22          THE COURT:  But I guess that's my question.

23  It has to -- you have to get at least one prior priority

24  date.  You can't rest on the one year before the

25  application date of the '354 patent.  You've got to go to

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 163 of 199 PageID #:  8948
Hearing on Post-Trial Motions, Volume 1

163

1  at least one -- one back in the chain, right?

2          MR. FOOTE:  That's correct.

3          THE COURT:  Okay.  So, what we're looking at,

4  then, is --

5          MR. FOOTE:  March 7th, '94.

6          THE COURT:  Right.

7          MR. FOOTE:  And the sale was made on

8  November 28th, '94.

9          THE COURT:  So, I would need to look at the

10  application of -- the '854 application which is now the

11  '259 patent.

12          MR. FOOTE:  Yes, your Honor.

13          And the jury in its jury verdict answered the

14  question, JetScan Currency Scanner/Counter Model 4062 and

15  no anticipation.

16          THE COURT:  Okay.  All right.  In terms of

17  this, the issue comes down to, I think -- and I'm pretty

18  sure counsel may agree -- whether or not the '354 patent

19  is entitled to an earlier priority date than its filing

20  date.  Its filing date is May 12, 1998.  So, for some

21  kind of prior invalidating art being the -- say the 4062

22  machine being on sale, it would have had to be on sale no

23  later than May 12th -- or 11th, 1997.  It actually did go

24  on sale in November of 1994.

25          It is clear from the evidence that the 4062

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 164 of 199 PageID #: 8949
Hearing on Post-Trial Motions, Volume 1

164

1   practices the claims of the '354 patent; so, the only

2   real issue then is does the '354 patent -- does that

3   claim 55 -- is it entitled to that earlier priority date.

4           And if you take a look at the '259 patent,

5   just like every other patent in the chain, they have

6   essentially most of the same diagrams.  But the first

7   time that I can find anywhere in one of the patents a

8   size requirement of five times the smaller

9   cross-sectional dimension and the width dimension being

10  two times the larger cross-sectional dimension is, in

11  fact, in claim 55 of the '354 patent.

12          And I think we've been over this in great

13  detail, and I'll give defendants *[sic]* one more chance.

14  Is there anywhere else that that was specifically stated

15  in any earlier patent?  I know that there was some

16  discussion about, well, you can measure the diagrams and

17  so forth.  But was that the best we have?

18          MR. FOOTE:  Well, maybe I didn't understand

19  your question; so, let me state it this way.  The first

20  time a claim was made was in the '354 patent.  I regard

21  that as a different issue than whether or not what the

22  Patent Office said was enabling in terms of diagrams or

23  specifications appeared in a prior patent.

24          THE COURT:  Okay.  And I guess my specific

25  question, then, is:  Is there an earlier time prior to

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 165 of 199 PageID #:  8950
Hearing on Post-Trial Motions, Volume 1

165

1  that claim, whether it's a claim or it's a

2  specification -- and more likely a specification or you

3  wouldn't have claimed it again -- where that size, that

4  five times the smaller cross-sectional by two times the

5  larger cross-sectional dimension, that five by two, is

6  stated?

7              MR. FOOTE:  That is not stated in the '354

8  patent.  The claim is made based upon the drawings --

9              THE COURT:  But I'm talking about any earlier

10 patent that it comes in.  In other words, these earlier

11 ones that you want priority --

12             MR. FOOTE:  The '259 patent, as we

13 demonstrated, has exactly the same --

14             THE COURT:  The same drawings.

15             MR. FOOTE:  -- figures --

16             THE COURT:  Okay.

17             MR. FOOTE:  -- that occurred; and we put this

18 on the screen many times.

19             THE COURT:  Right.

20             MR. FOOTE:  And it's exactly -- it is exactly

21 the same machine.

22             THE COURT:  All right.

23             MR. FOOTE:  It is the 4062.  It has exactly

24 the same dimensions, within an eighth of an inch, of the

25 claim; and the Patent Office said that is sufficient to

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 166 of 199 PageID #:  8951
Hearing on Post-Trial Motions, Volume 1

166

1 permit somebody to practice the invention.  The claim is

2 allowed over any argument about indefiniteness or

3 enablement.

4            THE COURT:  All right.

5            MR. FOOTE:  And that specific material appears

6 in '259, the earlier one.

7            THE COURT:  All right.  This is, I guess,

8 again, another one of these close points of law that has

9 to be decided; and I have not found the precise answer in

10 the cases.  But the Section 112, paragraph 1, requires

11 the specification to contain a written description of an

12 invention, the manner and process of making and using it.

13 And to meet the requirement, the disclosure of an earlier

14 application -- in other words, to use an earlier

15 application or an earlier patent, say a parent -- it must

16 reasonably convey to one of skill in the art that the

17 inventor possessed the later-claimed subject matter at

18 the time the parent application was filed.

19            So, we have plaintiff arguing that since the

20 drawings and specification are virtually the same, the

21 fact that claim 55 is allowed as enabled in the '354

22 patent must mean that it was also properly described and

23 enabled in the earlier application.

24            The other side of this is, of course, cases

25 which hold that a disclosure in a parent application that

1   merely renders a later claimed invention obvious is not

2   sufficient to meet that written description requirement.

3   The disclosure must describe the claimed invention with

4   all its limitations.  And I'm looking here at the

5   *Lockwood* case at 107 F.3d at 1572.

6            There also cases which hold fairly clearly

7   that the descriptions -- or that the drawings in a patent

8   are not to be considered to be scale drawings unless

9   specifically so stated; and that's in the

10  *Hockerson-Halberstadt versus Avia Group International,*

11  *Inc.*, 222 F.3d 951.

12           So, we seem to have a little conflict here.

13  On one side we have the cases talking in terms of

14  enablement.  In the other case *[sic]* we have cases

15  talking about priority and how exact it needs to be.

16           Now, the plaintiffs have made a good deal of

17  the fact that this small size was very important and very

18  new and the ability to do -- in fact, we have testimony

19  about that today, that it was a tremendous technological

20  feat to bring it down to this small size.  There were

21  ways of making it big; but if they could make it small,

22  then they would have it.

23           The fact that someone would have something

24  that got down to the small size of five times the smaller

25  cross-sectional dimension of the smallest-dimensioned

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 168 of 199 PageID #:  8953
Hearing on Post-Trial Motions, Volume 1

168

1   bill by two times the larger cross-sectional dimension

2   would be conveyed by the earlier specifications is not

3   correct.  You would know that you could make a machine;

4   but I don't think you get priority as to the earlier

5   machine just simply because you say, "I've got a machine"

6   and later on you figure out how to miniaturize the

7   machine and you claim that miniaturization.

8          I think you claim the miniaturization, you may

9   have to be able to show how you do it.  But, of course,

10  there has been no attack made on a lack of enablement in

11  this patent.  The question is was it properly described

12  or clearly described to the point of, as the case says,

13  the disclosure must describe the claimed invention with

14  all its limitations -- that's the *Lockwood* case I

15  mentioned.

16         And I think plaintiffs have clearly pushed

17  that these two limitations, the five times the smaller

18  cross-sectional dimension by two times the larger

19  cross-sectional dimension, are not only limitations but

20  very important limitations and very difficult to achieve

21  limitations.  Mr. Jones or Mr. Mennie said that today.  I

22  mean, this was, in effect, a breakthrough.

23         I don't think on one hand you can say, "It

24  took us a long time to figure out how to make it this

25  small" and then say, "Oh, we described that before even

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 169 of 199 PageID #:  8954
Hearing on Post-Trial Motions, Volume 1

169

1 though we didn't put it in our drawings and we didn't

2 mention it at all."

3 So, based on that, I am going to find that the

4 '354 patent, this claim 55, is not entitled to an earlier

5 priority date based on those specifications and

6 applications of those earlier patents and that based on

7 that, the defendants would be entitled to JMOL of

8 invalidity as to the '354 patent based on the JetScan

9 4062.

10 Now, it seems pretty clear that should a

11 higher court disagree and they want to clarify this

12 string of cases or, I guess, point out how I misread

13 them, they would be able to do so.  But I'm trying to

14 harmonize the enablement cases that go one way and then

15 the priority cases like *Lockwood* which go the other way.

16 I think I've done that.  But if that is disagreed, then I

17 guess it goes back to the earlier motion for JMOL which I

18 denied which is based on the 4061.

19 Yes, Mr. Rudisill?

20 MR. FOOTE:  Mr. Rudisill thinks he has a

21 relevant case.

22 THE COURT:  All right.

23 MR. RUDISILL:  The reexam of the '354, your

24 Honor, has reached exactly the opposite result.  They

25 have held that since the descriptions in the two

1  applications are identical, therefore, the written

2  description that satisfies the claim limitations that

3  we're talking about has to be satisfied by both

4  applications because they are identical.  And for that

5  reason, they have held that the priority date is the '259

6  date.

7           THE COURT:  And I guess what I'm saying is

8  that I think this is going to have to be given some

9  guidance by a higher court.  I would not be embarrassed

10 to argue either way.  I could stand on either of your

11 sides and make the arguments you've made without in the

12 slightest feeling embarrassed at all.  In the end, I've

13 got to pick one.  What I'm picking is -- and at the same

14 time, I'm trying to give meaning to both lines of cases

15 such as this *Lockwood* talking about to get this priority,

16 it has to describe the claimed invention with all its

17 limitations.

18           And in this particular case, these dimensional

19 limitations are not only in the claim, they have been

20 described as, one, highly important and, two, highly

21 difficult to achieve; and they weren't claimed by

22 defendant *[sic]* until the '354 patent comes out.  So, to

23 say that, oh, well, you can just kind of figure them out

24 from the drawings and guess at them I don't think is

25 correct.

171

1            MR. RUDISILL:  But that's exactly what we did

2   in the '354 application, in the prosecution --

3            THE COURT:  Well, and I do understand.  I

4   mean, I understand the argument you're making.  I

5   understand the decisions that have been made.  And I

6   think the issue is now presented squarely to the higher

7   court; and they get to make that decision as to which way

8   to go, given that I'm giving two different sets of cases.

9   It would be easy for them to say I'm correct.  It would

10  be just as easy for them to say, I think, "No, the lower

11  court has misread *Lockwood*.  That's not really what it

12  should be intended."  But in the end, I've got to come up

13  with a decision; and that's the one I'm coming up with.

14           MR. RUDISILL:  Thank you.

15           THE COURT:  On the other hand, if that's

16  incorrect, then they at that point can then look at the

17  ruling I've made on the 4061, on that.

18           All right.  I think that takes care of all of

19  the JMOLs on the patent.  Are there any left from

20  defendants' point of view?

21           MR. ROGERS:  Your Honor, I think the only one

22  left deals with the '456; but I think we have a

23  stipulation that is going to address that.

24           THE COURT:  Oh, that's right.  What do we have

25  on '456, then?

 1           MR. ROGERS:  We have a stipulation that's

 2  99 percent done.

 3           MR. HEARTFIELD:  Your Honor, this is the

 4  parties' stipulation regarding the '456 patent.

 5  Number 1, the court's decision to deny Plaintiff's motion

 6  to correct inventorship is appealable.  This denial

 7  results in a priority date as of the April 4, 1997,

 8  filing date for the '456 patent.

 9           Number 2, plaintiff stipulates that claims 35

10  and 41 of the '456 patent are invalid over the GFR-100.

11  This stipulation is contingent upon the appellate court

12  affirming the decision denying the Plaintiff's motion to

13  correct inventorship.

14           Number 3, the parties agree that if the

15  appealed decision denying Plaintiff's motion to correct

16  inventorship is reversed, the defendants' tenth

17  affirmative defense of inequitable conduct during the

18  reexam of the '456 can be tried on remand.

19           That concludes the parties' stipulation.

20           THE COURT:  So, the only thing that would come

21  back to me would be the inequitable conduct?

22           MR. HEARTFIELD:  On the -- on this issue, yes,

23  sir.

24           MR. ROGERS:  Yes.

25           THE COURT:  Do the parties agree that if I'm

173

1  wrong about the priority date, that the invalidity based

2  on GFR is out the window?

3            MR. HEARTFIELD:  Correct.  I mean, this --

4            THE COURT:  Well, let me hear from defendants.

5  I want to be sure about that one because you've said what

6  you've agreed.  Do they agree that if I get reversed on

7  that, then obviously they're going to get that earlier

8  priority date and GFR doesn't become your invalidating

9  device?

10            MR. ROGERS:  That's correct.

11            THE COURT:  Okay.  So, if I'm correct in

12  denying correction of inventorship, then the Glory

13  machine supports a finding of invalidity of this claim of

14  the '456 patent, correct?

15            MR. HEARTFIELD:  Yes, sir.

16            THE COURT:  Correct?

17            MR. ROGERS:  Yes, your Honor.

18            THE COURT:  And if I'm incorrect and I should

19  have allowed a correction of the inventorship, then the

20  jury's finding of -- or the jury's failure to find

21  invalidity should be upheld, correct?

22            MR. HEARTFIELD:  Plaintiff agrees.

23            THE COURT:  Defendant?

24            MR. ROGERS:  I think our --

25            THE COURT:  Other than except for the

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 174 of 199 PageID #:  8959
Hearing on Post-Trial Motions, Volume 1

174

 1  inequitable conduct.

 2          MR. ROGERS:  Well, I thought we would still

 3  have our -- just the JMOL.

 4          THE COURT:  On what?

 5          MR. ROGERS:  On whether or not the written

 6  description is met.  It's the nine words.  If the issue

 7  comes back --

 8          THE COURT:  You're talking about the failure

 9  to put in the pockets?

10          MR. ROGERS:  Yes.

11          THE COURT:  Okay.  I can tell you right now

12  that I would adopt the analysis and holding of the

13  Illinois court.

14          MR. RUDISILL:  Yes.  It's the Judge Guzman

15  decision?

16          THE COURT:  Right and, I think, also Judge

17  Ward.  But especially I thought Judge Guzman did an

18  extensive and careful analysis of that, and I have

19  reviewed what's been presented to me and would see no

20  reason to depart from that.  So, if that's going to be an

21  issue that might bring it back, you might as well take

22  that one on up to the Court of Appeals, also, because I

23  thought -- I mean, to save time and space and rather than

24  me rewriting Judge Guzman's decision, I don't think

25  that -- I think the prior specifications in the prior

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 175 of 199 PageID #:  8960
Hearing on Post-Trial Motions, Volume 1

175

1  patents amply describe more than one pocket or a

2  plurality of pockets, and that was no cursory opinion by

3  that judge.  There was some real detail there.  And I

4  also believe that Judge Ward went into it to some extent.

5  I can't remember, but I think so.

6          So -- all right.  I mean, I don't see a point

7  in me reexamining that one.  There is nothing I can see

8  that I -- and I did go through that when I was

9  considering this the first time.

10          So, then what we would be left with is this

11  possible inequitable conduct?

12          MR. HEARTFIELD:  Correct, your Honor.

13          MR. ROGERS:  Yes, your Honor.

14          THE COURT:  Okay.  All right.  Anything else

15  left on JMOL of any of the patents?

16          MR. RUDISILL:  I don't think so.

17          MR. ROGERS:  None from defendants, your Honor.

18          THE COURT:  Okay.  If there is any of the ones

19  left over from plaintiff, those are moot, I think,

20  because the jury went with you on just about everything

21  else on that.

22          We are left with the motion for permanent

23  injunction and the prejudgment interest.  What does

24  Cummins-Allison want to present, if anything, on

25  injunction?

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 176 of 199 PageID #: 8961
Hearing on Post-Trial Motions, Volume 1

176

1          MR. MCKONE:  Your Honor, we would like to

2    present the testimony of William Jones.

3          THE COURT:  Step forward, sir.

4          You remember you are still under oath?

5          THE WITNESS:  Yes, sir.

6          DIRECT EXAMINATION OF WILLIAM JONES

7          CALLED ON BEHALF OF THE PLAINTIFF

8    BY MR. MCKONE:

9    Q.    Mr. Jones, as chairman of Cummins, is it part of

10   your job to study and understand the marketplace for

11   currency discriminators?

12   A.    Yes, it is.  In our industry we don't have outside

13   analysis available like in the automotive market where

14   people are tracking things; so, we have to attempt to do

15   it ourselves as best we can.

16   Q.    Could you briefly tell the court what you do to

17   keep up on the market?

18   A.    Well, numerous things.  First of all, at least

19   once a month I meet with the regional sales managers.

20   They give me feedback on what's going on in the market,

21   what's happening with customers, so on and so forth.

22          Second, I meet with the national account

23   managers who handle the larger banks, the larger

24   retailers and so forth on even a more frequent basis as

25   they tell me what's going on with various accounts.

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 177 of 199 PageID #:  8962
Hearing on Post-Trial Motions, Volume 1

177

1        Third, I meet with the salesmen either

2  traveling to branches; or from time to time, we have

3  groups of salesmen in.  They give me feedback.

4        Fourth, we go to trade shows.  Throughout the

5  year I try to attend some of those.  Others do, as well.

6  They bring me feedback.

7        And there is also some things in public record

8  available from some of our competitors who are public

9  companies where they discuss some of the breakdown of

10  their various product sales.

11        And, finally, from time to time, I do meet

12  with the executives of some of our competing -- our

13  competitors and glean some information from those

14  discussions, as well.

15  Q.    Are relationships with customers important to

16  Cummins' business model?

17  A.    Yes, they are.  I mean, one reason we establish a

18  sales force and a service organization is when you're

19  introducing revolutionary technology, it's not something

20  you can sell over the Internet.  It's not just an

21  ordinary product.  You have to basically take the new

22  technology to the market and teach the marketplace and

23  the customers how to use this technology.

24        For instance, with the currency scanners when

25  we first introduced it, banks basically had to change how

1  they process currency.  Instead of separating it all out

2  by denomination before processing it, they could actually

3  run mixed currency.  And you can see that in the

4  commercial success.  In the early years we were selling

5  maybe 100 a month, then 200 a month; and about four or

6  five years into this, you start seeing the explosive

7  sales after we had educated the market.  And there is a

8  cost involved in maintaining a sales force to serve that

9  type of a purpose.

10 Q.    What large competitor does Cummins compete with

11 for business?

12 A.    Well, there are some very large competitors we

13 compete with, such as Glory, G&D, and De La Rue and a

14 spin-off from De La Rue, now known as "Talaris."  Anyway,

15 their sales are in excess of a billion dollars a year.

16 Their operating income typically exceeds what our total

17 sales revenue is.  Our revenue is about 150 million a

18 year.  So, to compete with them -- we really are a niche

19 player; and to get the attention of large banks and so

20 forth against these behemoths, we have to bring unique

21 technologies or solutions into the market --

22           THE COURT:  Well, now, wait a minute.  Wait a

23 minute.  We're talking about an injunction here in the

24 United States; and both the damages experts talked about,

25 I think, 85 percent, 80 -- yeah, 85 percent of the sales.

179

1   Let's not go off and talk about worldwide sales or

2   anything else.  Let's focus in on the United States

3   and --

4              THE WITNESS:  I stand corrected, then.

5              THE COURT:  -- keep some credible analysis

6   here on what we're talking about.

7              THE WITNESS:  All right.  Well, these

8   billion-dollar companies, their sales in the U.S. far

9   exceed ours.

10             THE COURT:  Well, that may be; but according

11  to your damage experts, you have 85 percent of the

12  market -- is the devices we're talking about here today.

13             THE WITNESS:  I agree, your Honor.

14             THE COURT:  So, let's keep focused on that.

15             THE WITNESS:  I agree.

16  BY MR. MCKONE:

17  Q.    I'll ask a different question.

18        Has defendants' infringement had any affect

19  on Cummins' business relationships other than lost

20  profits?

21  A.    Yes, it has.

22  Q.    Can you give examples of customer relationships

23  that have been affected?

24  A.    Well, we lost some large customers, such as Fifth

25  Third Bank, M&I Bank in Wisconsin, and the Hong Kong and

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 180 of 199 PageID #:  8965
Hearing on Post-Trial Motions, Volume 1

180

1  Shanghai Bank's U.S. group here in the United States.

2  Q.     Has defendants' infringement affected the price

3  that Cummins can sell its products for?

4  A.     Well, it does because they go in and -- say the

5  dealer in Ohio might go to Fifth Third and offer a lower

6  price.  And Fifth Third, before we lost them, was

7  purchasing the range, I think, of four or $500,000 worth

8  a year.  And if we reduce a price for them at that volume

9  range, you really have to offer that same reduction to

10 all of our other customers.  We have scales for units

11 they buy per year by contract.  So, it's forced us to

12 reduce our price across the board to other customers.

13 Q.     And if defendants are able to continue --

14        MR. WARDEN:  Your Honor, we object to

15 discussion of M&I Bank or HSBC, relationships and

16 communications with customers discussing -- or, I guess,

17 beginning the discussion of this topic of price erosion.

18 None of this information was produced during discovery.

19        THE COURT:  Well, I'll sustain to the extent

20 that -- let's get into the factors -- I mean, there was

21 an opportunity before the trial and all through the trial

22 to try to establish damages; but damages is money.

23        Let's now start getting into the irreparable

24 injury or the other items that I've got to rule on.  I

25 mean, this is not the time to gild the lily on stuff that

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 181 of 199 PageID #:  8966
Hearing on Post-Trial Motions, Volume 1

181

1  could have been out there at trial.  Let's get into the

2  factors I have to look at post-*eBay*.

3  BY MR. MCKONE:

4  Q.    Mr. Jones, if defendants are allowed to continue

5  selling their product, what effect will that have on the

6  price that Cummins can charge for machines that aren't --

7  that they are still able to sell, that aren't displaced

8  by defendants' products?

9  A.    Well, it continues to have price pressure on the

10  machines that we do sell.  You have to reduce the price;

11  and, therefore, I lose margin.

12  Q.    If defendants are allowed to continue to sell

13  their products, will that have any effect on the goodwill

14  that Cummins has with its customers?

15  A.    It does.  You know, based on our pricing, the

16  customers tell me that their payback is a year or year

17  and a half.  However, with the price reductions -- is

18  that what you asked me?

19  Q.    Yes.

20  A.    Could you repeat the question?

21  Q.    Yeah.

22        If defendants are allowed to continue to sell

23  their products, will that have any effect on the goodwill

24  that Cummins has with its customers?

25  A.    Oh.  So, where they're happy before this, Shinwoo

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 182 of 199 PageID #: 8967
Hearing on Post-Trial Motions, Volume 1

182

1    comes in, or others, offers a lower price.  Customers

2    start to think -- they've said things to us before like,

3    "Well, I guess you're not a very efficient company; you

4    can't compete" and so forth.  It kind of puts a cloud

5    over us that does hurt the relationship.  And when we

6    lose the account, such as with Fifth Third, they go and

7    sign a two- or three-year contract; and there is no way

8    to get back into that account.

9    Q.      Now, if defendants are allowed to continue to sell

10   their products, will Cummins lose potential other

11   opportunities with customers?

12   A.      We do.  First of all, when you don't get the

13   machine sale, you don't get the opportunity to obtain, A,

14   the service contracts; and about 80 percent of the

15   machines we sell, we get a service contract.  If you

16   don't get a contract, you lose the service revenue on a

17   per-call basis when they call for help or for upgrades.

18   You lose the supply sales related to that product, and

19   you also lose the options that you sell with it such as a

20   printer.

21          Second, when you lose a relationship with a

22   customer, you lose the opportunity to sell related

23   products, such as currency sorters, note counters, coin

24   sorters, self-service coin machines, and the add-on

25   service and things that come with that, as well.  Most of

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 183 of 199 PageID #:  8968
Hearing on Post-Trial Motions, Volume 1

183

1  these dealers that sell Shinwoo offer competitive

2  products in that range, as well.

3          You also lose the opportunity often to replace

4  that machine when it needs replacement four or five years

5  out because you're not in.

6          And, finally, you lose the feedback from the

7  customer working on new technologies to drive solutions

8  for other issues inside the banks and other customers;

9  and you lose that dialogue.

10 Q.     Now, can legal remedies such as monetary damages

11 fully compensate Cummins for this kind of loss?

12 A.     No, I don't believe it can.  Maybe an illustration

13 is for Shinwoo to continue selling what I believe is an

14 infringing product and making profits off of that between

15 now and the expiration of the patent enables them to

16 strengthen their distribution network, strengthen their

17 marketing efforts, and strengthen their ties to customers

18 before the expiration of the patent; and I don't think

19 monetary damages can compensate us for that.

20 Q.     Now, if defendants continue to sell the infringing

21 products and pay a royalty, will that have an effect on

22 the behavior of other potential competitors?

23 A.     Well, I'm concerned some of these larger

24 manufacturers that I've had discussions with in the past

25 about our technology -- they agreed to withdraw their

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 184 of 199 PageID #:  8969
Hearing on Post-Trial Motions, Volume 1

184

1  products.  And if there is a license, I'm concerned one

2  or more may decide, well, they should enter and force us

3  to give them a license, as well; and our philosophy

4  basically is we do not license.

5  Q.    Do you have reason to believe that some of these

6  competitors could introduce infringing products quickly?

7  A.    Well, they could.  Glory sells machines in other

8  parts of the world.  They could adapt it quickly and

9  bring it to the United States.  G&D has a machine, as

10  well, that they could quickly adapt and bring into the

11  United States.

12  Q.    If Cummins has to sue new infringers, what effect

13  would that have on Cummins' business?

14  A.    Well, it's always a diversion of resources in

15  terms of management's time.  Obviously, I'd rather spend

16  time developing technology, as we all would, to help

17  serve the market and our customers.

18          It also is a burden financially upon us.  For

19  instance, this litigation between the reexams and the

20  litigation has caused so much pressure that this year we

21  had to let about ten of our engineers go.  I regret that;

22  and if we weren't in this litigation, we wouldn't have to

23  do that.  So, it slows us down in the development of new

24  technologies.

25  Q.    If defendants cannot pay the judgment the jury has

185

1  awarded, will that have an effect on Cummins?

2  A.     Well, it would, particularly concerning if they go

3  on -- if they continue to sell, they can't pay the

4  damages awarded, they won't be able to pay us for

5  continuing to sell in the market.  But, you know, I've

6  not been able to find things that are reassuring that

7  they will be able to pay the damages.

8  Q.     Would continued sales of SBM's infringing products

9  have a particular effect on Cummins during the end of

10  this year?

11  A.     I think it could because particularly as banks

12  have recovered -- but this is typical of the banks in

13  particular is at the end of the year, they often give us

14  some big orders for scanners, for sorters, all sorts of

15  things because these department heads -- of course, they

16  want to use up their budget.  You use it, or you lose it.

17  And as the year progresses, they -- I'm overhearing that

18  there is a good opportunity to get some significant

19  orders; and the concern you have is that one or more of

20  those might be taken away from us before the end of the

21  year by Shinwoo if they continue in the market.

22  Q.     Thank you, Mr. Jones.

23         MR. MCKONE:  Pass the witness.

24                              *

25                              *

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 186 of 199 PageID #: 8971
Hearing on Post-Trial Motions, Volume 1

186

<u>CROSS-EXAMINATION OF WILLIAM JONES</u>

1

BY MR. WARDEN:

2

Q.     All right.  Mr. Jones, what's the price of an

3

SB-1000?

4

A.     Price of the SB-1000?  It seems to go up and down.

5

It depends on the dealer.  We've heard of dealers selling

6

them as low as $2,000.

7

Q.     Okay.  And what's the price of the JetScan 4062?

8

A.     It depends on the volume that the customers are

9

purchasing.

10

Q.     Well, what's the price range?

11

A.     I think the list price is around $2,500.  Someone

12

like Bank of America last year who bought thousands and

13

thousands, the price might have been about 1,900 or

14

$1,800.

15

Q.     Okay.  Well, how about -- there is a JetScan 4063,

16

isn't there?

17

A.     There is a 4062, a 4065, a 4068.

18

Q.     Okay.  How about the JetScan 4065?  How much does

19

that typically go for?

20

A.     That machine sells for closer to $3,000.

21

Q.     Okay.  And I guess there is a two-pocket JetScan,

22

too.  That's the 4095; is that right?

23

A.     That's correct.

24

Q.     How much does that one go for?

25

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 187 of 199 PageID #: 8972
Hearing on Post-Trial Motions, Volume 1

187

A.      I'm not certain of the price of the two-pocket.

Q.      Can you estimate a range in price for me?

A.      It's probably about $4,500.

Q.      Okay.  Now, you testified just a few minutes ago
about, you know, the end of the year coming up here.
Now, is that because the patents all expire in February,
I guess February 5th of next year?

A.      The end of fiscal year for banks is December 31st,
and they often make some big purchases before the end of
the year and require us to deliver the equipment before
the end of the year.

Q.      Okay.  But the patents do all expire in February
of next year.

A.      I know that the '806, I believe, expires in
February, 2010.  I'm not certain on the exact expiration
date of the other patents.

Q.      Okay.  But you say your customers -- let me get
this correct here.  Your customers make their big
purchases at the end of the year; is that --

A.      I said we typically get some large purchases from
one or more banks at the end of the year, not every
single bank.  But typically a number of banks come in
with some big orders at the end of the year.

Q.      Okay.  You mentioned -- my notes are a little
fuzzy here.  It says "M&I Bank Group"; is that correct?

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 188 of 199 PageID #:  8973
Hearing on Post-Trial Motions, Volume 1

188

1  A.     Wisconsin M&I Bank.

2  Q.     Okay.  Well, certainly this is a customer or

3  former customer of Cummins?

4  A.     M&I has been a customer in the past.  Right now

5  we're not selling them currency scanners, to my

6  knowledge.

7  Q.     Okay.  There is some correspondence or letters to

8  that effect in Cummins' office somewhere, isn't there?

9  A.     About M&I Bank?

10  Q.     Yeah.

11  A.     I've spoken to our Milwaukee branch manager who

12  has told me we're not selling to M&I.  I've spoken to

13  Frank Janezic, who is head of sales.  I've spoken to the

14  national accounts people.  They all inform me that we are

15  not selling to M&I Bank currently scanners.

16  Q.     Yes.  My question was:  There are communications,

17  letters and emails, to that effect back at Cummins'

18  office; is that correct?

19  A.     I don't know.  I know this from what the various

20  people in the accounts have told me.

21  Q.     Okay.  So, you're not aware of any letters,

22  emails, communications to that effect at all?

23  A.     On M&I Bank?

24  Q.     That's correct.

25  A.     I'm relying on what my sales reps have told me and

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 189 of 199 PageID #:  8974
Hearing on Post-Trial Motions, Volume 1

189

1  I can look at the order book and see that we have no

2  sales from M&I and I have checked the order book for M&I

3  and there is nothing there for currency scanners.  So,

4  I'm quite certain we haven't sold any because it's not on

5  the order book, which is a written document.

6  Q.    And I guess the same holds true for this Hong Kong

7  Singapore *[sic]* Bank Group.  Did I read that correctly?

8  A.    Well, in the case of Fifth Third and Hong Kong

9  Shanghai Bank, there are files and national accounts

10  which I have reviewed, including, in the case of Fifth

11  Third, the request for proposal that was put out and the

12  communications to us that we did not receive the orders.

13  Q.    Now, this HSBC, is that an abbreviation for Hong

14  Kong --

15  A.    HSBC is Hong Kong Shanghai Bank Corp.

16  Q.    Okay.  That's not the same thing as Fifth Third

17  Bank, is it?

18  A.    Different bank group.

19  Q.    Different bank group.  Okay.

20         You've got some sort of documents with regard

21  to Fifth Third Bank Group, and those are back at Cummins'

22  office?

23  A.    The national account reps keep the files.  I

24  reviewed the Fifth Third file.

25  Q.    Okay.

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 190 of 199 PageID #:  8975
Hearing on Post-Trial Motions, Volume 1

190

1   A.      I have looked briefly at the Hong Kong Shanghai

2   Bank file, as well.

3   Q.      And you say there are documents regarding, you

4   know, lost customer relationships with the HSBC Group?

5   A.      Well, in the case of Fifth Third, the document is

6   notification that we did not win the RFP.  In the case of

7   Hong Kong Shanghai Bank it is communications.  We're

8   trying to get the business, but currently we don't have

9   it.

10  Q.      And you're saying that it was an SBM product that

11  caused the loss of this business?

12  A.      I've been informed by the national account rep who

13  has been out to see Hong Kong Shanghai Bank and also been

14  in their vaults that, in fact, it is Shinwoo machines.

15  Q.      Would any of that information be reflected in any

16  of these records back at Cummins' office?

17  A.      I imagine in the national account records.

18  Q.      Okay.

19  A.      The national accounts people correspond by email

20  with these banks and so forth.

21  Q.      Okay.  Now, I guess you're aware, Mr. Jones, that

22  this lawsuit has been pending for, I guess, a couple of

23  years?

24  A.      Yes.  I think it was filed -- when was it?  2007?

25  Was it August, 2007, thereabout?

Case 9:07-cv-00196-RC  Document 220  Filed 11/05/09  Page 191 of 199 PageID #: 8976
Hearing on Post-Trial Motions, Volume 1

191

1  Q.    And Cummins didn't seek to enjoin or stop

2  defendants' sales of the accused products during the

3  course of this lawsuit; is that correct?

4  A.    Are you referring to a preliminary injunction?

5  Q.    Right.  Right.

6  A.    No, we did not ask for a preliminary injunction.

7  Q.    Okay.  What Cummins is asking for now is a

8  permanent injunction that will expire in four months.  Is

9  that not an accurate assessment of the situation?

10  A.    From the beginning in 2007, we were asking for a

11  permanent injunction.  There were a number of things that

12  caused a delay to trial.  It's unfortunate.  But the

13  trade-off you always have --

14         The trouble with preliminary injunctions, the

15  complete record is not there.  I mean, frankly, we've

16  tried those in the past and all we did was find out that

17  it slowed down getting to trial and it's a burden on the

18  court because the record isn't completed.  And, so, we

19  decided it's best to just push forward for an early trial

20  date and attempt to obtain a permanent injunction.  It

21  seems more efficient for the court, for the company, and

22  for everyone.

23  Q.    Okay.  But the --

24  A.    So, that's a strategic decision we made.

25  Q.    Okay.  I guess the fact remains, though, is that

1  you're asking for a permanent injunction that will last

2  four months now.

3  A.     If the patent had a life of five years, a month,

4  or whatever, yes, we're asking for a permanent

5  injunction --

6  Q.     Okay.

7  A.     -- for the balance of the life of the patent.

8  Q.     Now, the jury verdict in this case -- it's got a

9  component of future damages in the jury verdict.  Are you

10 aware of that?

11 A.     Yes, I agree with that.

12 Q.     Okay.  I guess the jury was asked whether these

13 future damages -- whether they should be lost profits --

14 Cummins' lost profits for future sales of the accused

15 devices or whether it should be a reasonable royalty.  Do

16 you recall seeing that in the verdict?

17 A.     Yes, sir.  I remember the verdict, the discussion

18 of it.

19 Q.     Okay.  Did the jury find that Cummins should be

20 awarded lost profits in the future for --

21 A.     No --

22 Q.     -- competition from defendants' sales?

23 A.     My understanding is the jury found a -- what do

24 you call it -- a -- is it a license fee or --

25 Q.     A reasonable royalty?

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 193 of 199 PageID #:  8978
Hearing on Post-Trial Motions, Volume 1

193

1   A.     You know, I'm not sure.  I think -- what is it --

2   four or $500 a machine?  I don't know what the

3   terminology was exactly.

4   Q.     Okay.

5          MR. WARDEN:  I think that's all we have, your

6   Honor.

7          Thank you, Mr. Williams.

8          THE WITNESS:  Thank you.

9          MR. MCKONE:  Nothing further.

10         THE COURT:  All right.  You may step down,

11  sir.

12         Anything else?

13         THE WITNESS:  Thank you, your Honor.

14         THE COURT:  Anything else?

15         MR. MCKONE:  As far as the --

16         THE COURT:  Evidence.

17         MR. MCKONE:  I'm not going to repeat --

18         THE COURT:  No, you're not going to repeat.

19         MR. MCKONE:  -- evidence that he just put in.

20  But as far as the other factors that *eBay* tells us to

21  take into account, balancing the hardships, Cummins will

22  continue to suffer price erosion --

23         THE COURT:  Okay.  Wait, wait, wait.  You're

24  not -- are you going to put on any other evidence, call

25  any other witnesses?

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 194 of 199 PageID #:  8979
Hearing on Post-Trial Motions, Volume 1

194

1           MR. MCKONE:  Sorry, your Honor.  No.

2           THE COURT:  Okay.  Any rebuttal evidence or

3    witnesses coming in from the other side?

4           MR. WARDEN:  No, your Honor.

5           THE COURT:  All right.  Unfortunately, the

6    court reporter has an appointment she's got to get to;

7    and I can't get through this in ten more minutes.  We

8    still have, I guess, any argument on permanent

9    injunction, my decision on permanent injunction.

10           An issue was raised, then, about whether it

11   would cover repair and servicing of products if an

12   injunction is granted.  We have the issue of what damages

13   would have accrued between the date of trial and the date

14   of the issuance of an injunction if an injunction is

15   issued or, alternatively, if an injunction is not issued,

16   what damages should go forward -- be imposed going

17   forward.

18           And then I guess the final issue, although

19   that's not going to take much argument or any argument

20   probably, is the motion for prejudgment interest.

21           In terms of planning, are there any other

22   issues left?

23           MR. HEARTFIELD:  Not from the plaintiff, your

24   Honor.

25           THE COURT:  From defendant?

Case 9:07-cv-00196-RC  Document 220   Filed 11/05/09  Page 195 of 199 PageID #:  8980
Hearing on Post-Trial Motions, Volume 1

195

1          MR. ROGERS:  Your Honor, there's one

2   procedural aspect that we're actually a little confused

3   over here on; and that has to do with potential Rule 59

4   motions for new trial.  And if that's something of the

5   post-trial type --

6          THE COURT:  Aren't those normally filed after

7   I enter judgment?

8          MR. ROGERS:  That's what we believe, but there

9   was some confusion about what was intended to be done at

10  this hearing so --

11         THE COURT:  Well, my guess is that if you

12  raise the exact same -- and this is frequently done.  You

13  raise the exact same things you did at JMOL and I've

14  already ruled on them, you're likely to get, "For the

15  reasons previously stated, I'm not going to change my

16  mind."

17         If you bring up something new or a new case or

18  convince me that I didn't analyze it properly, then, you

19  know, obviously I could change.  I'm not mired in

20  concrete.  But I'm unlikely to have another hearing like

21  this to go through the exact same things just to hear it

22  again.  I understand, however, to protect your record,

23  you may need to bring up these same arguments.

24         But so that you don't feel disappointed or

25  sandbagged, unless you bring me something new or

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 196 of 199 PageID #:  8981
Hearing on Post-Trial Motions, Volume 1

196

1  different or a different analysis -- I will readily -- I

2  know that with as many decisions as I've made, it is very

3  possible that a higher court with more judges and so

4  forth looking at it might decide a different decision

5  could have been made.

6           Is there any other question other than that

7  that -- yeah.  But I think you almost have to file those

8  after the judgment is entered.

9           MR. ROGERS:  Right.  And that answers my

10  question.

11           THE COURT:  Okay.

12           MR. ROGERS:  The only other thing, because of

13  some of the JMOL rulings from today, it brings in another

14  issue on the injunction that I don't think has been

15  addressed so far.  But I just want to kind of foreshadow,

16  let you know, one of the things we're going to be asking

17  for.  If there is an injunction, we have some issues as

18  to specificity that --

19           THE COURT:  Okay.

20           MR. ROGERS:  -- we want to address and --

21           THE COURT:  All right.

22           MR. ROGERS:  -- specifically, speed issues.

23  That's --

24           THE COURT:  Then what I'm going to propose --

25  like I say, I was hoping to get through this.  The part

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 197 of 199 PageID #:  8982
Hearing on Post-Trial Motions, Volume 1

197

1  this morning went a little longer than -- and that may

2  have been my fault or whatever -- than we needed.

3           But what I propose, then, is to recess and

4  finish this off -- and I think we had mentioned this

5  possibility -- finish it off tomorrow morning.  And we

6  will address that -- the rest of the permanent

7  injunction, any argument you've got on it.  If there are

8  any details to be fleshed out, I'll listen to that at

9  that time.

10           And then if not injunction, then should there

11  be an opportunity to work out an ongoing royalty or

12  should I just impose some sum based on the jury

13  verdict -- there's a lot of possibilities there, and

14  we'll discuss it at that time.

15           And then, finally -- there's a couple things I

16  would ask that you might be willing to consider.  Based

17  on my rulings so far, I think the judgment for damages

18  will be exactly what the jury said.  I don't think I've

19  done anything yet to -- or had any reason to change that.

20           Can you agree and work out what the

21  post-judgment -- well, that's actually just set by

22  statute; but that will be as of the date of the judgment.

23  Actually, there's no agreement for you there anyway, is

24  there?  It would be on the prejudgment.

25           Do either of you have -- and I think that the

1  plaintiffs are asking for prime going back, and

2  defendants suggested T-bill?

3          MR. TRUNCALE:  That's correct, your Honor.

4          THE COURT:  Does anybody have the --

5          MR. HEARTFIELD:  Your Honor, I actually

6  submitted both to the court for consideration, realizing

7  it's your discretion.

8          THE COURT:  Did you have the -- and I can't

9  remember.  Maybe you did.  It's the end of a long day.

10 Did you give me the actual percentages going back to

11 those days, in other words, what the numbers would have

12 worked out to be if I took prime back to when -- what --

13 six years?

14         MR. HEARTFIELD:  2003 to the first date of

15 infringement, I did.

16         THE COURT:  Okay.  All right.  That's what I

17 needed to know as I was looking at that to give us some

18 idea.  And I presume I've got the same for what prime

19 would wind up being?

20         MR. HEARTFIELD:  Plaintiff submitted both of

21 those --

22         THE COURT:  In percentages terms anyway?

23         Okay.  All right.  Then we will be in recess

24 until 9:30 in the morning.

25         (Off-the-record discussion.)

Case 9:07-cv-00196-RC   Document 220   Filed 11/05/09   Page 199 of 199 PageID #:  8984
Hearing on Post-Trial Motions, Volume 1

199

1          THE COURT:  And for the record, I mentioned

2  the *Juicy Whip* case; and just for completeness and so

3  it's easier for the reviewing court, although they may

4  have this readily at hand, that's *Juicy Whip, Inc. versus*

5  *Orange Bang, Inc.*, 292 F.3d 728, Fed Circuit 2002.

6          Actually, if there is no objection from either

7  side and for the convenience of any reviewing court and

8  the parties and if it can be done under the rules, I

9  would ask that that annotation be added into the record

10  where I first brought it up so it makes it easier for

11  everybody to read and know what the case is.

12          Any objection from defendant?

13          MR. ROGERS:  No objection.

14          THE COURT:  From plaintiff?

15          MR. RUDISILL:  No.

16          THE COURT:  Okay.  If it's acceptable, then,

17  to the rules of the court reporter, I'll ask that that be

18  annotated in there so they will have that citation

19  readily available.  And we'll be in recess until 9:30.

20          (Proceedings adjourned, 4:26 p.m.)

21  <u>COURT REPORTER'S CERTIFICATION</u>

22          I HEREBY CERTIFY THAT ON THIS DATE,
OCTOBER 29, 2009, THE FOREGOING IS A CORRECT TRANSCRIPT
23  FROM THE RECORD OF PROCEEDINGS.

*Christina Bickham*
_____
CHRISTINA L. BICKHAM,    CRR,    RMR

25

Christina L. Bickham, RMR, CRR
409/654-2891